**MEANSNO, CLAIMS, DelayODSC, ADV, 727OBJ, PRO_SE, APPEAL**

# U.S. Bankruptcy Court
## Northern District of Florida (Gainesville)
## Bankruptcy Petition #: 12−10462−KKS

|  |  |
|---|---|
| *Assigned to:* Judge Karen K. Specie | *Case Manager:* **Libby Deroche** |
| Chapter 7 | *Date filed:* 11/01/2012 |
| Voluntary | *341 meeting:* 03/06/2013 |
| Asset | *Deadline for objecting to discharge:* 05/31/2013 |
|  | *Deadline for financial mgmt. course:* 02/03/2013 |

| | | |
|---|---|---|
| ***Debtor*** | represented by | **Matthew Bruce Hintze** |
| **Matthew Bruce Hintze** | | PRO SE |
| 708 N.E. Blvd. | | |
| Gainesville, FL 32601 | | **Seldon J. Childers** |
| Alachua−FL | | ChildersLaw, LLC |
| SSN / ITIN: xxx−xx−4537 | | 2135 N.W. 40th Terrace |
| | | Suite B |
| | | Gainesville, FL 32605 |
| | | 866−996−6104 |
| | | Fax : 407−209−3870 |
| | | Email: jchilders@smartbizlaw.com |
| | | *TERMINATED: 02/13/2015* |

| | | |
|---|---|---|
| ***Joint Debtor*** | represented by | **Larina K. Hintze** |
| **Larina K. Hintze** | | PRO SE |
| 708 N.E. Blvd. | | |
| Gainesville, FL 32601 | | **Seldon J. Childers** |
| Alachua−FL | | ChildersLaw, LLC |
| SSN / ITIN: xxx−xx−8057 | | 2135 N.W. 40th Terrace |
| | | Suite B |
| | | Gainesville, FL 32605 |
| | | 866−996−6104 |
| | | Fax : 407−209−3870 |
| | | Email: jchilders@smartbizlaw.com |
| | | *TERMINATED: 02/13/2015* |

| | | |
|---|---|---|
| ***Trustee*** | represented by | **Theresa M. Bender** |
| **Theresa M. Bender** | | P.O. Box 14557 |
| P.O. Box 14557 | | Tallahassee, FL 32317 |
| Tallahassee, FL 32317 | | 850−205−7777 |
| 850−205−7777 | | Fax : 850−205−7780 |
| | | Email: tmbenderch7@yahoo.com |
| | | |
| | | **Trevor A. Thompson** |
| | | c/o Clark Partington |
| | | 106 East College Avenue, Suite 600 |
| | | Tallahassee, FL 32301 |
| | | 850−320−6827 |
| | | Fax : 850−597−7591 |
| | | Email: tthompson@cphlaw.com |

***U.S. Trustee***
**United States Trustee**
110 E. Park Avenue

Suite 128
Tallahassee, FL 32301
850−942−1660

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 09/14/2016 | | <u>611</u> | Order and Notice of Preliminary Hearing on Motion for Relief from Stay by FLH Holdings of Florida, LLC. Preliminary hearing to be held on October 4, 2016 (Re: <u>607</u> Motion for Relief from Stay.) Responses due by 9/29/2016. Service by the Court pursuant to applicable Rules. (Bikowitz, C.) (Entered: 09/14/2016) |
| 09/15/2016 | | <u>614</u> | Amended Motion (Re: <u>596</u> Motion for Damages for Creditor Misconduct) *to Deem Amended Complaint as Void and for Recovery of Damages Due to Violation of Automatic Stay* filed by Ryan E. Davis on behalf of Christopher M. James. (Attachments: # <u>1</u> Exhibit A through E) (Davis, Ryan) (Entered: 09/15/2016) |
| 09/22/2016 | | <u>622</u> | Affidavit Re: *Motion for Relief from Stay and Notice of Hearing* filed by Robert Drake Wilcox on behalf of FLH Holdings of Florida, LLC, InterMed Biomedical Services, Inc., John & Sheila Spence, David Whitney [Re: <u>607</u> Motion for Relief from Stay]. (Wilcox, Robert) (Entered: 09/22/2016) |

FORM onstay (Rev 1/15)

# UNITED STATES BANKRUPTCY COURT
Northern District of Florida
Gainesville Division

| | |
|---|---|
| In Re: Matthew Bruce Hintze<br>SSN/ITIN: xxx−xx−4537<br>Debtor | Bankruptcy Case No.: 12−10462−KKS |
| Larina K. Hintze<br>SSN/ITIN: xxx−xx−8057<br>Joint Debtor | Chapter: 7<br>Judge: Karen K. Specie |

## *ORDER AND NOTICE OF PRELIMINARY HEARING ON MOTION FOR RELIEF FROM STAY*

FLH Holdings of Florida, LLC, having filed a motion for relief from stay,

**NOTICE: if a response opposing the motion is timely filed** pursuant to L.R. 4001−1(c), a preliminary hearing will be held before the undersigned bankruptcy judge *via CourtCall\** on October 4, 2016 at 9:30 a.m., Eastern Time.

**IF NO TIMELY OPPOSITION RESPONSE IS FILED, NO HEARING WILL BE HELD AND AN ORDER GRANTING THE MOTION MAY BE ENTERED BY THE COURT.**

*IT IS HEREBY ORDERED AND FURTHER NOTICE GIVEN THAT*:

1. The preliminary hearing shall be non−evidentiary and will be restricted to documents of record and the argument of counsel. Testimony will not be permitted.

2. Within seven (7) days after the date of this order, the movant shall file and serve on the debtor and the trustee, if one has been appointed, supporting affidavits and such other documents demonstrating that the movant is entitled to relief, including the following as appropriate:

 a) a supporting affidavit of indebtedness;
 b) a supporting affidavit and documents establishing secured status;
 c) an appraisal or affidavit of value;
 d) an affidavit showing such other facts as may be necessary to demonstrate the movant's right to relief.

3. Within fifteen (15) days of the date of this order if they oppose the motion for relief, the debtor and/or trustee shall file and serve on the movant a response which shall be accompanied by such supporting affidavits or appraisals as applicable.

4. Motions that cannot be disposed of at the preliminary hearing will be set for a final evidentiary hearing within thirty (30) days, unless such time requirement is otherwise waived by the movant.

5. The automatic stay imposed by 11 U.S.C. § 362 is extended in this matter until a final order is entered on the motion.

**_DONE AND ORDERED_** at Tallahassee, Florida, September 14, 2016.


/s/ Karen K. Specie
Karen K. Specie
U.S. Bankruptcy Judge

**Service**:
Service by the Court to all interested parties.


*Instructions for using CourtCall may be found on the Court's website at
http://www.flnb.uscourts.gov/sites/default/files/court_resources/telephonic_appearance_procedures.pdf.*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

Case No. 12-10462-KKS

In re:                                        Chapter 7

Matthew Bruce Hintze ,
Larina K. Hintze,

              Debtor(s).
_____/

**AMENDED MOTION TO DEEM AMENDED COMPLAINT AS VOID
AND FOR RECOVERY OF DAMAGES DUE TO VIOLATION OF AUTOMATIC STAY**

Creditor, CHRISTOPHER JAMES ("James"), by and through his undersigned counsel,

hereby files this Motion to Deem Amended Complaint as Void and For Recovery of Damages

Against FLH Holdings of Florida, LLC, John Spence, Sheila Spence, Intermed Biomedical Services,

Inc. and David Whitney (the "Plaintiffs"), pursuant to 11 U.S.C. § 362, and as grounds therefore,

states as follows:

**Summary of the Argument**

The Plaintiffs have knowingly and wilfully violated the automatic stay by pursuing claims

with respect to which the Trustee enjoys exclusive standing. Specifically, the Plaintiffs have

pursued relief against James in state court based upon the purported transfer of the Debtors'

membership interest in TutoringZone, LC and based upon an alter ego theory, both of which

claims are exclusively held by the Trustee. James first raised the automatic stay issue by the

filing of a Motion to Dismiss in state court, and in response, Plaintiff's state court counsel

represented at the ensuing hearing that the Trustee did not have an objection and that this

Bankruptcy Court had already determined that pursuit of such claims was not a stay violation. In

Page 1 of 15

reality, the Plaintiffs did not seek permission from the Trustee to pursue such claims, nor had this Court ruled in this case that a creditor may pursue an alter ego theory or seek relief based upon the purported transfer of the membership interest. To the contrary, this Court's recent ruling in this case, along with this Court's published opinion, In re C.D. Jones & Co., Inc., 482 B.R. 449 (Bankr. N.D. Fla. 2012), stand for the proposition that the Trustee has exclusive standing to pursue such claims.[1] Moreover, as noted by Plaintiff, Intermed Biomedical Services' sister entity, Intermed Recovery, Section 326(a)(1) precludes an action by a creditor of the estate against third parties for avoidance of pre-petition transfers of the debtor's assets because such an action is an action "to recover a claim against the debtor." Intermed Recovery explained this in its *Motion for Determination that No Automatic Stay is in Effect* (Doc. No. 530)(the "Intermed Motion"), in which it relied upon Judge Killian's opinion, In re Saunders, 100 B.R. 303, 306 (Bankr. N.D. Fla. 1989), in support of that proposition.

In an effort to reach an amicable resolution, the undersigned prepared a detailed letter to Plaintiffs explaining the stay violation and simply requested dismissal of the offending lawsuit without any type of request for fees or costs-- yet Plaintiffs have refused to dismiss the lawsuit and in fact have continued to pursue it. Accordingly, this Court should declare that the state court lawsuit is void and award damages, including fees and costs, in favor of James.

### **Key Facts**

1.      On February 16, 2016, FLH Holdings of Florida, LLC ("FLH"), filed a complaint

---

[1]. James recognizes that, with respect to the fraudulent transfer claims, the Trustee's exclusive standing is not in perpetuity if the Trustee fails to act within the Section 546(a) limitations period, but here the Trustee had in fact filed an adversary proceeding premised on the identical theory advanced by the Plaintiffs in state court.

(the "Original Complaint") initiating a state court lawsuit, styled *FLH Holdings of Florida, LLC* v. *Christopher M. James and Cynthia Frenchman,* in the Circuit Court for the Eighth Judicial Circuit, in and for Alachua County, Florida, Case No.: 01-2016-CA-538 (the "State Court Action" or "FLH Litigation").

2.     Although over forty pages and over two hundred paragraphs, the Original Complaint was a garden variety fraudulent transfer action, seeking relief based upon the purported transfer of certain property, referred to as the "Intellectual Property," from TutoringZone, LC ("TZI"), to Christopher M. James and Cynthia Frenchman ("Frenchman").[2]

3.     The patent defect with the Original Complaint was that FLH is solely a creditor of Matthew and Larina Hintze (the "Hintzes"), not TZI. Therefore, FLH lacked standing to pursue recovery of a transfer from TZI. James and Frenchman moved for dismissal based upon the dispositive standing issue.

4.     Recognizing the infirmity with the Original Complaint, FLH, along with John Spence, Sheila Spence, Intermed Biomedical Services, Inc., and David Whitney (the "Plaintiffs"), filed an Amended Complaint on May 20, 2016 (the "Amended Complaint" or "FLH Litigation), which added a section entitled "TutoringZone as the Alter Ego of the Hintzes." A true and correct copy of the Amended Complaint (without exhibits) is attached hereto as **Exhibit "A."**  The Amended Complaint plainly argues, in ¶ 220, that TZI "was the alter ego of the Hintzes."

5.     Based upon the alter ego theory, the Amended Complaint subsequently contends, in

_____

[2] While James does not dispute that TutoringZone, LC, transferred certain property, he maintains that the consideration was adequate and that TutoringZone II, LLC, was the transferee.

¶ 261, that, "[a]lthough the form was a transfer of assets of TutoringZone, the substance was a transfer of the entire value of the Hintzes' ownership interest in TutoringZone to TutoringZone II." Thus, as drafted, the Amended Complaint seeks relief based on a purported transfer of the Hintzes' ownership interest in TZI. The Plaintiffs' modification to the Original Complaint was necessary to circumvent the fatal standing issue.

6.      The Plaintiffs filed the Amended Complaint, even though the Plaintiffs were fully aware that the Trustee had filed an adversary proceeding, Adv. Proc. No. 14-01005-KKS (the "Trustee's Complaint"), seeking relief based upon an identical theory that the Hintzes had conveyed their membership interest in TZI.  Specifically, Counts XIII-XV of the Trustee's Complaint (the "Fraudulent Transfer Counts") are labeled as either avoidance or fraudulent transfer counts of the "membership interest." The Trustee's theory, as stated in ¶ 226 of the Trustee's Complaint was that, "[t]he practical economic reality of the transaction was an indirect method of disposing of the membership interest in TutoringZone." Without question, the Amended Complaint and the Trustee's Complaint are premised upon an identical theory of relief.

7.      Moreover, at the time of the filing of the Amended Complaint, the Plaintiffs were fully aware that the Trustee had attempted to convey, through an auction in open Court (the "Sale"), the Fraudulent Transfer Counts of the Trustee's Complaint to TZ Acquisition, LLC ("TZ Acquisition"), which is an entity related to FLH[3], one of the Plaintiffs. In fact, the issue of whether the Trustee could convey the Fraudulent Transfer Counts was under advisement by this Court at the time of the filing of the Amended Complaint. Depending upon this Court's ruling, the Trustee would

---

[3] FLH Holdings and TZ Acquisition both disclose Steven Fieldman as their managing member with the Division of Corporations, Florida Department of State. Mr. Fieldman was present in Court during the recent discharge trial.

either convey the Fraudulent Transfer Counts to TZ Acquisition or retain them-- but under either scenario, the Plaintiffs would not have had standing.

8.      Despite knowledge of this pending bankruptcy case, knowledge of the pending Adversary Proceeding, and knowledge of the pending Sale, Plaintiffs contested James' Motion to Dismiss, dated June 9, 2016 ("Motion to Dismiss"), which sought dismissal based upon the Plaintiffs' lack of standing due to the Chapter 7 Trustee's exclusive standing. A true and correct of the Motion to Dismiss is attached hereto as **Exhibit "B."**

9.      In order to sidestep the exclusive standing issue, the Plaintiffs' counsel (Geddes Anderson), at the June 27, 2016 hearing on the Motion to Dismiss, insinuated to the state court that the Chapter 7 Trustee had somehow blessed the filing of the Amended Complaint. The relevant passage follows:

> First of all, the trustee is not objecting to us bringing this action. The defendants, we would argue, lack standing to assert the trustee's right to challenge the standing. This is something that they don't- the Trustee should be coming in and saying that we don't have standing to assert this cause of action. *If the trustee wanted to intervene or seek relief in the bankruptcy court, she could do that.* As a practical matter, if the trustee does not object, a creditor can bring individual claims.

See Hearing Transcript, dated June 27, 2016 ("Hearing Transcript"), page 31, lines 15-25 (emphasis added). A true and correct copy of the Hearing Transcript is attached hereto as **"Exhibit C."**

10.      Reiterating this point, Plaintiffs' counsel later represented, "if the trustee thought that we were doing something inappropriate, she could seek a bar order precluding all of this, but she has not done that." Hearing Transcript, page 33, lines 13-17. The clear implication of the representation to the state court was that the Chapter 7 Trustee had somehow authorized the filing of the Amended Complaint. In reality, Plaintiffs never obtained relief from stay, which would have been the proper

procedure, nor did they obtain permission from the Trustee to file the Amended Complaint (to the extent that is even relevant). Plaintiffs have now admitted to this misstatement through the discovery process in state court. A true and correct copy of John Spence's Response to Request For Admissions, dated August 15, 2016, is attached hereto as **"Exhibit D."** The tenth response admits that the Trustee was not notified of the Amended Complaint until the filing of "a Motion to Determination of Stay Relief on August 1, 2016, " over a month after the Motion to Dismiss hearing.

11. Concerned about the automatic stay issue, Plaintiffs' state court counsel later argued that relief from stay was unnecessary based upon a prior ruling by this Court related to a separate proceeding supplementary. As stated by state court counsel, with respect to the separate "proceeding supplementary that was referenced, the [bankruptcy] court did not find that that was any sort of stay violation. I don't have it in front of me, but it's my understanding from counsel that the court- this proceeding supplementary, which is a FUFTA claim, the court said that that was not a stay violation." Transcript of Proceeding, p. 40, lines 15-21. In reality, the separate proceeding supplementary involves Intermed Recovery, LLC ("Intermed Recovery"), *a creditor of TZI*.[4]

12. Moreover, as opposed to the FLH Litigation, Intermed Recovery's proceeding supplementary does not seek a determination that TZI is the alter ego of the Hintzes, nor does it seek recovery based upon a theory that the membership interest of TZI transferred. To the contrary, Intermed Recovery filed a motion with this Court, entitled *Motion for Determination that No Automatic Stay is in Effect as to Collection Efforts against Non-Debtor, TutoringZone, LC,* dated May 19, 2015 (Doc. No. 530), which clearly represents that Intermed Recovery is only seeking

---

[4] Intermed Recovery is a voluntary creditor of TZI by virtue of its purchase of a judgment in favor of TZI's former landlord.

recovery of a transfer from TZI, not the Debtors. Specifically, ¶ 12 of that motion plainly states that Intermed Recovery is seeking the "transfer of assets from TZI, which is also a non-debtor." Despite this glaring distinction, Plaintiffs' bankruptcy counsel, Robert Wilcox, who was present at the hearing and sitting next to Mr. Anderson, did not correct the record or clarify this issue for the state court. Mr. Wilcox did not clarify the misstatement even though Mr. Anderson represented his "understanding" was "from counsel," which was presumably a reference to Mr Wilcox. This misstatement should have been corrected as Intermed Recovery clearly had not sought relief based upon alter ego type theories. Intermed Recovery is an affiliate of Intermed Biomedical Services, one of the Plaintiffs in the FLH Litigation, so the distinction was certainly not unknown to the Plaintiffs.

13.    Subsequent to the June 27, 2016, hearing, this Court determined that the Trustee did not have the ability to convey the Fraudulent Transfer Counts, as reflected by this Court's *Order Determining Causes of Action Sold or Transferred Pursuant to Order Approving Report and Notice of Trustee 's Intention to Sell (ECF 580), and Sustaining Objection of Christopher James and Tutoringzone IL LLC (ECF 574)*, dated July 22, 2016 (Doc. No. 591)("Sale Order").

14.    In light of the Sale Order and case law upon which this Court relied, it was abundantly clear that the filing of the Amended Complaint was a violation of the stay, as set forth in the Motion to Dismiss. Yet, in an effort to reach an amicable resolution without Court action, the undersigned notified counsel for the Plaintiffs of the automatic stay violation with a comprehensive letter, dated July 29, 2016, a true and correct copy of which is attached hereto as **Exhibit "E"** (the "Notification Letter"). The detailed Notification Letter included citations to various cases that stand for the proposition that the Trustee had the exclusive rights to pursue the alter ego claim and the Fraudulent Transfer Action, which cases were relied upon by this Court in the Sale Order. The

Notification Letter simply requested that the Plaintiffs dismiss the State Court Action within three (3) days of the date of the letter and did not seek or request the recovery of any fees or costs. To date, the Plaintiffs have refused to dismiss the State Court and have continued to prosecute it, requiring the filing of this Motion.

### Legal Argument

Section 362 of the Bankruptcy Code operates to invoke a "stay" upon filing of a voluntary bankruptcy petition. As detailed in § 362, the automatic stay prevents, among other things, a debtor's creditors from taking any act to obtain possession of property of the estate, and bars actions that affect or interfere with property of the estate and property of the debtor. Section 362 provides further that "**an individual** injured by any willful violation of a stay provided by [Section 362] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k) (emphasis added).

In this instance, as of the date of the filing of the Amended Complaint, the Trustee retained exclusive rights to seek relief based upon the purported transfer of the membership interest of the Hintzes and to pursue an alter ego claim. See Steffen v. Gray, Harris, & Robinson, P.A., 283 F. Supp. 2d 1272 (M.D. Fla 2003), *aff'd,* 138 F. App'x 297 (11th Cir. 2005). As explained in Steffen, "[e]ven though this Court has concluded that *the fraudulent transfer action* was not property of the estate, the automatic stay barred the SEC form seeking avoidance of the transfers until the stay was lifted or terminated." Id. at 1284, n. 24 (emphasis added). Furthermore, as explained by this Court, in In re CD. Jones & Co., Inc., 482 B.R. 449 (Bankr. N.D. Fla. 2012), the trustee has the right to pursue state law fraudulent transfer. While the

Trustee does not retain exclusive rights in perpetuity if the Trustee fails to act within the Section 546(a) limitations period, the Trustee had, in fact, filed an action, which was still pending as of the date of the filing of the Amended Complaint.

The Trustee also enjoys exclusive jurisdiction with respect to alter ego claims that are general in nature affecting all creditors (as opposed to any one creditor). In C.D. Jones & Co., this Court relied, in part, upon the reasoning of In re Xenerga, Inc., 449 B.R. 594 (Bankr. M.D. Fla 2011), which held that general alter ego claims were property of the estate and that only the Chapter 7 trustee may bring an alter ego claim on behalf of the general creditor body. Thus, by pursuing an alter ego theory, the Plaintiffs infringed upon the Trustee's exclusive standing and clearly violated the automatic stay.

Plaintiffs' sole argument that the stay is inapplicable– that Section 362 only operates to prohibit actions previously commenced against the debtor– is unavailing and in fact contradicted by the Intermed Motion, which was filed by the Plaintiff, Intermed Biomedical's, sister entity. As recognized in n. 3 of the Intermed Motion, an action by a creditor of the estate against third parties for avoidance of a pre-petition transfer of the debtor's assets is stayed because such an action constitutes an action "to recover a claim against the debtor." 11 U.S.C. § 362(a)(1); In re Saunders, 101 B.R. at 305-306. Section 362(a)(1) clearly bars actions "to recover a claim against the debtor," which is applicable here. 11 U.S.C. §362(a)(1). "Absent a claim against the debtor, there is no independent basis for the action against the transferee." Id. As opposed to Intermed Recovery, the Plaintiffs here are contending that the Intellectual Property was actually the property of the Debtors and hence a pre-petition transfer of the Debtors' assets, thereby invoking Section 362(a)(1). Moreover, the Plaintiffs describe the transfer as a transfer of the Debtors'

membership interest, which again invokes the automatic stay, as acknowledged by Intermed

Recovery when it cited <u>Saunders</u>. Absent from Plaintiffs' separate Motion for Declaration is any

discussion of <u>Saunders</u> or any attempt to distinguish it.

      As set forth below, James has standing to seek relief with respect to the stay violation, the

Amended Complaint should be deemed void, and this Court should award damages in favor of

James.

      **a.**     ***James has standing to pursue the automatic stay violation as a creditor of the estate.***

      Actions to pursue violations of the automatic stay are not limited to only the trustee or the

debtor. Rather, § 362(k) also creates a right of action for, among others, creditors to challenge

automatic stay violations, seek determinations of stay violations, and recover damages. <u>In re</u>

<u>Clemmer</u>, 178 B.R. 160 (Bankr. E.D. Tenn. 1995). Courts have indicated that standing to bring a

right of action under § 362(k) may extend to any natural person who is "injured by willful

violation of the automatic stay." <u>Matter of Ring</u>, 178 B.R. 570 (Bankr. S.D. Ga. 1995).

      A party has standing to sue for willful violations of the automatic stay where the party is

an individual who can demonstrate a direct injury particular to himself. <u>In re Ampal-American</u>

<u>Israel Corp.</u>, 502 B.R. 361 (Bankr. S.D.N.Y. 2013). Contrary to Plaintiffs' assertions, James has

standing to pursue the relief sought herein as he is "individual" who has sustained an actual and

unique injury as a result of Plaintiffs' willful and continuing violation of the automatic stay. <u>See</u>

11 U.S.C. § 362(h); <u>In re Clemmer</u>, 178 B.R. 160. Indeed, James has had to incur substantial

attorneys' fees and costs to respond to the Amended Complaint and otherwise defend the State

Court Action. Accordingly, James has been injured, and is entitled to recover his damages.

In this instance, Plaintiffs' willful filing of the Amended Complaint seeking relief based upon a purported transfer of the Debtors' property, coupled with Plaintiffs' refusal to dismiss the Amended Complaint after receiving notice of their violation of the automatic stay, warrants both monetary sanctions and entry of an order which deems the Amended Complaint void *ab initio,* as set forth below.

      **b.**     ***The Amended Complaint should be deemed void, and in turn, the State Court Action should be dismissed due to the stay violation.***

Any action in violation of the automatic stay is void, even if a party fails to seek redress declaring it so.  In re Kilmer, 501 B.R. 208 (Bankr. S.D.N.Y. 2013); Borg-Warner Acceptance Corporation, 685 F.2d 1306 (11th Cir. 1982) (holding that actions taken in violation of the automatic stay are void and without effect); accord Matter of Ring, 178 B.R. 570 (Bankr. S.D. Ga. 1995) (holding that in the Eleventh Circuit, actions in violation of the automatic stay are an absolute nullity and void automatically). For example, in In re Kilmer, a tax sale of a debtor's property was conducted during the pendency of debtor's bankruptcy case.  In re Klimer, 501 B.R. at 210.  The tax sale proceeding violated the automatic stay, and consequentially, the sale and transfer of the debtor's property was considered void *ab initio*.  Id. at 213.

In this instance, the Amended Complaint should be deemed void due to the knowing and wilful violation and the State Court Action should be dismissed.

      **c.**     ***James is entitled to actual and punitive damages due to the wilful stay violation.***

The purpose of awarding actual damages for a violation of the automatic stay is to compensate a party for a proven injury or loss.  See In re Dean, 490 B.R. 662, 667–68 (Bankr. M.D. Pa. 2013).  In fact, where a willful violation of the automatic stay has occurred, § 362(k)

mandates the award of actual damages, including costs and attorneys' fees, caused by the violation. See, e.g., In re Daniels, 316 B.R. 342, 354 (Bankr.D. Idaho 2004). Even though the damages provision of § 362(k) is stated in mandatory terms, a damages award must have a sufficient factual foundation. Under § 362(k), a plaintiff is entitled only to damages "reasonably incurred as a proximate result of the violation of the stay." In re Grine, 439 B.R. 461, 468 (Bankr. N.D. Ohio 2010).

A moving party has the burden of proof with regard to showing that the willful violation of the automatic stay caused him to suffer harm and incur damages, and then to show what relief is appropriate. See In re Dunn, 202 B.R. 530, 531 (Bankr.D.N.H.1996). Sanctions for actual damages and attorneys' fees have been awarded for a willful violation of the automatic stay when creditor filed a state court lawsuit against the debtor after a petition was filed. In re NWFX, Inc., 81 B.R. 500, 503 (Bankr. W.D. Ark. 1987). Punitive damages may also be appropriate. For example, in the case of In re White, a creditor's attempts to induce a debtor to repay prepetition debts, despite the creditor having knowledge of the bankruptcy proceeding, warranted actual damages in the amount of $5,000 plus $10,000 in punitive damages. In re White, 410 B.R. 322 (Bankr. M.D. Fla. 2009).

Akin to In re NWFX, Inc. and In re White, James should be awarded actual damages for the substantial attorneys' fees he has incurred in having to defend the Amended Complaint. As noted above, Plaintiffs at all times relevant were aware of this bankruptcy, and were aware that the Amended Complaint violated the automatic stay. James' letter cited to substantial case law explaining how the Amended Complaint violated the automatic stay. Nevertheless, Plaintiffs have refused to dismiss the Amended Complaint, and continue to pursue their claims in state

Page 12 of 15

court.  This willful and blatant violation of the automatic stay warrants an award of actual damages.

Punitive damages are also appropriate in light of the misstatements to the state court. Plaintiffs were fully cognizant of the automatic stay issue and forged ahead anyway. When faced with the issue, rather than filing a motion for relief, the Plaintiffs misrepresented to the state court that the Trustee had somehow blessed their actions and that this Court had already ruled on the issue. Neither statement is in any way accurate. The statements were false and misleading. Then, when given the opportunity to correct the misstep without any monetary concessions, the Plaintiffs filed a Motion to declare that the automatic stay was not applicable, which did not address any of the cases cited in this Court's recent opinion and omitted any discussion of the Saunders opinion.

WHEREFORE, Creditor, CHRISTOPHER JAMES, by and through his  undersigned counsel, hereby respectfully requests that this Court: (1) declare that the Amended Complaint is void and dismiss the State Court Action; (2) award a judgment for actual damages against the Plaintiffs in favor of James for attorneys' fees and costs incurred in defending the State Court Action; and (3) award a judgment for punitive damages against the Plaintiffs in favor of James in an amount that this Court deems appropriate; and (4) grant any other relief that this Court deems appropriate.

Dated this 15th day of September, 2016.

/s/ Ryan E. Davis
RYAN E. DAVIS
Florida Bar No. 0179851
rdavis@whww.com

WINDERWEEDLE, HAINES, WARD
  & WOODMAN, P.A.
Post Office Box 1391
Orlando, FL 32802-1391
(407) 423-4246 (T); (407) 423-7014 (F)
Attorneys for Christopher James

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of September, 2016, a true and correct copy of the foregoing has been furnished via:

**CM/ECF to**:

Seldon J. Childers, Esq.
ChildersLaw, LLC
2135 N.W. 40th Terrace, Suite B
Gainesville, FL 32605

*Trustee*
Theresa M. Bender
P.O. Box 14557
Tallahassee, FL 32317

*U.S. Trustee*
United States Trustee
110 E. Park Avenue
Suite 128
Tallahassee, FL 32301

*TZ Acquisition LLC*
c/o Robert D. Wilcox, Esq.
814 AlA North, Suite 202
Ponte Vedra Beach, FL 32082
rw@wlflaw.com

**U.S. Mail to**:

Matthew Bruce Hintze
708 N.E. Blvd.
Gainesville, FL 32601

Page 14 of 15

Larina K. Hintze
708 N.E. Blvd.
Gainesville, FL 32601

/s/ Ryan E. Davis
RYAN E. DAVIS

Filing # 41797339 E-Filed 05/20/2016 03:42:29 PM

IN THE CIRCUIT COURT, EIGHTH
JUDICIAL CIRCUIT, IN AND FOR
ALACHUA, FLORIDA

CASE NO.: 01-2016-CA-538

FLH HOLDINGS OF FLORIDA, LLC,
a Florida limited liability company,
JOHN SPENCE, SHEILA SPENCE,
INTERMED BIOMEDICAL SERVICES,
INC., a Florida corporation, and
DAVID WHITNEY,

JURY TRIAL DEMANDED

       Plaintiffs,

vs.

CHRISTOPHER M. JAMES,
CYNTHIA L. FRENCHMAN, and
SELDON J. CHILDERS,

       Defendants.

_____/

### AMENDED COMPLAINT

Plaintiffs, FLH HOLDINGS OF FLORIDA, LLC, JOHN SPENCE, SHEILA SPENCE,
INTERMED BIOMEDICAL SERVICES, INC., and DAVID WHITNEY (collectively, the
"Plaintiffs"), files this Amended Complaint against Defendants, CHRISTOPHER M. JAMES,
CYNTHIA L. FRENCHMAN, and SELDON J. CHILDERS (collectively "Defendants"), and
state as follows:

### JURISDICTION AND VENUE

1.    This is an action for damages against Defendants in excess of fifteen thousand
dollars ($15,000.00), exclusive of interest and costs.

2.    Plaintiff FLH Holdings of Florida, LLC ("FLH Holdings") is a limited liability
company organized under the laws of the State of Florida.



3. Plaintiffs John Spence and Sheila Spence (the "Spences") are a married couple who reside in Gainesville, Florida.

4. Plaintiff InterMed Biomedical Services, Inc., also known as Intermed Biomedical Services, Inc. ("InterMed"), is a corporation organized under the laws of the State of Florida. At all material times, Richard Staab ("Staab") was the President and Chief Executive Officer of InterMed.

5. Plaintiff David Whitney ("Whitney") is an individual who resides in Gainesville, Florida.

6. Defendant Christopher M. James ("James") is an individual who resides in Gainesville, Florida.

7. Defendant Cynthia L. Frenchman ("Frenchman") is an individual who currently resides in Napa, California but upon information and belief resided in Gainesville, Florida during all times material to this action.

8. Defendant Seldon J. Childers, Esq. ("Childers") is an individual who resides in Gainesville, Florida. Childers is an attorney and, at all times material, was an active member of the Florida Bar.

9. The conduct giving rise to this action occurred in Gainesville, Florida, Alachua County.

10. Venue is proper in this Court pursuant to Sections 47.051 and 47.011, Florida Statutes.

## FACTUAL ALLEGATIONS

11. At all relevant times prior to June 2011, Matthew Bruce Hintze ("Matt Hintze") owned a fifty-percent interest in TutoringZone, LC ("TutoringZone"), a Florida limited liability

2

company, which was commonly known and referred to as "TutoringZone."

  12. The remaining fifty-percent interest in TutoringZone was owned by Ethan Fieldman ("Fieldman").

  13. TutoringZone was in the business of providing personal tutors and tutoring materials for students taking courses offered primarily at the University of Florida, Florida State University and the University of Georgia.

  14. TutoringZone's most valuable asset was its intellectual property, which included its trademarks, service marks, course materials, tests, mock exams and solutions, practice problems, graphics, audio tapes, videos, instructional materials, workbooks, computer software, electronic documents, training materials, forms, coursework, web materials, logos, domain names, applications and Facebook webpage (the "Intellectual Property").

  15. Matt Hintze is a sophisticated and educated individual that has nearly received a Ph.D. in finance and whose business, TutoringZone, involves tutoring others in finance.

  16. Matt Hintze and Fieldman became unable to manage TutoringZone together.

  17. In the course of litigation filed by Matt Hintze seeking the dissolution of TutoringZone, Matt Hintze and Fieldman submitted bids to a court-appointed custodian for the purchase of TutoringZone's assets. Matt Hintze had the higher bid.

  18. In order to raise sufficient funds to purchase Fieldman's interest in TutoringZone, Matt Hintze and his wife Larina K. Hintze ("Larina Hintze") (collectively referred to as the "Hintzes") began to solicit loans from individuals in the community.

  19. James is the William H. Dial/SunBank Eminent Scholar in Finance in the Department of Finance, Insurance and Real Estate at the University of Florida.

  20. James is a long-time family friend of the Hintzes, and a former instructor and

3

advisor to Matt Hintze.

21. Frenchman is James' assistant, serving as a point of contact and personnel manager for James' business, CMJ Consulting, Inc.

22. On November 10, 2010, the Hintzes executed and delivered a promissory note to James in the principal amount of $375,000.00 at a 12% interest maturing within one year. The note purports to be secured by an interest "in all of Maker's assets." A true and correct copy of the James Promissory Note I is attached hereto as **Exhibit 1**.

23. On May 12, 2011, the Hintzes executed and delivered a second promissory note to James in the principal amount of $100,000.00. A true and correct copy of the James Promissory Note II is attached hereto as **Exhibit 2**.

24. The Hintzes were indebted to James for a total principal amount of $475,000.00.

25. Around the middle of May 2011, the custodian announced that he would recommend Matt Hintze's offer to the court and as a condition to that offer being approved, Matt Hintze was required to deposit the sum of $835,000.00 in the custodian's trust account by May 31, 2011.

26. On or about May 19, 2011, the Hintzes learned that an investor in Memphis, Tennessee on whom they were counting to loan them $250,000.00 of the total funds needed was not going to be able to make the loan.

27. The Hintzes consequently were in the emergency situation of having only a short time to obtain an additional $250,000.00, which they ultimately obtained from the Spences, InterMed, Whitney, and Randy and Sally Scott (collectively, the "Scotts"), the initial holders of the promissory note now held by FLH Holdings (collectively referred to herein as the "Lenders").

4

28.     The Hintzes represented to the Lenders that interest payments on the loans would be made from TutoringZone's cash flows and that the principal balance of the loans would be repaid within one year from the long term financing that TutoringZone would be obtaining. The note holders would be considered as holding "senior debt" in TutoringZone.

29.     The Hintzes presented the Lenders with information that combined their personal financial condition with TutoringZone.

30.     The Hintzes represented to one or more of the Lenders on multiple occasions that Larina Hintze's rental properties were the source of collateral for the debts of Tutoring Zone and that the Lenders' notes were considered the debts of TutoringZone.

31.     The Lenders required the creation of an Advisory Committee for TutoringZone consisting of four members: Matt Hintze as CEO of TutoringZone, and three investors – David Whitney, John Spence and Kevin Ogilby. All of the committee members executed a letter agreement dated June 7, 2011 confirming this understanding. A true and correct copy of the June 7, 2011 Letter Agreement is attached hereto as **Exhibit 3**.

32.     As alleged in detail below, in order to convince the Lenders to make the loans, the Hintzes represented, or led them to believe, among other things, that Fieldman and the tutors employed by TutoringZone were bound by non-compete agreements that prohibited them from competing with TutoringZone in Gainesville and Tallahassee and that Fieldman could not be a competitor and the tutors were completely loyal to TutoringZone.

33.     As a further inducement for the loans, the Hintzes also grossly misrepresented their personal financial information and that of TutoringZone by understating liabilities and overstating the value of assets.

34.     Contrary to the representations made to the Lenders, the Hintzes did not have or

5

obtain non-compete agreements from Fieldman or all of the tutors before the purchase of Fieldman's interest in TutoringZone on June 17, 2011.

35.    The Hintzes also failed to disclose to the Lenders that they knew that Fieldman planned to start a competing tutoring business and had no restrictions on immediately doing so. In fact, Fieldman did just that, using the funds he received in the sale of his interest in TutoringZone to Matt Hintze to start a company called Study Edge.

36.    On May 27, 2011, Matt Hintze and Fieldman executed a final settlement agreement effectuating the bid, at which point Matt Hintze became the sole 100% owner and manager of TutoringZone.

37.    Immediately following the closing of Matt Hintze's acquisition of Fieldman's interest in TutoringZone, several of TutoringZone's most important tutors resigned and went to work for Study Edge.

38.    The Lenders subsequently discovered that the Hintzes had understated their liabilities and that, contrary to the Hintzes' representations, the Hintzes had no equity in their real estate assets.

39.    Other than a few interest payments made by TutoringZone to InterMed in 2011, the Hintzes failed to make any payments to the Lenders on their loans.

40.    Beginning in June 2012, without the knowledge of the Lenders, the Hintzes caused TutoringZone to transfer its intellectual property and other assets to a new entity called TutoringZone II, LLC ("TutoringZone II"), a Florida limited liability company, which continues to operate under the same name of "TutoringZone."

41.    TutoringZone II, LLC was not registered or authorized to do business in the state of Florida until July 3, 2012.

6

42.     TutoringZone II currently operates the business formerly operated by TutoringZone by applying its intellectual property and service marks in continuation of the business.

43.     TutoringZone II is owned by James and was created with the assistance of Childers.

44.     Frenchman is the registered agent of TutoringZone II.

45.     As set forth below, James and Childers, together with the Hintzes, engaged in a scheme to hinder, delay or defraud the Hintzes' creditors, which scheme involved the winding down of TutoringZone's business, the transfer of its assets to the newly-formed TutoringZone II, and the continuation of TutoringZone's business under the name TutoringZone II.

### The Spence Promissory Note

46.     On May 24, 2011, Matt Hintze called John Spence and told him that he urgently needed to borrow $250,000.00 by May 31, 2011 in order to close his purchase of Fieldman's interest in TutoringZone. John Spence agreed to meet Matt Hintze on that same day at a local Starbucks to discuss the loan.

47.     During their meeting at Starbucks, Matt Hintze represented to John Spence that, among other things, TutoringZone was a consistently profitable company with excellent cash flow and an extremely loyal set of tutors and that there were non-compete agreements in place to prevent Fieldman and the tutors from competing against TutoringZone in Gainesville and Tallahassee.

48.     On May 24, 2011, Matt Hintze sent an email to John Spence in which he attached information concerning the investment proposal. A true and correct copy of the email and attachments are attached hereto as **Composite Exhibit 4.**

7

49.     On May 24, 2011, the Hintzes provided to the Spences a written statement containing corporate and personal financial information, which included representations that:

    a.  TutoringZone would have a total of $935,000.00 in debt, consisting of $835,000.00 for the purchase of Fieldman's interest and $100,000 for working capital;

    b.  The Hintzes had over $300,000.00 of equity in their personal residence;

    c.  The Hintzes had between $150,000.00 and $200,000.00 in equity in rental properties;

    d.  Matt Hintze would sell his 50% interest in a company called GIN within four months for an amount between $150,000.00 and $650,000.00;

    e.  There would be ample cash flow from TutoringZone to service the debt; and

    f.  The Hintzes would have no problem securing permanent refinancing to repay the $935,000.00 debt owed by TutoringZone.

A true and correct copy of the financial information provided by the Hintzes to the Spences is attached hereto as part of **Composite Exhibit 4**.

50.     On May 26, 2011, in a telephone call with Sheila Spence, Matt Hintze made the same representation set forth in paragraph 49 above concerning the non-compete agreement with Fieldman being in place which would prohibit Fieldman from starting a competing tutoring business similar to TutoringZone in Gainesville and other markets.

51.     The Hintzes misrepresented to the Spences that the Hintzes had substantial equity in their real estate, including their home and the properties comprising Larina Hintze's so-called "real estate empire." Further, the Hintzes falsely and materially understated the amount of debt that the Hintzes and TutoringZone would need to service by failing to disclose hundreds of

8

thousands of dollars in debt that the Hintzes owed to other creditors. The Hintzes also misrepresented that Matt Hintze would be able to sell his interest in a company called GIN for a significant sum of money, that TutoringZone would have ample cash flow to service its debt, that TutoringZone would have no immediate competitors, and that the Hintzes would have no problem securing permanent refinancing.

52.   The Hintzes representations concerning the non-compete agreements with Fieldman and the tutors were false. The Hintzes knew at the time they made the representations that Fieldman and the tutors did not have non-compete agreements and that Fieldman was planning to open a competing business and to hire tutors from TutoringZone.

53.   The Hintzes' representations concerning the Hintzes' and TutoringZone's financial condition as alleged above were also false. Specifically:

    a.   The Hintzes failed to disclose that they were indebted to James in the principal amount of $475,000.00, by virtue of loans made by James to the Hintzes in November 2010 and May 2011;

    b.   The Hintzes failed to disclose that they were indebted to Ryan Dix in the principal amount of $50,000.00 by virtue of a loan made by Dix in October 2010;

    c.   The Hintzes misrepresented the value of Matt Hintze's interest in GIN and the ability to sell that interest;

    d.   The Hintzes misrepresented the equity in their personal residences and rental properties;

    e.   The Hintzes failed to disclose other substantial debts of TutoringZone; and

    f.   The Hintzes were never in a position to obtain a refinancing of $935,000.00 in debt in order to repay the loan from the Spences.

9

54.    The Hintzes knew the representations alleged herein were false when they made them. The Hintzes made these misrepresentations with the intent to deceive the Spences in order to induce them to make the loan to the Hintzes.

55.    Based on the representations of the Hintzes, the Spences loaned $75,000.00 to the Hintzes on May 27, 2011. The loan is evidenced by a promissory note in the amount of $75,000.00 dated May 27, 2011 executed by the Hintzes (the "Spence Promissory Note"). A true and correct copy of the Spence Promissory Note is attached hereto as **Exhibit 5.**

56.    The Spence Promissory Note contains a provision providing that the collateral for the loan includes both the Hintzes' personal assets as well as the assets of TutoringZone and all other business interests in which the Hintzes have full or partial ownership.  Further, the Spence Promissory Note provides that any proceeds from the sale of any TutoringZone assets exceeding, individually or collectively $10,000.00 must first be applied to the Spences' debt and accumulated interest thereon.  Finally, the Spence Promissory Note provides that the Hintzes may not subordinate the Spences' debt without their prior written consent, including through any borrowing in which TutoringZone's assets or business operations are used as collateral to support any form of indebtedness that could be determined to be senior to the debt of the Spences.

57.    The Spences reasonably and justifiably relied on the Hintzes' false representations and statements as material inducements to entering into the loan transaction with the Hintzes.

### The InterMed Promissory Note

58.    On or about May 19, 2011, Matt Hintze approached Staab, the President and Chief Executive Officer of InterMed, and asked him to loan the Hintzes $200,000.00 to be used to purchase Fieldman's interest in TutoringZone.

10

59.     During their initial conversation and at other times prior to InterMed agreeing to make a loan, the Hintzes represented to Staab that, among other things, TutoringZone was a consistently profitable company with excellent cash flow and an extremely loyal set of tutors and led Staab to believe that there were non-compete agreements in place to prevent Fieldman and the tutors from competing against TutoringZone in Gainesville and Tallahassee.

60.     On May 19, 2011, Matt Hintze sent an email to Staab attaching information concerning the investment proposal. A true and correct copy of the email and attachments are attached hereto as **Composite Exhibit 6.**

61.     On May 19, 2011, the Hintzes provided to Staab a written statement of the Hintzes' corporate and personal financial information, which included representations that:

   a. TutoringZone would have a total of $935,000.00 in debt, consisting of $835,000.00 for the purchase of Fieldman's interest and $100,000 for working capital;

   b. The Hintzes had over $300,000.00 of equity in their personal residence;

   c. The Hintzes had between $150,000.00 and $200,000.00 in equity in rental properties;

   d. Matt Hintze would sell his 50% interest in a company called GIN within four months for an amount between $150,000.00 and $650,000.00;

   e. There would be ample cash flow from TutoringZone to service the debt; and

   f. The Hintzes would have no problem securing permanent refinancing to repay the $935,000.00 debt owed by TutoringZone.

A true and correct copy of the financial information provided by the Hintzes to Staab is attached hereto as part of **Composite Exhibit 6.**

11

62.     The Hintzes misrepresented to Staab that the Hintzes had substantial equity in their real estate, including their home and the properties comprising Larina Hintze's so-called "real estate empire." Further, the Hintzes falsely and materially understated the amount of debt that the Hintzes and TutoringZone would have to service by failing to disclose hundreds of thousands of dollars in debt that was owed to other creditors. The Hintzes also misrepresented that Matt Hintze would be able to sell his interest in a company called GIN for a significant sum of money, that TutoringZone would have ample cash flow to service its debt, that TutoringZone would have no immediate competitors, and that the Hintzes would have no problem securing permanent refinancing.

63.     The Hintzes' representations concerning the non-compete agreements with Fieldman and the tutors were false. The Hintzes knew at the time they made the representations that Fieldman and the tutors did not have non-compete agreements and that Fieldman was planning to open a competing business and to hire tutors from TutoringZone.

64.     The Hintzes' representations concerning the Hintzes' and TutoringZone's financial condition as alleged above were also false. Specifically:

  a.  The Hintzes failed to disclose that they were indebted to James in the principal amount of $475,000.00 by virtue of loans made by James to the Hintzes in November 2010 and May 2011;

  b.  The Hintzes failed to disclose that they were indebted to Ryan Dix in the principal amount of $50,000.00 by virtue of a loan made by Dix in October 2010;

  c.  The Hintzes misrepresented the value of Matt Hintze's interest in GIN and the ability to sell that interest;

  d.  The Hintzes misrepresented the equity in their personal residences and rental

12

properties;

e.  The Hintzes failed to disclose other substantial debts of TutoringZone; and

f.  The Hintzes were never in a position to obtain a refinancing of $935,000.00 in debt in order to repay the loan from InterMed.

65.    The Hintzes knew the representations alleged herein were false when they made them. The Hintzes made these misrepresentations with the intent to deceive InterMed in order to induce it to make the loan to the Hintzes.

66.    Based on the representations of the Hintzes, InterMed loaned $150,000.00 to the Hintzes on May 27, 2011. The loan is evidenced by a promissory note in the amount of $150,000.00 dated May 27, 2011 executed by the Hintzes (the "InterMed Promissory Note"). A true and correct copy of the InterMed Promissory Note is attached hereto as **Exhibit 7.**

67.    The InterMed Promissory Note contains a provision providing that the collateral for the loan includes both the Hintzes' personal assets as well as the assets of TutoringZone and all other business interests in which the Hintzes have full or partial ownership. Further, the InterMed Promissory Note provides that any proceeds from the sale of any TutoringZone assets exceeding, individually or collectively $10,000.00 must first be applied to InterMed's debt and accumulated interest thereon. Finally, the InterMed Promissory Note provides that the Hintzes may not subordinate InterMed's debt without their prior written consent, including through any borrowing in which TutoringZone's assets or business operations are used as collateral to support any form of indebtedness that could be determined to be senior to the debt of InterMed.

68.    InterMed reasonably and justifiably relied on the Hintzes' false representations and statements as material inducements to entering into the loan transaction with the Hintzes.

13

### The Whitney Promissory Note

69.     Over the spring of 2011, the Hintzes approached Whitney and asked him to loan $125,000.00 in funds to be used to purchase Fieldman's interest in TutoringZone.

70.     During conversations and meetings with the Hintzes prior to Whitney agreeing to loan the money, the Hintzes represented to Whitney that, among other things, TutoringZone had excellent cash flow, an extremely loyal set of tutors and that there were non-compete agreements in place to prevent Fieldman and the tutors from competing against TutoringZone in Gainesville and Tallahassee.

71.     The Hintzes provided to Whitney the Hintzes' corporate and personal financial information, which included representations that:

   a.  TutoringZone is a consistently profitable and well-managed company that will be able to obtain longer term financing by June/July 2012 to repay investors the $835,000.00 loaned for the purchase of Fieldman's interest and have capital growth and expansion as set forth in its business plan;

   b.  Matt Hintze will leave in TutoringZone the $100,000.00 that he will receive from funds in TutoringZone's bank account at the closing with Fieldman in order to finance TutoringZone's operations over the summer;

   c.  The Hintzes had over $300,000.00 of equity in their personal residence;

   d.  The Hintzes had between $150,000.00 and $200,000.00 in equity in rental properties; and

   e.  Matt Hintze owns a 50% interest in a sibling company called GIN that should sell for between $150,000.00 and $650,000.00 in the next four to six months, if Fieldman submits the winning bid for Matt Hintze's interest in GIN.

14

72.     The Hintzes' representations concerning the non-compete agreements with Fieldman and the tutors were false. The Hintzes knew at the time they made the representations that Fieldman and the tutors did not have non-compete agreements and that Fieldman was planning to open a competing business and to hire tutors from TutoringZone.

73.     The Hintzes' representations concerning the Hintzes' and TutoringZone's financial condition as alleged above were also false. Specifically:

a.  The Hintzes failed to disclose that they were indebted to James in the principal amount of $475,000.00 by virtue of loans made by James to the Hintzes in November 2010 and May 2011;

b.  The Hintzes failed to disclose that they were indebted to Ryan Dix in the principal amount of $50,000.00 by virtue of a loan made by Dix in October 2010;

c.  The Hintzes misrepresented the value of Matt Hintze's interest in GIN and the ability to sell that interest;

d.  The Hintzes misrepresented the equity in their personal residences and rental properties;

e.  The Hintzes failed to disclose other substantial debts of TutoringZone;

f.  The Hintzes knew that TutoringZone would have to borrow money for operating capital; and

g.  The Hintzes were never in a position to obtain longer term financing in order to repay the loan from Whitney.

74.     The Hintzes knew the representations alleged herein were false when they made them. The Hintzes made these misrepresentations with the intent to deceive Whitney in order to induce him to make the loan to the Hintzes.

15

75.    Based on the representations of the Hintzes, Whitney loaned $125,000.00 to the Hintzes on May 12, 2011. The loan is evidenced by a promissory note in the amount of $125,000.00 dated May 12, 2011 executed by the Hintzes (the "Whitney Promissory Note"). A true and correct copy of the Whitney Promissory Note is attached hereto as **Exhibit 8**.

76.    Whitney, with the Hintzes' knowledge, obtained the final $25,000.00 of the $125,000.00 loaned to the Hintzes from a line of credit with a high rate of interest attached to his checking account. The Hintzes orally agreed to repay Whitney the $25,000.00 shortly after the closing with Fieldman from TutoringZone's funds. That repayment never occurred.

77.    Whitney reasonably and justifiably relied on the Hintzes' false representations as material inducements to entering into the loan transaction with the Hintzes.

### The Scott Promissory Note

78.    On or about May 22, 2011, Whitney contacted Randy Scott and related to him the information that the Hintzes had provided to Whitney concerning the Hintzes' request for funding for the purchase of Fieldman's interest in TutoringZone.

79.    Whitney acted as the Hintzes' agent with respect to procuring a loan from the Scotts. The Hintzes knew that Whitney had approached the Scotts about the loan and that Whitney had communicated what the Hintzes had told to Whitney. Whitney was unaware at the time that the representations that had been made by the Hintzes were false.

80.    Whitney told Randy Scott that, among other things, TutoringZone was a consistently profitable company with excellent cash flow and an extremely loyal set of tutors and that there were non-compete agreements in place to prevent Fieldman and the tutors from competing against TutoringZone in Gainesville and Tallahassee.

81.    On May 24, 2011, the Hintzes, through Whitney, sent an email to the Scotts

16

containing information concerning the investment proposal. A true and correct copy of the email and attachments are attached hereto as **Composite Exhibit 9.**

82. On May 24, 2011, Whitney provided to Randy Scott a written statement containing the Hintzes' corporate and personal financial information, which included representations that:

a. TutoringZone is a consistently profitable and well-managed company that will be able to obtain longer term financing by June/July 2012 to repay investors the $835,000.00 loaned for the purchase of Fieldman's interest and have capital growth and expansion as set forth in its business plan;

b. Matt Hintze will leave in TutoringZone the $100,000.00 that he will receive from funds in TutoringZone's bank account at the closing with Fieldman in order to finance TutoringZone's operations over the summer;

c. The Hintzes had over $300,000.00 of equity in their personal residence;

d. The Hintzes had between $150,000.00 and $200,000.00 in equity in rental properties; and

e. Matt Hintze owns a 50% interest in a sibling company called GIN that should sell for between $150,000.00 and $650,000.00 in the next four to six months, if Fieldman submits the winning bid for Matt Hintze's interest in GIN.

83. The Hintzes, through Whitney, misrepresented to the Scotts that the Hintzes had substantial equity in their real estate, including their home and the properties comprising Larina Hintze's so-called "real estate empire." Further, the Hintzes, through Whitney, falsely and materially understated the amount of debt that the Hintzes and TutoringZone would have to service by failing to disclose hundreds of thousands of dollars in debt that was owed to other

17

creditors. The Hintzes, through Whitney, also misrepresented that Matt Hintze would be able to sell his interest in a company called GIN for a significant sum of money, that TutoringZone would have ample cash flow to service its debt, that TutoringZone would have no immediate competitors, and that the Hintzes would have no problem securing permanent refinancing.

84. Based on the representations related to the Scotts by Whitney, the Scotts loaned $25,000.00 to the Hintzes on May 27, 2011. The loan is evidenced by a promissory note in the amount of $25,000.00 dated May 27, 2011 executed by the Hintzes (the "Scott Promissory Note"). A true and correct copy of the Scott Promissory Note is attached hereto as **Exhibit 10**.

85. The Scott Promissory Note contains a provision providing that the collateral for the loan includes both the Hintzes' personal assets as well as the assets of TutoringZone and all other business interests in which the Hintzes have full or partial ownership. Further, the Scott Promissory Note provides that any proceeds from the sale of any TutoringZone assets exceeding, individually or collectively $10,000.00 must first be applied to the Scotts' debt and accumulated interest thereon. Finally, the Scott Promissory Note provides that the Hintzes may not subordinate the Scotts' debt without their prior written consent, including through any borrowing in which TutoringZone's assets or business operations are used as collateral to support any form of indebtedness that could be determined to be senior to the debt of the Scotts.

86. By accepting the proceeds of the Scotts' loan and executing the Scott Promissory Note, the Hintzes ratified the statements and information provided to the Scotts by Whitney. Additionally, at a lunch meeting between the Scotts and the Hintzes on or about June 13, 2011, the Hintzes provided no information to the Scotts that caused them to question the accuracy of those statements and information.

87. The Hintzes' representations concerning the non-compete agreements with

18

Fieldman and the tutors were false. The Hintzes knew at the time they made the representations that Fieldman and the tutors did not have non-compete agreements and that Fieldman was planning to open a competing business and to hire tutors from TutoringZone.

88.　　The Hintzes' representations concerning the Hintzes' and TutoringZone's financial condition as alleged above were also false. Specifically:

    a.  The Hintzes failed to disclose that they were indebted to James in the principal amount of $475,000.00 by virtue of loans made by James to the Hintzes in November 2010 and May 2011;

    b.  The Hintzes failed to disclose that they were indebted to Ryan Dix in the principal amount of $50,000.00 by virtue of a loan made by Dix in October 2010;

    c.  The Hintzes misrepresented the value of Matt Hintze's interest in GIN and the ability to sell that interest;

    d.  The Hintzes misrepresented the equity in their personal residences and rental properties;

    e.  The Hintzes failed to disclose other substantial debts of TutoringZone;

    f.  The Hintzes knew that TutoringZone would have to borrow money for operating capital; and

    g.  The Hintzes were never in a position to obtain longer term financing in order to repay the loan from the Scotts.

89.　　The Hintzes knew the representations alleged herein were false when they made them. The Hintzes made these misrepresentations with the intent to deceive the Scotts in order to induce them to make the loan to the Hintzes.

90.　　The Scotts reasonably and justifiably relied on the Hintzes' false representations

19

as material inducements to entering into the loan transaction with the Hintzes.

91.     On or about May 29, 2012, Steven D. Fieldman, as Trustee, purchased the Scott Promissory Note from the Scotts and transferred the Scott Promissory Note to FLH Holdings on September 19, 2012, subsequent to its formation on September 16, 2012. True and correct copies of the Bill of Sale and Assignment of Note executed by the Scotts on May 29, 2012 and the Bill of Sale and Assignment of Note executed by Steven D. Fieldman, as Trustee, as of September 19, 2012 are attached hereto as **Composite Exhibit 11.**

92.     As the holder of the Scott Promissory Note, FLH Holdings is entitled to bring this action.

### The Conspiracy to Hinder, Delay or Defraud Creditors of the Hintzes and/or TutoringZone

93.     Matt Hintze was a managing member of TutoringZone from June 17, 2011 until November 1, 2012 and was in control of TutoringZone during that time. It is unclear whether Matt Hintze's wife, Larina Hintze, was also a managing member of TutoringZone.

94.     TutoringZone was not successful following the settlement agreement with Fieldman.

95.     By early 2012, the Hintzes were having financial difficulties and began contemplating filing personal bankruptcy and/or bankruptcy for TutoringZone and obtained advice from James about their financial problems.

96.     At the time, the Hintzes were personally indebted to James in the principal amount of $475,000.00. The Hintzes were also personally indebted to other Lenders in the amount of approximately $676,000.00.

97.     In or before April 2012, the Hintzes engaged in negotiations with James for a personal debt buyout in exchange for an equity stake in TutoringZone.

20

98.   In April 2012, the Hintzes asked the Lenders to subordinate their notes to a "new investor" in order to raise capital. The Lenders refused.

99.   The Hintzes did not disclose to the Lenders that the "new investor" was actually James until after the assets of TutoringZone were sold to TutoringZone II.

100.   In May 2012, Study Edge offered to purchase TutoringZone for $350,000.00. The Lenders expressed a desire for the Hintzes to accept the offer and/or negotiate with Study Edge for a higher price.

101.   Because of their personal enmity to Fieldman, the Hintzes did not want Study Edge to acquire TutoringZone. However, the Hintzes led the Lenders to believe that they were negotiating with Study Edge in good faith.

102.   The Hintzes' promissory notes to James, unlike their promissory notes to most of the Lenders, did not provide that the Hintzes' personal debt would be repaid from the assets of TutoringZone upon sale or liquidation of TutoringZone. Therefore, James had no incentive to direct the Hintzes to sell the assets of TutoringZone for cash. Rather, James' incentive was to direct a cashless transfer of the assets and employees of TutoringZone to a new company, owned by James, that would carry on the business of TutoringZone without being saddled by debt to the Lenders.

103.   The Hintzes met with Childers in May 2012 and sought legal advice regarding TutoringZone's indebtedness and restructuring. At the time of the Hintzes' meeting with Childers, he was already representing James.

104.   James, Childers and the Hintzes formulated a plan that they referred to as the "pump and dump" plan.

105.   Childers and James counseled the Hintzes away from a reorganization of

21

TutoringZone that would pay other creditors of the Hintzes and toward a scheme that would benefit James in favor of the Hintzes' other creditors, including Plaintiffs.

106.    Through the "pump and dump" plan devised by Childers, James and the Hintzes, James and Frenchman would form a new company that would receive the assets of TutoringZone, including its Intellectual Property and name.    Further, Matt Hintze and TutoringZone's tutors would become employees of the new company, which would carry on the business of TutoringZone. Finally, the Hintzes would file personal bankruptcy to discharge their debts, including the debts owed to the Lenders, but would wait ninety days after the asset transfer to avoid the ninety-day period for preferential transfers.

107.    James, Childers and the Hintzes conspired to sell TutoringZone's assets in such a manner as to deprive the Lenders of their interest in TutoringZone.

108.    From the time of his initial involvement in April or May of 2012, Childers simultaneously represented, inter alia, the Hintzes, James, and TutoringZone II.

109.    The Lenders were not advised of the "pump and dump" plan and were repeatedly told by James and the Hintzes that the Hintzes were continuing to negotiate with Fieldman for the purchase of TutoringZone.

110.    The Lenders repeatedly demanded information regarding TutoringZone's finances and future plans.  During a May 14, 2012 meeting with the Lenders, the Hintzes concealed the fact that they intended to lease the intellectual property of TutoringZone to James and sell the assets of TutoringZone to a new entity to be formed.

111.    The Lenders did not know that James was conspiring with the Hintzes and Childers to create a new entity to acquire TutoringZone's assets.

112.    Matt Hintze initially sought a majority ownership in the new entity to be formed

22

by James. However, upon information and belief, James and Matt Hintze decided that Matt Hintze would not receive an ownership interest in the new company at that time in order to avoid that interest becoming an asset of his bankruptcy estate. Instead, a "side deal" was discussed in which Matt Hintze would have the opportunity to receive an equity position in the new company at a later date.

113. Pursuant to the scheme devised by the Hintzes, James and Childers, as an initial step of the plan, Matt Hintze caused TutoringZone to enter into an Intellectual Property Lease in favor of James and Frenchman. A true and correct copy of the Intellectual Property Lease is attached hereto as **Exhibit 12**.

114. The Lease states it is made and entered into as of May 22, 2012, but it was actually not executed until May 30, 2012 at the earliest. The Hintzes, Childers and James executed the Intellectual Property Lease and backdated it after they learned FLH Holdings had acquired the Scott Promissory Note.

115. The Intellectual Property Lease was drafted by Childers. At the time of the drafting, Childers was acting in his capacity as an attorney for both sides of the transaction.

116. The Intellectual Property Lease granted to James and Frenchmen an assignable, non-exclusive ten-year lease of the intellectual property of TutoringZone with the option to renew the lease in perpetuity for ten year terms at the fixed cost of $10,000.00 per ten year terms with no provision made for inflation.

117. Pursuant to the lease, James and Frenchman received the non-exclusive license to use the business marks and all tutoring materials, including all reproduction, modification, publishing, distribution, and leasing rights that might reasonably be required to market, sell, and deliver tutoring services.

118. Neither James nor Frenchman intended to develop any independent tutoring business. James and Frenchman had no independent use for the Intellectual Property of TutoringZone.

119. The lease contemplated use of the intellectual property by a new company to be called "TutoringZone II, LLC," an entity that was not registered and authorized to do business in the state of Florida until July 3, 2012.

120. James' and Frenchman's interest in the Intellectual Property Lease was then purportedly transferred to TutoringZone II as James' and Frenchman's capital contribution.

121. The purported consideration for the Intellectual Property Lease was the payment of $75,000.00 to TutoringZone.

122. James and Frenchman allegedly advanced $75,000.00 in emergency capital to help TutoringZone meet current expenses. In fact, James was the exclusive source of any funds, if any, provided as consideration to the Intellectual Property Lease.

123. James provided four payments of $25,000.00 to TutoringZone from May to August of 2012. Although these payments were purportedly consideration for the Intellectual Property Lease, on TutoringZone's accounting records, they were characterized as loans from James that were still to be repaid.

124. The financing was used to fund TutoringZone's operations after its assets were transferred to TutoringZone II and to hide the existence of the transfers until after the ninety-day clock for preferential transfers had run out.

125. It was not plausible and was not contemplated by the Hintzes or James that $75,000.00 would be sufficient to stabilize the company at that time given TutoringZone's financial circumstances.

24

126. Nor was it plausible and contemplated by the Hintzes or James that $75,000.00 was reasonable value of a non-exclusive lease of TutoringZone's Intellectual Property, except insofar as the Hintzes and James were contemplating TutoringZone's dissolution and it would no longer exist as competition for TutoringZone II.

127. The Intellectual Property Lease required that James and Frenchman, or any affiliated entity, "may not explicitly hold themselves out to be Lessor or to be affiliated with Lessor" while at the same time permitting full use of TutoringZone's service marks and prior intellectual property.

128. The Intellectual Property Lease was executed as a prelude to and in full contemplation of the eventual sale of TutoringZone's Intellectual Property.

129. There was no practical ability to expand the business or mark under the circumstances and the Intellectual Property Lease is more appropriately characterized as a sham prelude to the Intellectual Property Transfer Agreement.

130. Because sale and the Hintzes' bankruptcy were contemplated by the Hintzes, James and Childers at the time of the Intellectual Property Lease, there was no ordinary purpose in executing the lease. All parties knew that the purported $75,000.00 consideration would be no more than an effective offset against the eventual debt forgiveness embodied in the forthcoming Intellectual Property Transfer Agreement.

131. All proceeds from the Intellectual Property Lease were utilized for the benefit of the Hintzes and James. The use of the proceeds in this manner was in direct violation of the terms of the Lenders' promissory notes, which provide that proceeds exceeding $10,000.00 must first be applied to the Lenders' debt.

132. On June 4, 2012, a mere thirteen days after the execution of the Intellectual

Property Lease, the Hintzes caused TutoringZone to transfer all of its Intellectual Property to TutoringZone II pursuant to the Intellectual Property Transfer Agreement between TutoringZone and TutoringZone II. A true and correct copy of the Transfer Agreement is attached hereto and made a part hereof as **Exhibit 13.**

133.    The Intellectual Property Transfer Agreement was drafted by Childers.  At the time of the drafting, Childers was acting in his capacity as an attorney for both sides of the transaction.

134.    The Hintzes agreed to sell TutoringZone's intellectual property to TutoringZone II for the consideration of $200,000.00, with an offset for amounts that "Seller" owed James.

135.    Although "Seller" is defined as TutoringZone in the agreement, TutoringZone did not owe any amounts to James.  Rather, the Hintzes were personally indebted to James.

136.    The value of the consideration received was not reasonably equivalent to the value of the assets improperly transferred.

137.    TutoringZone never received the alleged monetary consideration of $200,000.00. Instead, in order to orchestrate a "cashless" transaction, and avoid paying the Lenders the "consideration" for the transfer, James forgave a portion of the Hintzes' personal debt. No debt forgiveness or cash flowed to TutoringZone.

138.    Upon information and belief, the Hintzes, James and Childers decided James would forgive only $200,000.00 of the Hintzes' $475,000.00 debt to James so that James could maintain a creditor claim in the Hintzes' anticipated bankruptcy case and interfere with, hinder, delay or defraud the Hintzes' other creditors, including the Lenders.

139.    The lack of consideration to TutoringZone shows that the Intellectual Property Transfer Agreement was actually a poorly conceived fraudulent sham, an attempt to prevent

Plaintiffs from realizing any benefit from the sale, and an attempt by James to step in front of the Hintzes' other creditors, including the Lenders whose promissory notes provided for payment in the event of sale or liquidation of TutoringZone's assets.

140.    James executed the Intellectual Property Lease and the Intellectual Property Transfer Agreement as "organizer and managing member" of TutoringZone II, in advance of its valid formation under the laws of the State of Florida.

141.    The Hintzes, James and Childers knew at the time James and the Hintzes executed the Intellectual Property Lease and the Intellectual Property Transfer Agreement that TutoringZone II had not been formed with the Florida Division of Corporations.

142.    On or about July 3, 2012, James filed TutoringZone II, LLC's articles of organization with the Florida Secretary of State.

143.    James is TutoringZone II's managing member and majority owner.    Upon information and belief, Frenchman also has an ownership interest in TutoringZone II.

144.    Childers assisted in the creation of TutoringZone II and prepared its Operating Agreement.    At the time of his assistance, Childers was acting as an attorney for James and the Hintzes.

145.    TutoringZone II is in essence a continuation of TutoringZone.

146.    TutoringZone II is commonly known and referred to by the same "TutoringZone" name and provides the same personal tutors and tutoring materials for the same courses as TutoringZone once offered.

147.    James hired the Hintzes and other TutoringZone employees to perform similar if not identical work.

148.    The Hintzes and other TutoringZone employee email addresses did not change as

27

a result of the sale of TutoringZone to TutoringZone II.

149.   TutoringZone and TutoringZone II shared their principal place of business.

150.   The TutoringZone II website refers to both Matt Hintze's personal professional history and the history of TutoringZone II as including the history of TutoringZone.

151.   As a result, to outside consumers, the TutoringZone entity as a going concern appeared to continue in business without significant interruption.

152.   Customers experienced a seamless transition because the intellectual property transfer allowed TutoringZone II to use all marks and other indicia of TutoringZone's business. Upon information and belief, many if not all customers did not realize that a change had occurred.

153.   In fact, TutoringZone II offers tutors and materials relating to an introduction to finance course that all business majors are required to take that is taught in the finance department at the University of Florida where James is a professor.

154.   The only changes were that the business had a new owner, James, and the business was "on paper" no longer burdened by the debts incurred for ordinary business expenses and any practical requirement to service loans owed by the Hintzes.

155.   Between April 2012 and November 2012, the Hintzes continued to control TutoringZone and were responsible for all TutoringZone and TutoringZone II operations.

156.   Over the summer of 2012, Matt Hintze caused TutoringZone to transfer other assets, including computers, desk, chairs, copiers and other tangible property, to TutoringZone II without receiving any consideration in return.

157.   The transfer of its Intellectual Property and other assets left TutoringZone without any significant assets, thereby depleting the estate of any value that the Hintzes' ownership

28

interest in TutoringZone might have had.

158.    Although the form was of a transfer of the assets of TutoringZone, the substance was a transfer of the entire value of the Hintzes' ownership interest in TutoringZone to TutoringZone II.

159.    The Hintzes induced the Lenders to invest and then consistently represented that the assets and cash flow of TutoringZone would be available to satisfy the loans. Further, the Plaintiffs' promissory notes provide that TutoringZone's assets are collateral for the loans.

160.    In furtherance of the scheme to place the assets of TutoringZone out of the reach of creditors, James, through Frenchman and with the Hintzes' knowledge, filed a UCC-1 Financing Statement with the Florida Secured Transaction Registry on or about June 11, 2012, which purported to perfect a security interest in favor of James covering TutoringZone's personal property and Intellectual Property. A true and correct copy of the UCC-1 Financing Statement is attached hereto as **Exhibit 14.**

161.    Specifically, James claimed an interest in "All personal and intellectual property owned by the Debtor [TutoringZone], including but not limited to the intellectual property described on the attached Schedule A." The attached Schedule A to the UCC-1 filing is substantively identical to the Schedule A attached to the Intellectual Property Transfer Agreement.

162.    James falsely asserted a security interest in intellectual property that he knew or had reason to know no longer belonged to TutoringZone but instead belonged to TutoringZone II by virtue of a transfer executed by James himself a week before the UCC-1 filing.

163.    At the time of the UCC-1 filing, James knew or had reason to know that TutoringZone did not possess certain key assets that were purportedly encumbered.

164. No security agreement granting James a security interest over the personal and intellectual property of TutoringZone exists. Moreover, any such transfer of a security interest in TutoringZone is unsupported by consideration and avoidable under Chapter 726, Florida Statutes.

165. The UCC-1 filing was a mere failsafe to cloud title to TutoringZone's assets and dissuade interested parties, including Plaintiffs, from bringing appropriate fraudulent transfer actions.

166. The Hintzes, James and Childers concealed and/or failed to disclose the existence of the Intellectual Property Lease, the Intellectual Property Transfer Agreement, and TutoringZone II from the Advisory Committee and the Lenders.

167. Plaintiffs did not know and had no reason to know of the existence of the Intellectual Property Lease, the Intellectual Property Transfer Agreement, or TutoringZone II.

168. The Hintzes, James and Childers concealed and/or failed to disclose that Matt Hintze had caused TutoringZone to lease and then sell all of its Intellectual Property to TutoringZone II, and that Matt Hintze and other TutoringZone employees would be working for TutoringZone II.

169. The payments for the Intellectual Property Lease and the sale of TutoringZone's assets were concealed from Plaintiffs to prevent Plaintiffs from objecting to the sale or attempting to assert their legal rights.

170. In an effort to delay and keep the Lenders off of their "trail," the Hintzes, Childers and James schemed that the Hintzes would continue to pretend to negotiate for the purchase of TutoringZone by Study Edge during June 2012.

171. Even after the lease and transfer agreements had been signed, the Hintzes used

negotiations with Study Edge regarding the possibility of a sale of TutoringZone and/or a non-compete with Matt Hintze as a way to keep the Lenders from knowing that TutoringZone's assets had been transferred.

172.  Despite the fact that all right, title and interest in the intellectual property of TutoringZone had been transferred to TutoringZone II as of the "Execution Date" of the Intellectual Property Agreement on June 4, 2012, TutoringZone continued to utilize the intellectual property and operate under the business marks through the end of the Summer 2012 semester.

173.  At the conclusion of the Summer 2012 semester, TutoringZone as a business continued without interruption under the new management of TutoringZone II.

174.  Notwithstanding the lack of provision for physical assets of TutoringZone in any document including the Intellectual Property Transfer Agreement, TutoringZone II took possession of non-intellectual personal property in the conduct of the business, including computers, desks, chairs, copiers and other equipment.

175.  The Transfer Agreement does not provide for TutoringZone or the Hintzes to receive any monetary consideration for the transfer of TutoringZone's valuable Intellectual Property and other assets to TutoringZone II. Instead, the only stated "consideration" for the transfer of the Intellectual Property in the Transfer Agreement was a $200,000.00 reduction in the Hintzes' personal debt to James.

176.  Contrary to provisions in the promissory notes from the Hintzes owned and held by the Spences, InterMed, and FLH Holdings requiring that proceeds of a sale of TutoringZone's assets must first be applied to repay the notes, the Hintzes did not pay any money to the Spences, InterMed, or FLH Holdings (or its predecessors in interest) following the transfer of

TutoringZone's assets to TutoringZone II.

177. The Hintzes, with James' and Childers' knowledge and prompting, improperly exerted control over TutoringZone to cause it to transfer its substantial assets while receiving no consideration in return.

178. The transfer involved no consideration to TutoringZone or from TutoringZone II, with the only substantial consideration being the forgiveness of certain debt flowing from James to the benefit of the Hintzes.

179. The effective transfer of the Hintzes' membership interest in TutoringZone was for the benefit of James, whose full ownership of TutoringZone II vested him with a substantial asset.

180. Despite the fact that Matt Hintze was still a manager of TutoringZone, he became an employee of TutoringZone II after the transfer. Upon information and belief, Matt Hintze currently receives at a minimum an annual salary of $144,000.00 for his work as a "tutor" for TutoringZone II.

181. As a manager, Matt Hintze owed a duty of loyalty to TutoringZone to refrain from competing with TutoringZone in the conduct of its tutoring business.

182. Upon information and belief, Matt Hintze has the ability to exercise significant control over the operations and decision-making of TutoringZone II. The Hintzes retained effective day-to-day control of the operations of TutoringZone II and James remained only a passive investor.

183. Many of the former employee tutors who worked for TutoringZone work for TutoringZone II. TutoringZone II continues to engage in the same lines of business as TutoringZone, in the same geographic areas. For all intents and purposes, TutoringZone II is

32

TutoringZone.

184.    James admitted in an email correspondence, dated September 8, 2012 to an employee of the University of Florida, Warrington College of Business that TutoringZone II was formed to shelter TutoringZone's business from creditors: "In order to shelter the business from some creditors, and to help Matt [Hintze] out, a partner and I set up an LLC in August and acquired the intellectual property of Tutoringzone. Matt still runs his business but is now an employee of the LLC." A true and correct copy of this correspondence is attached hereto as **Exhibit 15.**

185.    Plaintiffs have not received any payment on their loans to the Hintzes.

186.    On November 1, 2012, the Hintzes filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

187.    The Hintzes were represented by Childers in their bankruptcy case until February 2015.

188.    Prior to filing the Hintze's petition for bankruptcy, the Hintzes, Childers and James caused TutoringZone to transfer all of its Intellectual Property and other valuable assets to TutoringZone II with the intent to hinder, delay, or defraud the Lenders.

189.    Many "badges of fraud" exist with respect to the transfer, including:

a.    After the transfer was made, the Hintzes and TutoringZone were insolvent;

b.    The transfer was made for less than adequate consideration;

c.    The transfer was made to or for the benefit of James;

d.    The transfer involved nearly all of TutoringZone's assets;

e.    The transfer was not disclosed to the Lenders prior to it having been made;

f.    The Hintzes, Childers and James concealed the existence of the transfer from the

33

Lenders after it was made;

g. The Hintzes, Childers and James concealed the existence of TutoringZone II from the Lenders;

h. At Childers' and James' urging, the Hintzes concealed the source of TutoringZone's financing for operations from June 2012 to August 2012 from Plaintiffs;

i. At Childers' and James' urging, the Hintzes intentionally misled Plaintiffs from May 2012 to August 2012 regarding the operations of TutoringZone and the Hintzes' intent to repay the amounts, or some portion thereof, due and owing pursuant to the Plaintiffs' promissory notes;

j. TutoringZone continued to operate until August 2012 notwithstanding the transfer;

k. The Hintzes continue to use and benefit from the Intellectual Property and other assets of TutoringZone after the transfer;

l. Matt Hintze became an employee of TutoringZone II in August of 2012 and became an independent contractor through Hintze Management, LLC to TutoringZone II in late 2014 or early 2015.

190. At James' and Childers' direction and assistance, the Hintzes waited to file for bankruptcy until November 2012 in order to allow more than ninety days to pass from the date of the transfer of TutoringZone's Intellectual Property and other assets in an effort to avoid the ninety-day claw back period for preferential transfers.

191. After receiving inquiries and communications from the Plaintiffs during the period of May 2012 to September 2012 regarding the financial condition of TutoringZone, the

34

Hintzes sought advice from James and Childers regarding what to tell Plaintiffs to delay their taking legal action to protect their rights.

192.    Childers and James advised the Hintzes not to disclose the creation of TutoringZone II until ninety days had run from the transfer of the assets of TutoringZone.

193.    Childers and James coached the Hintzes on how to conceal the "pump and dump" scheme from Plaintiffs.

194.    Childers and James counseled the Hintzes to be evasive and tell Plaintiffs that TutoringZone was going out of business.

195.    The transfer of TutoringZone's Intellectual Property and other assets damaged the Plaintiffs.

196.    The transfer of TutoringZone's Intellectual Property and other assets enabled the Hintzes to favor their business partner, James, over all of their other creditors, including the Plaintiffs.

197.    The Hintzes did not disclose the Intellectual Property lease or transfer to Plaintiffs because the Hintzes knew they would proceed with collection efforts. The Hintzes, James and Childers sought to delay those efforts until after the sale was final.

198.    Had the transfer not been made, the Intellectual Property and other assets of TutoringZone would have been available for sale by the trustee in the Hintzes' bankruptcy case and could have generated sales proceeds for distribution to all creditors, including the Plaintiffs.

199.    The actions taken by the Hintzes, James and Childers were not taken for the benefit of TutoringZone or the Lenders but for the benefit of Hintze, James and Childers.

200.    TutoringZone has been left a non-functioning shell based on the improper transactions effected by the Hintzes, James and Childers, in an attempt to bifurcate

TutoringZone's assets from TutoringZone's and/or the Hintzes' liabilities.

201.    The transfer reflected not an arms-length transaction to maximize the value of TutoringZone for its creditors but a willful attempt to strip the shell of its assets to the detriment of TutoringZone's and/or the Hintzes' creditors, including the Plaintiffs.

202.    The transfer provided no value to TutoringZone or its creditors and was not made in the ordinary course of business.

203.    But for the improper scheme by the Hintzes, James and Childers, TutoringZone as operated in good faith would not have leased or transferred its intellectual property absent some reasonably equivalent value for the lease or transfer.

204.    The overall effect of the conspiracy between the Hintzes, James and Childers was to deprive TutoringZone of substantial value and to defraud TutoringZone's and/or the Hintzes' creditors, including the Plaintiffs.

205.    TutoringZone received no money or benefit from the lease or transfer of its intellectual property.  Instead, the benefit flowed from James to the Hintzes in the form of debt forgiveness.

206.    The transfer was incurred with actual intent to hinder, delay or defraud the Lenders.

207.    The Hintzes intended to effectively continue the business of TutoringZone but discard liabilities through personal bankruptcy, even though the business assets would have otherwise been available in bankruptcy but for the transfer.

208.    The Intellectual Property Lease and any earlier transactions purporting to place any lien on the substantial assets of TutoringZone in exchange for plainly insufficient operating capital were part of this overall scheme.

209.    The additional consideration failed to approximate reasonably equivalent value for the transaction because the consideration of the Intellectual Property lease was effectively pro-rata over a ten-year period and the parties executed the agreement in contemplation of the Intellectual Property Transfer Agreement within only a few weeks.

210.    The Hintzes were insolvent at the time of the transfer or became insolvent as a result of the transfer and had contemplated personal bankruptcy as a mechanism for "saving" their business for some time prior to executing the scheme with James and Childers.

211.    The Hintzes, James and Childers conspired to strip TutoringZone of its substantial assets in an effort to create a continuing business interest devoid of TutoringZone's and the Hintzes' liabilities.

212.    As part of this conspiracy, the Intellectual Property Lease and the Intellectual Property Transfer Agreement were executed and Matt Hintze came to work for TutoringZone II as owned by James.

213.    Childers was actively involved and instrumental in the creation, formulation, construction, implementation and furtherance of the scheme.  Childers received payment from James and/or the Hintzes for his participation in the scheme.

214.    James was a long-time family friend, a former instructor and advisor to Matt Hintze, and was trusted by the Hintzes to preserve the rights and assets of the Hintzes through the above-described abnormal and improper transactions.

215.    The Hintzes, James and Childers orchestrated the timing of the filing of the Hintzes' bankruptcy petition to fall outside the standard ninety-day window for preferential transfers.

## TutoringZone as the Alter Ego of the Hintzes

216.  The Hintzes are managing members of TutoringZone and its sole owners.

217.  The TutoringZone ownership interest was the property of the Hintzes.

218.  The Intellectual Property Lease and Intellectual Property Transfer Agreement were part of a larger scheme to allow the Hintzes to continue to enjoy the benefits of their ownership interest in TutoringZone, while leaving the Lenders, including Plaintiffs, empty-handed.

219.  The putative transfer of TutoringZone's Intellectual Property was substantially all of its assets. The transfers had the effect of permitting the Hintzes to continue to enjoy the benefits of their ownership in TutoringZone (and of TutoringZone assets), in the form of their continuing control over TutoringZone II.

220.  At the time of the putative lease and transfer, TutoringZone was the alter ego of the Hintzes.

221.  The Hintzes dominated TutoringZone in May and June 2012, which is demonstrated by their ability to transfer TutoringZone's assets, for their own personal benefit, without providing notice to any of the Lenders, including Plaintiffs.

222.  Despite the sale restriction clauses in the Spence Promissory Note, the Intermed Promissory Note, and the Scott Promissory Note, the Hintzes had the power to, and did, transfer TutoringZone's assets without fulfilling those clauses.

223.  The Hintzes represented to the Lenders, that TutoringZone and the Hintzes were "one and the same."

224.  Despite the fact that the Hintzes were the debtors, the Plaintiffs' debts were to be paid from the revenue and assets of TutoringZone.

38

225. Throughout negotiations with the Lenders, including Plaintiffs, the Hintzes made repeated promises of payment of the personal notes by the provision of equity in TutoringZone. The Hintzes' attempted to exchange equity in TutoringZone for debt forgiveness and indicated that TutoringZone would be the source of repayment of the notes.

226. At a May 14, 2012 meeting with the Lenders, including some or all of the Plaintiffs, the Hintzes portrayed their personal debts and liabilities as the debts and liabilities of TutoringZone, and the debts of TutoringZone as the Hintzes' personal debts and liabilities.

227. In the Intellectual Property Transfer Agreement, although the "Seller" is defined as TutoringZone, the "consideration" for the transfer of the company's Intellectual Property was a $200,000.00 reduction in the personal debt that the Hintzes owed to James.

228. Even after the Intellectual Property Lease and Intellectual Property Transfer Agreement, the Hintzes continued to comingle their personal assets and liabilities with those of TutoringZone and TutoringZone II.

229. The Hintzes disregarded the separate corporate existence of TutoringZone and treated its assets and liabilities as their own.

230. The Hintzes used the corporate form fraudulently or for an improper purpose. In making the transfers, the Hintzes treated TutoringZone's assets as their own and obtained $200,000.00 in personal debt forgiveness for transferring the entity's assets to James and TutoringZone II. The transfer was essentially a distribution of all of TutoringZone's assets for the benefit of its owners, as if TutoringZone had sold assets for cash and the Hintzes had kept some or all of the proceeds without regard for the entity's creditors. In this instance, the "proceeds" included personal debt forgiveness.

231. The misuse of TutoringZone by the Hintzes damaged the Plaintiffs.

232.   The Spence Promissory Note, the Intermed Promissory Note, and the Scott Promissory Note had a clause that required the application of any TutoringZone asset sale proceeds over $10,000.00 to the amounts due under the note.  Those clauses created a contractual right for the noteholders to be paid from any significant asset sale, and created a contractual duty for the Hintzes to so apply any sale proceeds.

233.   The Hintzes and James, with Childers' assistance, circumvented those contractual clauses by directing the $200,000.00 stated consideration (itself a manipulated figure) to the Hintzes in the form of personal debt forgiveness, rather than in the form of cash to TutoringZone.

234.   The Hintzes, with James' and Childers' assistance, concealed the transactions from the Plaintiffs in order to deprive Plaintiffs of the ability to exercise their legal rights.

### COUNT I – CIVIL CONSPIRACY
#### (Against all Defendants)

235.   Paragraphs 1 through 234 are realleged and incorporated herein.

236.   James, Childers, Frenchman, and the Hintzes conspired to strip TutoringZone of its substantial assets in an effort to create a continuing business interest devoid of the Hintzes' and/or TutoringZone's liabilities and to hinder, delay or defraud the Hintzes' and/or TutoringZone's creditors, including the Plaintiffs.

237.   As described above, the conspiracy involved the winding down of TutoringZone's business, the fraudulent transfer of its assets to the newly-formed TutoringZone II, and the continuation of TutoringZone's business under the name TutoringZone II.

238.   The conspiracy also involved concealing, misleading and/or failing to disclose to the Lenders, including Plaintiffs, the existence of the Intellectual Property Lease or the Intellectual Property Transfer Agreement.  The conspiracy involved concealing, misleading and/or failing to disclose that the Hintzes had caused TutoringZone to lease and then transfer all

40

of its Intellectual Property and other tangible assets to TutoringZone II, which was going to continue the business of TutoringZone, and that Matt Hintze and other TutoringZone employees would be working for TutoringZone II. The "payments" for the Intellectual Property Lease and the transfer of TutoringZone's assets were concealed from Plaintiffs to prevent Plaintiffs from objecting to the transfer or attempting to assert their legal rights. In an effort to delay and keep the Lenders off of their "trail," the Hintzes, Childers and James schemed that the Hintzes would continue to pretend to negotiate for the purchase of TutoringZone by Study Edge during June 2012 and would mislead the Lenders about TutoringZone's financial status and future plans until more than ninety days had passed, at which time the Hintzes would file for bankruptcy.

239. James, Frenchman, Childers and the Hintzes took specific actions in arranging and facilitating transfers to hinder, delay or defraud the Hintzes' creditors, including the Plaintiffs.

240. James, Frenchman and Childers were involved in a scheme with the Hintzes to create TutoringZone II and then conceal the existence of TutoringZone II from the Plaintiffs.

241. James, Frenchman and Childers colluded with the Hintzes on how to hinder, delay and/or defraud the Plaintiffs.

242. In furtherance of the conspiracy, James, Frenchman, Childers and the Hintzes committed the following overt acts:

    a. Scheming and strategizing with the Hintzes to devise a way to hinder, delay or defraud the Hintzes' and/or TutoringZone's creditors, including the Plaintiffs;

    b. Orchestrating a "cashless" transaction to avoid paying Plaintiffs such that the "consideration" given for the transfer was forgiveness by James of a portion of the Hintzes' personal debt to James;

41

c. Forgiving only $200,000.00 of the Hintzes' $475,000.00 personal debt to James so that James could maintain a creditor claim in the Hintzes' anticipated bankruptcy case and interfere with, hinder, delay or defraud the Hintzes' other creditors, including the Plaintiffs;

d. Drafting and executing the Intellectual Property Lease;

e. Drafting and executing the Intellectual Property Transfer Agreement;

f. Executing the Intellectual Property Lease and Intellectual Property Transfer Agreement without the Lenders' knowledge, approval and consent;

g. Filing the UCC-1 Financing Statement with the Florida Secured Transaction Registry;

h. Creating TutoringZone II;

i. Transferring all or substantially all of TutoringZone's assets, including the Intellectual Property and other tangible assets, to TutoringZone II for less than adequate consideration;

j. Depriving TutoringZone of substantial value to the detriment of TutoringZone's and/or the Hintzes' creditors, including the Plaintiffs;

k. Continuing TutoringZone's business under the name TutoringZone II;

l. Hiring Matt Hintze and other TutoringZone employees to work for TutoringZone II;

m. Inducing Matt Hintze to breach his fiduciary duties to TutoringZone and compete against TutoringZone;

n. Concealing, misrepresenting and/or failing to disclose the existence of the Intellectual Property Lease, the Intellectual Property Transfer Agreement, and

42

TutoringZone II from the Lenders;

o.  Competing with TutoringZone in the conduct of its tutoring business;

p.  Misleading the Lenders and the public about the continuation of TutoringZone's business under TutoringZone II;

q.  Misleading the Lenders about the Hintzes' negotiations with Study Edge for the purchase of TutoringZone;

r.  Failing to negotiate in good faith with Study Edge for the sale of TutoringZone;

s.  Counseling the Hintzes away from a reorganization of TutoringZone that would pay other creditors of the Hintzes and toward a scheme that would benefit James in favor of the Hintzes' other creditors, including Plaintiffs;

t.  Filing personal bankruptcy to discharge the Hintzes' debts, including the debts owed to Plaintiff;

u.  Timing of the filing of the Hintzes' bankruptcy petition to fall outside the standard ninety-day window for preferential transfers.

243.  As a result of the acts performed pursuant to the conspiracy to commit fraud, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, prejudgment interest, costs, and other further relief as the Court deems proper.

## COUNT II – FRAUDULENT TRANSFER OF INTELLECTUAL PROPERTY
### (Against James)

244.  Paragraphs 1 through 234 are realleged and incorporated herein.

245.  This is an action pursuant to Chapter 726, Florida Statutes, against James as transferee of the Intellectual Property or as the person for whose benefit the transfer of the Intellectual Property was made.

43

246.    Plaintiffs are creditors of the Hintzes.

247.    Pursuant to their respective promissory notes, with the exception of Whitney, the collateral for the Plaintiffs' loans to the Hintzes includes both the Hintzes' personal assets as well as the assets of TutoringZone and all other business interests in which the Hintzes have full or partial ownership. Further, with the exception of Whtiney, the Plaintiffs' promissory notes provide that any proceeds from the sale of any TutoringZone assets exceeding, individually or collectively $10,000.00 must first be applied to the Plaintiffs' debt and accumulated interest thereon. Finally, the Plaintiffs' promissory notes provide that the Hintzes may not subordinate the Plaintiffs' debts without their prior written consent, including through any borrowing in which TutoringZone's assets or business operations are used as collateral to support any form of indebtedness that could be determined to be senior to the debt of the Plaintiffs.

248.    James, who had two executed promissory notes from the Hintzes, had no provision in his notes for the repayment of the notes from the proceeds of any sale of the assets of TutoringZone in excess of $10,000.00.

249.    Prior to filing the Hintze's petition for bankruptcy, the Hintzes, Childers and James caused TutoringZone to transfer all of its Intellectual Property and other valuable assets to TutoringZone II with the intent to hinder, delay, or defraud the Lenders, including the Plaintiffs.

250.    As of the time of the transfer, TutoringZone was the alter ego of the Hintzes.

251.    At the time of execution of the Intellectual Property Transfer Agreement on June 4, 2012, TutoringZone's Intellectual Property represented substantially all of TutoringZone's assets.

252.    TutoringZone became "insolvent" within the meaning of Chapter 726, Florida Statutes when it transferred its Intellectual Property to TutoringZone II. After the transfer, the sum of TutoringZone's debts was greater than the value of its assets at fair valuation, and TutoringZone

44

was unable to pay its debts as they came due.

253.    The transfers of the Intellectual Property and the other tangible assets were made with the actual intent to hinder, delay, or defraud the creditors of TutoringZone and/or the Hintzes, including the Plaintiffs.

254.    The transfer of the Intellectual Property and other tangible assets to TutoringZone II was in furtherance of a scheme to place TutoringZone's primary assets out of the reach of the Hintzes' creditors while continuing to use the assets to the benefit of TutoringZone's owners, the Hintzes.

255.    The transfer of the Intellectual Property and other tangible assets to TutoringZone II was in furtherance of a scheme to avoid paying money to the Lenders from the proceeds of the sale of TutoringZone's assets.

256.    The transfers of the Intellectual Property and other tangible assets of TutoringZone were not disclosed to the Lenders so as to conceal the transfers from the knowledge of creditors, including the Plaintiffs.

257.    The transfers of the Intellectual Property and other tangible assets were not made in exchange for reasonably equivalent value. TutoringZone did not receive any consideration for the transfer of its Intellectual Property or other tangible assets. Rather, the purported "consideration" for the Intellectual Property transfer was the forgiveness of a portion of the Hintzes' personal debt owed to James. Alternatively, the stated consideration of $200,000.00 for the Intellectual Property was not reasonably equivalent to the value of the Intellectual Property.

258.    The Hintzes, Childers and James orchestrated the "cashless" transaction to avoid applying the proceeds from the transaction to Plaintiffs' debt in accordance with the terms of the Plaintiffs' promissory notes.

259.    By virtue of the transaction, the Hintzes subordinated the Plaintiffs' debt in favor

of James without their prior written consent.

260.    The transfer of the Intellectual Property by TutoringZone on June 4, 2012 pursuant to the Intellectual Property Transfer Agreement was in reality a transfer of the Intellectual Property by TutoringZone to James, and James was the person for whose benefit the transfer of the Intellectual Property was made.

261.    Although the form was of a transfer of the assets of TutoringZone, the substance was a transfer of the entire value of the Hintzes' ownership interest in TutoringZone to TutoringZone II.

262.    At the time of the transfer of the Intellectual Property by TutoringZone, TutoringZone II had not yet been incorporated as a valid Florida limited liability company. TutoringZone II was not registered and authorized to do business in the state of Florida until July 3, 2012.

263.    The consideration for the transfer of the Intellectual Property was forgiveness by James of personal debt owed to him by the Hintzes, the managing members of TutoringZone. Thus, the alleged consideration for the transfer by TutoringZone flowed from James to the Hintzes. No consideration was received by TutoringZone for the transfer. No consideration was made by TutoringZone II for the transfer.

264.    Further, on June 11, 2012, shortly after the execution of the Intellectual Property Transfer Agreement, James caused the UCC-1 Financing Statement to be filed with the Florida Secured Transaction Registry. The collateral described in the Financing Statement is identical to the description of the Intellectual Property in the Intellectual Property Transfer Agreement. Therefore, shortly after the execution of the Intellectual Property Transfer Agreement, James, not TutoringZone II, claimed to have a security interest in the identical Intellectual Property.

46

265.    The transfer of the Intellectual Property is a fraudulent transfer under Chapter 726, Florida Statutes.

266.    Pursuant to Section 726.109(2)(a), Florida Statutes, James must be regarded as the first transferee or the person for whose benefit the transfer was made with respect to the transfer by TutoringZone of the Intellectual Property.

WHEREFORE, Plaintiffs request that the Court enter an order (a) finding, pursuant to Section 726.109(2)(a), Florida Statutes, that James is a transferee of the transfer of the Intellectual Property from TutoringZone or the person for whose benefit the transfer of the Intellectual Property was made, (b) finding that the transfer of the Intellectual Property was a fraudulent transfer avoidable under Sections 726.105 and 726.106, Florida Statutes, (c) awarding damages against James, (d) awarding reasonable attorneys' fees and costs to Plaintiffs, and (e) granting such other and further relief as the Court deems appropriate.

## COUNT III – FRAUDULENT TRANSFER OF INTELLECTUAL PROPERTY LEASE
### (Against James and Frenchman)

267.    Paragraphs 1 through 234 are realleged and incorporated herein.

268.    This is an action pursuant to Chapter 726, Florida Statutes, against James and Frenchman as transferees of assets fraudulently transferred by TutoringZone.

269.    At the time of execution of the Intellectual Property Lease on May 22, 2012, TutoringZone's Intellectual Property represented substantially all of TutoringZone's assets.

270.    As of the time of the lease, TutoringZone was the alter ego of the Hintzes.

271.    At the time of the leasing of the Intellectual Property to James and Frenchman pursuant to the Intellectual Property Lease, TutoringZone became "insolvent" within the meaning of Chapter 726, Florida Statutes when it leased its Intellectual Property to TutoringZone II. After the transfer, the sum of TutoringZone's debts was greater than the value of its assets at fair valuation, and

47

66

TutoringZone was unable to pay its debts as they came due.

272.    The leasing of TutoringZone's rights to the Intellectual Property was made with the actual intent to hinder, delay or defraud the creditors of TutoringZone and/or the Hintzes, including the Plaintiffs.

273.    The leasing of TutoringZone's rights to the Intellectual Property to James and Frenchman was in furtherance of a scheme to place TutoringZone's primary assets out of the reach of the Hintzes' creditors while continuing to use the assets to the benefit of TutoringZone's owners, the Hintzes.

274.    The leasing of TutoringZone's rights to the Intellectual Property was not disclosed to the creditors of TutoringZone or the Hintzes, so as to conceal its existence from the knowledge of creditors, including the Plaintiffs.

275.    The leasing of TutoringZone's rights to the Intellectual Property was not made in exchange for reasonably equivalent value. Payments made by James and/or Frenchman, directly or indirectly, were treated as loans to TutoringZone for payroll.  Alternatively, if consideration was received, the stated consideration of $75,000.00 for the lease of the rights of the Intellectual Property was not reasonably equivalent to the value of the Intellectual Property.

276.    The lease of the Intellectual Property is a fraudulent transfer under Chapter 726, Florida Statutes.

277.    Pursuant to Section 726.109(2)(a), Florida Statutes, James and Frenchman must be regarded as the first transferee or the person for whose benefit the transfer was made with respect to the lease by TutoringZone of the Intellectual Property.

WHEREFORE, Plaintiffs request that the Court enter an order (a) finding, pursuant to Section 726.109(2)(a), Florida Statutes, that James and Frenchman are a transferee of the transfer of the Intellectual Property from TutoringZone or the person for whose benefit the transfer of the

48

Intellectual Property was made, (b) finding that the leasing of TutoringZone's rights to the Intellectual Property was a fraudulent transfer avoidable under Sections 726.105 and 726.106, Florida Statutes, (c) cancelling, avoiding and nullifying the Intellectual Property Lease; (d) awarding monetary damages against James and Frenchman, (e) awarding reasonable attorneys' fees and costs to Plaintiffs, and (f) granting such other and further relief as the Court deems appropriate.

## COUNT IV – AIDING AND ABETTING COMMON LAW FRAUD
### (Against all Defendants)

278.    Paragraphs 1 through 234 are realleged and incorporated herein.

279.    James, Childers, Frenchman, and the Hintzes conspired to strip TutoringZone of its substantial assets in an effort to create a continuing business interest devoid of the Hintzes' and/or TutoringZone's liabilities and to hinder, delay or defraud the Hintzes' and/or TutoringZone's creditors, including the Plaintiffs.

280.    As described above, the conspiracy involved the winding down of TutoringZone's business, the fraudulent transfer of its assets to the newly-formed TutoringZone II, and the continuation of TutoringZone's business under the name TutoringZone II.

281.    The conspiracy also involved concealing, misleading and/or failing to disclose to the Lenders, including Plaintiffs, the existence of the Intellectual Property Lease or the Intellectual Property Transfer Agreement.  The conspiracy involved concealing, misleading and/or failing to disclose that the Hintzes had caused TutoringZone to lease and then transfer all of its Intellectual Property and other tangible assets to TutoringZone II, which was going to continue the business of TutoringZone, and that Matt Hintze and other TutoringZone employees would be working for TutoringZone II. The "payments" for the Intellectual Property Lease and the transfer of TutoringZone's assets were concealed from Plaintiffs to prevent Plaintiffs from

49

objecting to the transfer or attempting to assert their legal rights. In an effort to delay and keep the Lenders off of their "trail," the Hintzes, Childers and James schemed that the Hintzes would continue to pretend to negotiate for the purchase of TutoringZone by Study Edge during June 2012 and would mislead the Lenders about TutoringZone's financial status and future plans until more than ninety days had passed, at which time the Hintzes would file for bankruptcy.

282.    The lease and transfer reflected not an arms-length transaction to maximize the value of TutoringZone for TutoringZone's or the Hintzes' creditors but a willful attempt to strip the company of its assets to the detriment of TutoringZone's and the Hintzes' creditors, including the Plaintiffs, and to the benefit of the Hintzes and Defendants.

283.    Defendants had knowledge of the wrongful and fraudulent conduct described herein.

284.    Defendants provided substantial assistance to the Hintzes and each other to advance the commission of the fraud, including but not limited to:

    a.  Scheming and strategizing with the Hintzes to devise a way to hinder, delay or defraud the Hintzes' and/or TutoringZone's creditors, including the Plaintiffs;

    b.  Counseling the Hintzes away from a reorganization of TutoringZone that would pay other creditors of the Hintzes and toward a scheme that would benefit James in favor of the Hintzes' other creditors, including Plaintiffs;

    c.  Orchestrating a "cashless" transaction to avoid paying Plaintiffs, such that the "consideration" given for the transfer of TutoringZone's assets was forgiveness by James of a portion of the Hintzes' personal debt to James;

    d.  Determining that James should forgive only $200,000.00 of the Hintzes' $475,000.00 personal debt to James so that James could maintain a creditor claim

50

in the Hintzes' anticipated bankruptcy case and interfere with, hinder, delay or defraud the Hintzes' other creditors, including the Plaintiffs;

e. Drafting and executing the Intellectual Property Lease;

f. Drafting and executing the Intellectual Property Transfer Agreement;

g. Executing the Intellectual Property Lease and Intellectual Property Transfer Agreement without the Lenders' knowledge, approval and consent;

h. Filing the UCC-1 Financing Statement with the Florida Secured Transaction Registry;

i. Creating TutoringZone II;

j. Transferring all or substantially all of TutoringZone's assets, including the Intellectual Property and other tangible assets, to TutoringZone II for less than adequate consideration;

k. Depriving TutoringZone of substantial value to the detriment of TutoringZone's and/or the Hintzes' creditors, including the Plaintiffs;

l. Continuing TutoringZone's business under the name TutoringZone II;

m. Hiring Matt Hintze and other TutoringZone employees to work for TutoringZone II;

n. Inducing Matt Hintze to breach his fiduciary duties to TutoringZone and compete against TutoringZone;

o. Concealing, misrepresenting and/or failing to disclose the existence of the Intellectual Property Lease, the Intellectual Property Transfer Agreement, and TutoringZone II from the Lenders;

p. Competing with TutoringZone in the conduct of its tutoring business;

51

q. Misleading the Lenders and the public about the continuation of TutoringZone's business under TutoringZone II;

r. Misleading the Lenders about the Hintzes' negotiations with Study Edge for the purchase of TutoringZone;

s. Assisting in the Hinztes' preparation and filing of personal bankruptcy to discharge the Hintzes' debts, including the debts owed to Plaintiffs;

t. Timing of the filing of the Hintzes' bankruptcy petition to fall outside the standard ninety-day window for preferential transfers.

285.   As a result of Defendants' substantial assistance in the conspiracy to commit fraud and in the acts performed pursuant to the conspiracy, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, prejudgment interest, costs, and other further relief as the Court deems proper.

**COUNT V – TORTIOUS INTERFERENCE**
**(Against all Defendants)**

286.   Paragraphs 1 through 234 are realleged and incorporated herein.

287.   Plaintiffs had a legitimate business relationship with TutoringZone and the Hintzes, as demonstrated by their respective promissory notes, the June 2, 2011 Letter Agreement, and their status as Lenders.

288.   Pursuant to the Hintzes' representations, payments on the Plaintiffs' loans were to be made from TutoringZone's cash flows. Pursuant to their respective promissory notes, with the exception of Whitney, the collateral for the Plaintiffs' loans to the Hintzes includes both the Hintzes' personal assets as well as the assets of TutoringZone and all other business interests in which the Hintzes have full or partial ownership. Further, with the exception of Whitney, the Plaintiffs' promissory notes provide that any proceeds from the sale of any TutoringZone assets

52

exceeding, individually or collectively $10,000.00 must first be applied to the Plaintiffs' debt and accumulated interest thereon. Finally, the Plaintiffs' promissory notes provide that the Hintzes may not subordinate the Plaintiffs' debts without their prior written consent, including through any borrowing in which TutoringZone's assets or business operations are used as collateral to support any form of indebtedness that could be determined to be senior to the debt of the Plaintiffs.

289. Pursuant to the Hintzes' representations to the Lenders, payments on the loans from the Lenders would be made from TutoringZone's cash flows and assets.

290. At all material times, Defendants were aware of Plaintiffs' business relationship with TutoringZone and the Hintzes.

291. Despite Defendants' knowledge of the business relationship between Plaintiffs, TutoringZone and the Hintzes, Defendants intentionally and unjustifiably interfered with these relationships through the acts described above, including but not limited to the following:

   a. Scheming and strategizing with the Hintzes to devise a way to hinder, delay or defraud the Hintzes' and/or TutoringZone's creditors, including the Plaintiffs;

   b. Counseling the Hintzes away from a reorganization of TutoringZone that would pay other creditors of the Hintzes and toward a scheme that would benefit James in favor of the Hintzes' other creditors, including Plaintiffs;

   c. Orchestrating a "cashless" transaction to avoid paying Plaintiffs, such that the "consideration" given for the transfer of TutoringZone's assets was forgiveness by James of a portion of the Hintzes' personal debt to James;

   d. Determining that James should forgive only $200,000.00 of the Hintzes' $475,000.00 personal debt to James so that James could maintain a creditor claim

53

in the Hintzes' anticipated bankruptcy case and interfere with, hinder, delay or

defraud the Hintzes' other creditors, including the Plaintiffs;

e. Drafting and executing the Intellectual Property Lease;

f. Drafting and executing the Intellectual Property Transfer Agreement;

g. Executing the Intellectual Property Lease and Intellectual Property Transfer

Agreement without the Lenders' knowledge, approval and consent;

h. Filing the UCC-1 Financing Statement with the Florida Secured Transaction

Registry;

i. Creating TutoringZone II;

j. Transferring all or substantially all of TutoringZone's assets, including the

Intellectual Property and other tangible assets, to TutoringZone II for less than

adequate consideration;

k. Depriving TutoringZone of substantial value to the detriment of TutoringZone's

and/or the Hintzes' creditors, including the Plaintiffs;

l. Continuing TutoringZone's business under the name TutoringZone II;

m. Hiring Matt Hintze and other TutoringZone employees to work for TutoringZone

II;

n. Inducing Matt Hintze to breach his fiduciary duties to TutoringZone and compete

against TutoringZone;

o. Concealing, misrepresenting and/or failing to disclose the existence of the

Intellectual Property Lease, the Intellectual Property Transfer Agreement, and

TutoringZone II from the Lenders;

p. Competing with TutoringZone in the conduct of its tutoring business;

54

q.  Misleading the Lenders and the public about the continuation of TutoringZone's business under TutoringZone II;

r.  Misleading the Lenders about the Hintzes' negotiations with Study Edge for the purchase of TutoringZone;

s.  Assisting in the Hinztes' preparation and filing of personal bankruptcy to discharge the Hintzes' debts, including the debts owed to Plaintiffs;

t.  Timing of the filing of the Hintzes' bankruptcy petition to fall outside the standard ninety-day window for preferential transfers.

292.  Through these interferences, Defendants engaged in wrongful conduct by which they sought to gain a financial benefit to the detriment of Plaintiffs.

293.  As a result of the wrongful means and intentional and tortious interference by Defendants with Plaintiffs' business relationships with TutoringZone and the Hintzes, Defendants deprived Plaintiffs of economic benefits which would have arisen had Defendants not unjustifiably interfered.

294.  As a direct and proximate result of Defendants' wrongful conduct and intentional and tortious interference, Plaintiffs have suffered damages as a result of the breach of the relationship.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, prejudgment interest, costs, and other further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues triable.

Respectfully submitted,

MURPHY & ANDERSON, P.A.

/s/ Geddes D. Anderson, Jr.
**GEDDES D. ANDERSON, JR., ESQ.**
Florida Bar No.: 0138894
ganderson@murphyandersonlaw.com
kgreiner@murphyandersonlaw.com
**NICOLE T. MELVANI, ESQ.**
Florida Bar No.: 0108361
nmelvani@murphyandersonlaw.com
handerson@murphyandersonlaw.com
1501 San Marco Boulevard
Jacksonville, Florida 32207
904-598-9282 (phone)
904-598-9283 (fax)
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2016, the foregoing was furnished via the Florida Courts E-Filing Portal to the following parties:

**PEGGY-ANNE O'CONNOR**
Florida Bar No. 170471
peg@turnerlawpartners.com
lah@turnerlawpartners.com
Turner O'Connor Kozlowski, P.L.
102 N.W. Second Avenue
Gainesville, Florida 32601
*Attorney for Christopher M. James*

**RYAN E. DAVIS**
Florida Bar No. 0179851
rdavis@whww.com
Winderweedle, Haines, Ward & Woodman, P.A.
P.O. Box 1391
Orlando, Florida 32802
*Attorney for Defendants*

**W. CHARLES HUGHES**
Florida Bar No. 627781
chughes@shrlawfirm.com
knorman@shrlawfirm.com
dhiggins@shrlawfirm.com
Siegel Hughes & Ross
4046 Newberry Road
Gainesville, Florida 32607
*Attorney for Christopher M. James*

/s/ Geddes D. Anderson, Jr.
ATTORNEY

56

Filing # 42558848 E-Filed 06/09/2016 04:53:58 PM

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA
CIVIL DIVISION

FLH HOLDINGS OF FLORIDA, LLC,
a Florida limited liability company, JOHN
SPENCE, SHEILA SPENCE, INTERMED
BIOMEDICAL SERVICES, INC. a Florida
corporation, and DAVID WHITNEY

             Plaintiff,

vs.

CHRISTOPHER M. JAMES, CYNTHIA
L. FRENCHMAN, and SELDON J.
CHILDERS,

             Defendants.

Case No.: 2016-CA-000538
Div. J

_____/

## DEFENDANTS JAMES' AND FRENCHMAN'S
## MOTION TO DISMISS AMENDED COMPLAINT

Defendants CHRISTOPHER M. JAMES (hereinafter "JAMES") and CYNTHIA L.

FRENCHMAN (hereinafter "FRENCHMAN"), by and through their undersigned counsel and

pursuant to *Fla.R.Civ.P.* 1.140(b), hereby move to dismiss Plaintiffs' Amended Complaint, dated

May 20, 2016, for failure to state a cause of action for which relief can be granted. In support

thereof, JAMES and FRENCHMAN state:

       1.      On February 16, 2016, Plaintiff FLH HOLDINGS OF FLORIDA, LLC

(hereinafter "FLH"), filed the initial Complaint in this action alleging claims against JAMES and

FRENCHMAN sounding in Civil Conspiracy, Fraudulent Transfer of Intellectual Property (as to

JAMES only), Fraudulent Transfer of Intellectual Property Lease, Aiding and Abetting Common

Law Fraud, Tortious Interference, and Conversion (as to JAMES only).



FLH Holdings of Florida, LLC, et al v. James, et al.
Case No. 2016-CA-000538
Defendants James' and Frenchman's Motion to Dismiss Amended Complaint
Page 2

2. On March 14, 2016, JAMES filed his Motion to Dismiss Plaintiff's Complaint, and then FRENCHMAN filed a Motion to Dismiss Plaintiff's Complaint on April 4, 2016 (hereinafter collectively the "Motions").

3. The Motions sought dismissal of FLH's Complaint based, in part, upon FLH's lack of standing.

4. The allegations in the original Complaint demonstrated that FLH lacked standing to bring claims under the Florida Uniform Fraudulent Transfer Act ("FUFTA") because FLH is not a creditor of TutoringZone, LC (hereinafter "TZ"). FLH alleged standing by virtue of its ownership of a promissory note, the only parties to which were Matthew B. Hintze, Larina K. Hintze (hereinafter collectively the "Hintzes") and Randy Scott; TZ was not a party to the promissory note. Because FLH is not a creditor of TZ, it lacked standing to bring the fraudulent transfer actions alleged in the Complaint.

5. FLH likewise lacked standing, as pled in the original Complaint, to bring claims for conspiracy and aiding and abetting fraud, as those claims were based upon the alleged fraudulent transfer claims.

6. Before the Motions could be heard by this Court, FLH, along with new party Plaintiffs, JOHN SPENCE and SHEILA SPENCE (hereinafter collectively the "SPENCES"), INTERMED BIOMEDICAL SERVICES, INC. (hereinafter "INTERMED"), and DAVID WHITNEY (hereinafter "WHITNEY") filed an Amended Complaint, alleging claims against JAMES, FRENCHMAN and new party Defendant, SELDON J. CHILDERS (hereinafter "CHILDERS"), sounding in Civil Conspiracy, Fraudulent Transfer of Intellectual Property (as to

FLH Holdings of Florida, LLC, et al v. James, et al.
Case No. 2016-CA-000538
Defendants James' and Frenchman's Motion to Dismiss Amended Complaint
Page 3

JAMES only), Fraudulent Transfer of Intellectual Property Lease (as to JAMES and FRENCHMAN), Aiding and Abetting Common Law Fraud, and Tortious Interference.

7.    In an effort to remedy the lack of standing, Plaintiffs allege that TZ was the alter ego of the Hintzes. (*See* Amended Complaint, ¶¶216-234)

8.    Specifically, Plaintiffs state that "at the time of the putative lease and transfer, TutoringZone was the alter ego of the Hintzes." (*Id.* at ¶220)

9.    Plaintiffs further allege that the Hintzes commingled their personal assets and liabilities with those of TZ and disregarded its separate corporate existence. (*Id.* at ¶¶228-229)

10.    Essentially, Plaintiffs allege that, as creditors of the Hintzes, they are also creditors of TZ because it was the alter ego of the Hintzes.

11.    Therefore, according to the Plaintiffs' theory as pled in the Amended Complaint, they have standing to bring their claims against the Defendants because TZ and the Hintzes were essentially one and the same.

12.    Assuming the facts as pled by the Plaintiffs are correct,[1] and TZ was the alter ego of the Hintzes, then any claims related to the purported fraudulent transfer of the assets of TZ are the property of the Hintzes' bankruptcy estate, and are solely within the power of the Hintzes' bankruptcy trustee. *In re Zwirn*, 362 B.R. 536, 539 (Bankr. S.D. Fla. 2007); *also see Raber v. Osprey Alaska, Inc.*, 187 F.R.D. 675, 678-679 (M.D. Fla. 1999) (stating that where the alter ego doctrine is applied, the corporation and the persons who dominate it are treated as one person under the law).

---

[1] For purposes of a Motion to Dismiss, all material factual allegations of the complaint must be taken as true. *Varnes v. Dawkins*, 624 So.2d 349, 350 (Fla. 1st DCA 1993).

FLH Holdings of Florida, LLC, et al v. James, et al.
Case No. 2016-CA-000538
Defendants James' and Frenchman's Motion to Dismiss Amended Complaint
Page 4

13.     In *Zwirn*, the court stated that there is "a substantial body of case law [that] stands for the position that commencement of bankruptcy stays any state court fraudulent transfer conveyance actions involving a debtor or his transferees, which supports the conclusion that these claims are indeed property of the [bankruptcy] estate."

14.     The *Zwirn* court analyzed the two theories under which other courts have reached this conclusion: the first theory is that the debtor[2] retains an equitable interest in the fraudulently transferred property, and therefore the property constitutes part of the debtor's estate. *Id.* The Bankruptcy Code stays any action by a creditor to obtain possession of property of the estate. *Id.* The second theory is that the property does not become part of the estate until the trustee recovers the property, but nonetheless, any state court lawsuit to recover a fraudulent conveyance violated the automatic stay as an action "to recover a claim against the debtor." *Id.* at 539. The *Zwirn* court concluded that the first theory was the better theory, and held that fraudulent conveyance claims are property of the estate "that with rare exception may *only* be prosecuted by the trustee." *Id.* [emphasis in original].

15.     Plaintiffs appear to acknowledge that the fraudulent transfer claims actually belong to the Hintzes' bankruptcy estate, stating that the transfer of the intellectual property and other assets "left TutoringZone without any significant assets, thereby depleting the estate of any value" [emphasis added] (Amended Complaint, ¶157) and "Had the transfer not been made, the Intellectual Property and other assets of TutoringZone would have been available for sale by the trustee in the Hintzes' bankruptcy case." (*Id.* at ¶ 198)

---

[2] In the instant action the Hintzes are the debtors and filed for Chapter 7 bankruptcy in 2012. *See In re Matthew Bruce Hintze and Larina K. Hintze*, Case No. 12-10462-KKS (N. D. Fla. 2012).

FLH Holdings of Florida, LLC, et al v. James, et al.
Case No. 2016-CA-000538
Defendants James' and Frenchman's Motion to Dismiss Amended Complaint
Page 5

16.    Accordingly, the Plaintiffs lack standing to bring the claims in the Amended Complaint because the only party who may bring claims related to the purported fraudulent transfer of TZ's property is the trustee in the Hintzes' bankruptcy case. *See Zwirn*, 362 B.R. at 542 (stating that the trustee had "exclusive standing" to prosecute or settle a fraudulent transfer claim).

17.    The trustee in the Hintzes' bankruptcy did in fact exercise that exclusive standing and brought claims for fraudulent transfer. Specifically, on April 14, 2014, Theresa M. Bender, as Chapter 7 Trustee of the Bankruptcy Estate of Matthew Bruce Hintze and Larina K. Hintze, and as managing member of TutoringZone and TUTORINGZONE, LC, a Florida limited liability company, filed a Complaint that included claims for Avoidance of Preferential Transfer, Fraudulent Transfer under 11 U.S.C. §548(a)(1)(A) and Fraudulent Transfer under 11 U.S.C. §548(a)(1)(B).[3]  A true and correct copy of the Trustee's Complaint is attached hereto as Exhibit "A" and is by reference incorporated herein.

18.    The continuation of Plaintiffs' claims – which are effectively identical to those brought by the Trustee – could lead to inconsistent results in the two cases.[4]

---

[3] The bankruptcy Court conducted an auction in which TZ Acquisition, LLC, purchased from the Trustee the bankruptcy estate's interest in TZ, as well as Counts I-XX of the Trustee's Complaint attached hereto as Exhibit "A".  However, the sale is subject to JAMES' objection to the sale of Counts XIII-XX of the Complaint, which includes the specific claims discussed above.  A true and correct copy of the Order Approving Report and Notice of Trustee's Intention to Sell Property of the Estate by Private Sale is attached hereto as Exhibit "B" and is by reference incorporated herein.  Accordingly, while the sale of the estate property may transfer standing to TZ Acquisition, LLC, it does not confer standing on FLH.  Standing to pursue the fraudulent transfer claims belongs solely to either the Trustee or TZ Acquisition, LLC.

[4] *See In re Fundamental Long Term Care, Inc.*, 500 B.R. 147, 159 (Bankr. M.D. Fla. 2013) (holding that "the same danger that another forum will resolve issues the Trustee is statutorily obligated to investigate [i.e., the fraudulent transfer and alter ego claims] exists unless the creditors are enjoined. While the Trustee would not necessarily be collaterally estopped by the state court rulings, allowing the creditors to pursue the fraudulent transfer and alter ego claims in state court creates a very real possibility of inconsistent results."); *also see Zwirn*, 362 B.R. at 541 (noting that allowing individual creditors to usurp the avoiding powers of the trustee potentially exposes the court to multiple lawsuits by individual creditors, which effectively defeats the purpose of the bankruptcy).

FLH Holdings of Florida, LLC, et al v. James, et al.
Case No. 2016-CA-000538
Defendants James' and Frenchman's Motion to Dismiss Amended Complaint
Page 6

19.     Accordingly, Plaintiffs' Amended Complaint must be dismissed, as Plaintiffs lack standing to bring the claims asserted in the Amended Complaint because they are all based upon the same purported fraudulent transfer of TZ's assets.

20.     In the event this Court finds that Plaintiffs have standing to bring the claims alleged, JAMES and FRENCHMAN hereby reallege and reincorporate by reference Sections B, C and D of the Motions.

WHEREFORE, Defendants, JAMES and FRENCHMAN, respectfully request the Court dismiss Plaintiffs' Amended Complaint with prejudice and for any further relief that the Court deems appropriate and just.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document is being served on all counsel of record in the manner described in the attached Service List on this ___9___ day of June, 2016.

SIEGEL HUGHES & ROSS

W. CHARLES HUGHES
chughes@shrlawfirm.com
Fla. Bar No.: 625781
4046 Newberry Road
Gainesville, Florida 32607
Secondary Email Addresses:
knorman@shrlawfirm.com
ssiler@shrlawfirm.com
(352) 375-7700 / Fax: (352) 375-1080
Counsel for Christopher M. James and
Cynthia L. Frenchman

FLH Holdings of Florida, LLC, et al v. James, et al.
Case No. 2016-CA-000538
Defendants James' and Frenchman's Motion to Dismiss Amended Complaint
Page 7

## SERVICE LIST

**FLH Holdings of Florida, LLC v. James, et al.**
**Case No.: 2016-CA-000538**
**Eighth Judicial Circuit Court, Alachua County**

**Ryan Davis, Esq.**
rdavis@whww.com
WINDERWEEDLE, HAINES, WARD &
WOODMAN, PA
PO Box 1391
Orlando, FL 32802-1391
(407) 423-4246 / Fax: (407) 423-7014
Co-Counsel for Christopher M. James and
Cynthia L. Frenchman
Method of Service: E-Portal

**Geddes D. Anderson, Jr., Esq.**
ganderson@murphyandersonlaw.com
**Nicole T. Melvani, Esq.**
nmelvani@murphyandersonlaw.com
Secondary email addresses:
kgreiner@murhpyandersonlaw.com
handerson@murphyandersonlaw.com
MURPHY & ANDERSON, PA
1501 San Marco Boulevard
Jacksonville, FL 32207
(904) 598-9282 / Fax: (904) 598-9283
Counsel for Plaintiffs
Method of Service: E-Portal

**Seldon J. Childers, Esq.**
jchilders@smartbizlaw.com
Secondary email address:
notice@smartbizlaw.com
ellen.lord@smartbizlaw.com
CHILDERS LAW, LLC
2135 N.W. 40th Terrace, Suite B
Gainesville, FL 32605-5802
(352) 335-0400 / Fax: (407) 209-3870
*Pro Se* Defendant
Method of Service: E-Portal

**Peggy-Anne O'Connor, Esq.**
peg@tunerlawpartners.com
Secondary email address:
lah@turnerlawpartners.com
TURNER O'CONNOR KOZLOWSKI, PL
102 NW Second Avenue
Gainesville, FL 32601
(352) 372-4263
Co-Counsel for Christopher M. James and
Cynthia L. Frenchman
Method of Service: E-Portal

**Michael A. Tessitore, Esq.**
mtessitore@morankidd.com
Secondary email address:
epolanco@morankidd.com
MORAN KIDD LYONS & JOHNSON, PA
111 N. Orange Ave., Suite 900
Orlando, FL 32801
(407) 841-4141 / Fax: (407) 841-4148
Counsel for Seldon J. Childers
Method of Service: E-Portal

1

```
 1              IN THE CIRCUIT COURT OF THE
                EIGHTH JUDICIAL CIRCUIT, IN AND
 2              FOR ALACHUA COUNTY, FLORIDA

 3               Case No.: 01-2016-CA-00538

 4   FLH HOLDINGS OF FLORIDA, LLC, a
     Florida limited liability company,
 5   JOHN SPENCE, SHEILA SPENCE, INTERMED
     BIOMEDICAL SERVICES, INC., a Florida
 6   corporation, and DAVID WHITNEY,

 7        Plaintiffs,

 8   vs.

 9   CHRISTOPHER J. JAMES, CYNTHIA L. FRENCHMAN,
     and SELDON J. CHILDERS,
10
          Defendants.
11   --------------------------------------------x

12           TRANSCRIPT OF PROCEEDINGS

13

14   DATE TAKEN:  Monday, June 27th, 2016

15   TIME:        9:30 a.m. - 10:50 a.m.

16   PLACE:       Alachua County Courthouse
                  201 East University Avenue
17                Gainesville, FL 32601

18   BEFORE:      Honorable Toby S. Monaco

19

20        This cause came on to be heard at the time and

21   place aforesaid, when and where the following

22   proceedings were reported by:

23               Carol Baer, RPR, FPR
                 U.S. Legal Support
24               Gainesville, FL
                 877-769-0040
25
```



EXHIBIT "C"

83

2

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3        MURPHY & ANDERSON, P.A.
          1501 San Marco Boulevard
 4        Jacksonville, FL 32207
          (904)598-9282
 5        ganderson@murphyandersonlaw.com
          lbrooks@murphyandersonlaw.com
 6        BY:  GEDDES D. ANDERSON, ESQUIRE

 7   ON BEHALF OF THE DEFENDANTS, CHRISTOPHER M. JAMES and
     CYNTHIA L. FRENCHMAN:
 8
          SIEGEL, HUGHES & ROSS
 9        4046 Newberry Road
          Gainesville, FL 32607
10        (352)375-7700
          chughes@shrlawfirm.com
11        BY:  W. CHARLES HUGHES, ESQUIRE

12        WINDERWEEDLE, HAINES, WARD & WOODMAN, P.A.
          390 North Orange Avenue, Suite 1500
13        Orlando, FL 32802
          (407)423-4246
14        rdavis@whww.com
          thiggens@whww.com
15        BY:  RYAN DAVIS, ESQUIRE, CO-COUNSEL

16        TURNER O'CONNOR KOZLOWSKI, P.L.
          102 N.W. Second Avenue
17        Gainesville, FL 32601
          (352)372-4263
18        peg@turnerlawpartners.com
          BY:  PEGGY-ANNE O'CONNOR, ATTORNEY AT LAW,
19             CO-COUNSEL

20   ON BEHALF OF THE DEFENDANT, SELDON J. CHILDERS:

21        CHILDERS LAW, LLC
          2135 N.W. 40th Terrace, Suite B
22        Gainesville, FL 32605
          (352)335-0400
23        jchilders@smartbizlaw.com
          BY:  SELDON J. CHILDERS, ESQUIRE

24                      -- AND --

25
```

3

```
 1        MORAN, KIDD, LYONS & JOHNSON, P.A.
          111 N. Orange Avenue, Suite 900
 2        Orlando, FL 32801
          (407) 841-4141
 3        mtessitore@morankidd.com
          BY:  MICHAEL A. TESSITORE, ESQUIRE, CO-COUNSEL
 4             (Via telephone)

 5

 6   ALSO PRESENT:

 7   Robert D. Wilcox, Esquire

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1    Thereupon,

2              The following proceedings were had:

3              THE COURT:  This is Judge Monaco.  Is this

4    Mr. Tessitore?

5              MR. TESSITORE:  Good morning, Your Honor.

6    Yes, it is.  I'm Mike Tessitore, co-counsel for

7    defendant Childers.

8              THE COURT:  And we're going to go around the

9    room and everybody else is going to announce their

10   appearances today so you know who's here.  And we

11   have the court reporter in attendance as well.

12             Why don't we start with the plaintiff's side.

13             MR. ANDERSON:  Good morning, Your Honor,

14   Geddes Anderson on behalf of the plaintiffs.

15             MR. CHILDERS:  Good morning, Your Honor.  Jeff

16   Childers on behalf of myself.

17             MR. HUGHES:  Charley Hughes on behalf of

18   Christopher James and Cynthia Frenchman.

19             MS. O'CONNOR:  Peg O'Connor on behalf of

20   Professor Christopher James and Cynthia Frenchman.

21             MR. DAVIS:  Ryan Davis on behalf of

22   Christopher James and Cynthia Frenchman.

23             THE COURT:  So they have three attorneys.  All

24   right.

25             I understand that we're here on some motions
```

Case 1:12-cv-00452-KKS-GRJ  Document 614  Filed 09/15/2008  Page 69 of 132  Case 1:12-cv-00452-KKS-GRJ  Document 614  Filed 09/15/2008  Page 69 of 156

5

1   to dismiss.  And if you're ready to argue, do you

2   have a pecking order you've already agreed on?

3        MR. CHILDERS:  Have you had a chance to look

4   at any of the papers yet or do you need some

5   background?

6        THE COURT:  I've looked at the amended

7   complaint.  I've looked Mr. Childers' motion.  I

8   looked at James' and Frenchman's motion and I've

9   looked at the opposition that had been filed.

10  That's what I've seen so far.

11       MR. CHILDERS:  I think it makes sense to begin

12  with Dr. James' argument about the standing issue

13  because that's a dispositive issue.  And if they're

14  correct, which I believe they are, we don't need to

15  reach some of the other stuff.

16       MR. DAVIS:  I'm prepared to start with that.

17       THE COURT:  Okay, Mr. Davis.  Go right ahead.

18       MR. DAVIS:  Thank you, Your Honor.  I have

19  some case law notebooks for the parties here.

20       Your Honor, our motion to dismiss has two

21  different parts.  The first part addresses

22  standing.  The second section addresses defects

23  with particular counts.  And the standing issue is

24  potentially case dispositive, so I'll address that

25  first.

1          In order to analyze the standing issue, it is

2     important --

3          THE COURT:  Hold on just a second.  It looks

4     like we've got somebody else coming in as well.

5          MR. ANDERSON:  Your Honor, this is Rob Wilcox.

6     He is here with me.  He's actually the attorney for

7     the plaintiffs in the bankruptcy matters and so he

8     is here.

9          MR. WILCOX:  Thank you, Your Honor.  I

10    apologize for my delay.

11         THE COURT:  That's all right.  Okay.  Thank

12    you.

13         MR. DAVIS:  Thank you.

14         So in order to analyze the standing issue,

15    it's first important to understand the nature of

16    the complaint.  The complaint, although it's

17    multiple counts and it's over 50 pages, it is, at

18    its core, a garden-variety fraudulent transfer

19    complaint.  Now, the plaintiffs put different

20    labels on different counts and try to allege other

21    types of conduct but at the end of the day, it

22    really is a fraudulent transfer complaint.  Every

23    allegation ultimately ties back to the property

24    that was transferred from TZ-1 to TZ-2.  And each

25    count hinges on the purported fraudulent transfers.

1    As such, if the plaintiffs do not have standing to

2    pursue the avoidance of the transfers, they do not

3    have standing to bring any of the counts.

4         With respect to standing, standing must exist

5    at the time of the filing of the complaint and

6    cannot be acquired thereafter.  We cited in our

7    motion the Rigby v. Wells Fargo case in support of

8    that proposition, 84 So. 3d 1195.  So here, a

9    standing did not exist at the time of filing, then

10   the complaint would need to be dismissed and cannot

11   be refiled unless the plaintiffs later obtain

12   standing.  So, in other words, standing is not

13   something that can be fixed midstream.  It either

14   exists at the time of the filing or it doesn't.

15        Now, in order to determine whether the

16   plaintiffs have standing, it's probably easiest to

17   think about it in a two-step process.  The first

18   step would be to identify what property was

19   allegedly transferred, and the second step would be

20   to then determine, well, what universe of parties

21   would have the ability to recover that property

22   that was allegedly transferred.

23        So as a starting point, Your Honor, it is

24   helpful to at least briefly consider the original

25   complaint, which was filed by FLH Holdings.  And

that original complaint alleged a transfer from
Tutoring Zone 1, which I'll refer to as TZ-1, of
intellectual property to Tutoring Zone 2, which
I'll refer to as TZ-2.

The allegation in that complaint was that TZ-1
improperly transferred its intellectual property,
such as course videos and materials, to TZ-2. The
complaint had attached the IP lease agreement and
the IP transfer agreement as exhibits to establish
what was transferred.

As an aside, we don't dispute that the
intellectual property was transferred. It was
transferred. We just disagree as to whether the
consideration was sufficient.

The issue then becomes what universe of
parties would have standing to pursue the avoidance
of a transfer of the intellectual property. The
answer to that question is found under the Uniform
Fraudulent Transfer Act, which states that only
creditors may pursue the recovery of the transfers.
Section 726.108 provides that a creditor may obtain
relief.

Likewise, the Supreme Court of Florida in the
Friedman case, which we cited and included in the
notebook, provides that only creditors are

1    qualified to pursue relief under the Uniform

2    Fraudulent Transfer Act.  And this makes perfect

3    sense, as the creditors would have the interest in

4    the property that was transferred.

5         So in this instance, under the original

6    complaint, it would mean that only creditors of

7    Tutoring Zone 1 would have standing to pursue the

8    transfer.  In fact, a creditor of TZ-1 has pursued

9    recovery through a separate proceeding

10   supplementary, which is not before Your Honor.  But

11   in that case, the creditor that is a related party

12   called Intermed Recovery, it's related to one of

13   the plaintiffs, Intermed Biomedical.  It acquired

14   the claim of the landlord of Tutoring Zone 1, who

15   obtained a judgment against Tutoring Zone 1, so

16   there, it was a situation where the plaintiff had a

17   claim against the purported transferor.

18        The problem with the original complaint is

19   that FLH is not a creditor of TZ-1.  FLH, by its

20   own admission and as demonstrated by the exhibits

21   to the complaint, is a creditor of the Heintzes,

22   not of TZ-1.  The promissory note is made by the

23   Heintzes.  TZ-1 is not a party to the promissory

24   note and TZ-1 cannot be liable under the note.

25        As such, FLH had an obvious standing issue,

1    and we properly moved for dismissal, which was set

2    for hearing. FLH recognized the infirmity in its

3    position and amended the complaint. And when it

4    amended the complaint, it contended that the

5    transfer was really a transfer of the ownership

6    interest of the Heintzes. The amended complaint,

7    it added additional plaintiffs. But like FLH, they

8    are creditors of the Heintzes, not of TZ-1. Again,

9    the additional plaintiffs are parties under the

10    promissory notes made by the Heintzes, not of TZ-1.

11    This is undisputed and consistent with the face of

12    the promissory notes.

13        In the alternative, they allege that the

14    Heintzes in TZ-1 are alter egos, in which case the

15    IP was a transfer of an asset of the Heintzes. The

16    problem with the proposed fix by the plaintiffs is

17    that the Heintzes are in bankruptcy, and that's

18    alleged in Paragraph 186 of the amended complaint,

19    and that's not disputed. So the issue becomes what

20    happens once a bankruptcy case is filed? Well,

21    once a bankruptcy case is filed, the trustee has

22    exclusive standing to pursue fraudulent transfers

23    during the two-year limitation period under Section

24    546 of the bankruptcy code.

25        In support of this proposition, we've cited a

1  case out of the Southern District of Florida, which

2  is the Zwirn case, and it references two lines of

3  cases as to why the trustee has exclusive

4  jurisdiction.  Your Honor, we included that case in

5  our packet.  A quote from that case is:

6  Nonetheless, these courts -- and this is on page

7  3 -- and Zwirn is tab 6.  If we look at page 3 of

8  the opinion, the bottom of the first column where

9  we start with the highlight:  Nonetheless, these

10  courts hold that any state court lawsuit to recover

11  fraudulent conveyances violates the automatic stay

12  under Section 362(a)(1) as an action to recover a

13  claim against the debtor.

14      The court then goes on to state that:  All

15  courts appear to agree that commencing a bankruptcy

16  case stays any state court fraudulent transfer

17  action by a creditor, thereby ensuring that the

18  estate's interest in the fraudulent transfer claim

19  are properly protected to ensure that the estate

20  and its creditors may receive the benefits.

21      The Eleventh Circuit has also held in a

22  similar fashion, and we added in the pocket part

23  there, Your Honor, and we circulated this to

24  Mr. Anderson this morning, there's the VanDiepen

25  case.  That's a May 31st, 2007 opinion.  Now, that

1    opinion dealt with a proceeding supplementary, but

2    what the court held in that case is:  The

3    proceeding supplementary implicates property of the

4    estate, therefore, the trustee can only pursue it.

5    Now, the rationale behind these holdings, it's

6    completely sensible.  The trustee is has a

7    fiduciary duty on behalf of the entire creditor

8    body to the extent of any fraudulent conveyed

9    property.  The trustee has and should have

10   exclusive rights to recover the property for the

11   benefit of all creditors.

12        That avoids, Your Honor, the race to the

13   courthouse.  It avoids inconsistent opinions and

14   outcomes.  It avoids multiple litigation in

15   multiple forums.  In addition, the recovery of

16   property would be property of the estate under

17   Section 541(a)(3) of the bankruptcy code.

18        Now, in this instance, the question becomes,

19   well, did the trustee actually file a fraudulent

20   transfer action within that two-year window during

21   which the trustee has exclusive jurisdiction?  And

22   the answer is yes, the trustee did, in fact, file a

23   fraudulent transfer action, which we referenced as

24   Exhibit A to the complaint and we filed with the

25   court on Friday.

THE COURT: The Heintzes are in bankruptcy?

MR. DAVIS: The Heintzes are in bankruptcy.

THE COURT: So the trustee is stepping in the shoes of the Heintzes, right?

MR. DAVIS: That's exactly right. So the trustee has, in fact, brought a fraudulent transfer action against the defendants in this case and had been pursuing that fraudulent transfer action.

The complaints that assert the fraudulent transfer are counts 14 and 15 of that complaint. They're both labeled fraudulent transfer counts as to the membership interest. They're also rescission counts that the trustee brought in order to claw back the intellectual property. So we know for a fact that the trustee has been pursuing these causes of action.

Now, as it turns out, after some litigation without a whole lot of progress by the trustee, the trustee decided to sell the causes of action to the extent permitted by law. An auction was held and TZ Acquisition, which is an entity affiliated with the plaintiffs, was the high bidder. So the issue before the bankruptcy court right now is which causes of action may be conveyed. That issue has been briefed and is under advisement. I believe

1   that we may not have attached Exhibit B to the --
2   Did we attach Exhibit B to the motion?

3       MR. HUGHES:  I think there was not an Exhibit
4   B.

5       MR. DAVIS:  We had referenced in the motion --
6   Oh, here.  Actually in a footnote, in a footnote we
7   did reference an Exhibit B, and I think we
8   inadvertently did not attach it, Your Honor.  And
9   I'll provide this to counsel (indicating).

10      This was referenced in a footnote and this is
11  the order approving report and notice of trustee's
12  intention to sell property of the estate.
13  Mr. Wilcox is bankruptcy counsel for these
14  plaintiffs in the bankruptcy court.  And we have
15  both briefed the issue as to what causes of action
16  may be conveyed.  And the relevant paragraph, Your
17  Honor, is Paragraph 4 on page 2, and it states that
18  the sale -- and this is the bankruptcy sale by the
19  trustee -- is subject to the James objection with
20  respect to the inclusion of counts 13 through 20 of
21  the trustee's complaint in AP 14-1005 in the sale
22  property.

23      The last sentence reads:  That portion of the
24  James objection, which objected to the inclusion of
25  counts 13 through 20 of the trustee's complaint in

1    AP 14-1005 in the sale property, is preserved.

2    That issue is currently under advisement.

3        Now, once that issue is decided, Your Honor,

4    the outcome will be either that TZ Acquisition has

5    purchased the fraudulent transfer action or the

6    fraudulent transfer action retains with the

7    trustee.  Under either scenario, either way that it

8    plays out, the plaintiffs in this lawsuit will not

9    have standing.  So that's why, in terms of

10   dismissal, we believe that there should not be

11   dismissal with leave to amend because the standing

12   issue cannot be fixed.  Either the trustee will

13   retain standing or the TZ Acquisition-related

14   entity will have standing.  TZ Acquisition is

15   controlled by Ethan Fieldman, who also controls the

16   original plaintiff, FLH Holding.

17       Now, in the plaintiff's response, they

18   distinguish our situation from the Zwirn case that

19   we cited in support of our motion by indicating

20   that they filed their lawsuit after the bankruptcy

21   case was filed.  And to be fair, the exact quote

22   from the response brief is as follows:  Here, this

23   action was initiated well after the Heintzes filed

24   for bankruptcy.  While that is the distinction,

25   it's a distinction without a difference.  The

1    trustee enjoys exclusive rights irrespective of

2    whether the creditor filed the fraudulent transfer

3    action before or after the bankruptcy filing.  The

4    plaintiffs failed to cite a single case in support

5    of this proposition.  In reality, the automatic

6    stay under 362(a)(1) -- which I included in the

7    pocket part, Your Honor -- 362(a)(1) applies to the

8    commencement or continuation of any actions.  So

9    the automatic stay applies to actions that are

10   continuing or any new actions to be commenced.  So

11   whether the action was filed before or after the

12   bankruptcy doesn't have any impact on the analysis;

13   the automatic stay still applies.

14       So the plaintiffs then go on to state:  There

15   is nothing in the bankruptcy code, Florida

16   Statutes, or any ruling of the bankruptcy court to

17   support defendants' position that plaintiffs lack

18   standing under FUFTA.  But we know that not to be

19   true.  We cited the Zwirn case, which clearly

20   states the trustee has exclusive standing.  We

21   provided you with the Eleventh Circuit opinion.

22   We've also taken a look at the bankruptcy code,

23   subsection 362(a)(1).  We can also look to the

24   highlighted section 362(1)(3), which precludes any

25   act to obtain possession of property of the estate

1    or of property from the estate or to exercise

2    control over property of the estate.

3      So the automatic stay would preclude what the

4    plaintiffs are attempting to do here. So here, the

5    plaintiffs are attempting to recover the membership

6    interest, which was an asset of the Heintzes; and

7    it's subject to a pending lawsuit by the trustee.

8    Yet the plaintiffs, they have not obtained relief

9    from stay. So they haven't come to this court and

10   shown Your Honor that they've obtained relief from

11   stay in order to pursue this lawsuit.

12      So, in short, the case law and the bankruptcy

13   code supports the fact that the plaintiff's action

14   is not only stayed, but they simply don't have

15   standing because the trustee did act within that

16   two-year period. If the trustee would not have

17   taken any action, then the causes of action would

18   have reverted back to the plaintiffs, but we know

19   for a fact the trustee did act. We further know

20   that there was an auction, and right now it's being

21   decided by Judge Specie as to who is going to

22   control this cause of action.

23      As for the second part of our motion, which

24   addresses the defects in the individual counts,

25   I'll address those relatively quickly. We have the

civil conspiracy count, which requires an underlying tort. Here, the alleged tort is the aiding and abetting of a fraudulent transfer. As set forth in the Luzinski case that we cited, an independent tort for aiding and abetting a fraudulent transfer, just simply does not exist.

As explained by the Fifth DCA, neither Section 22.30, nor Chapter 726 Florida Statutes creates a cause of action against a party who allegedly assists a debtor in a fraudulent transfer conversion or transfer of property where the person does not come into possession of the property.

Counts 2 and 3, Your Honor, are the fraudulent transfer counts, and we've addressed those with the standing defect issue.

The next count is the aiding and abetting common law fraud. Now, this count is really a renaming of the original count, which was aiding and abetting a fraudulent transfer. The Supreme Court has spoken on this issue in the Freeman v. First Union National Bank case, which we included that in our packet. We highlighted that opinion.

The question that was presented was that the certified question was under Florida law, is there a cause of action for aiding and abetting the

fraudulent transfer when the alleged aider and
abettor is not a transferee?

THE COURT: That's under FUFTA?

MR. DAVIS: Correct. And the court says: We
conclude that the creation of such an action was
not contemplated by enactment of that statute.

Now, the plaintiffs' response to that is, if
you look at that quote, it phrases it in the
context of, is there aiding and abetting liability
if the party is not a transferee? And takes the
position that, well, if the party is a transferee,
then that must mean that there could be aiding and
abetting liability, even though they don't cite any
case law in support of that.

But to answer that question, Your Honor, we go
back to the Uniform Fraudulent Transfer Act. And
the Uniform Fraudulent Transfer Act is very clear
in what type of liability a transferee may have.
Now, this instance, the plaintiffs are seeking a
judgment. And so the question becomes what type of
judgment could the plaintiffs recover? We look to
726.109, which I included in the pocket part. It
says: A creditor may recover judgment for the
value of the assets transferred subject to
adjustment of Subsection 3, or the amount necessary

1   to satisfy the creditors' claim, whichever is less.

2       Again, that makes perfect sense. As the

3   transferee, you'd be liable for either the value of

4   the transfer capped at the amount of the creditors'

5   claim, which ever is less. So the Uniform

6   Fraudulent Transfer Act doesn't create any sort of

7   aiding and abetting-type liability. There's no

8   liability for consequential-type damages. You're

9   just restricted to what's provided under the

10  Uniform Fraudulent Transfer Act. So, again,

11  there's no tort. There's no ability to pursue a

12  cause of action for aiding and abetting common law

13  fraud.

14      Lastly, I'll touch on tortious interference.

15  This one is one where the facts just don't fit

16  here. If you review tortious interference cases,

17  they deal with situations where a party has usurped

18  a business opportunity, and that didn't happen

19  here. That wasn't alleged here. The plaintiffs do

20  not cite a single case with an analogous fact

21  pattern. The situation here was a promissory note

22  that was breached well before the transfers in

23  question even occurred. So this is just not a

24  tortious interference-type case.

25      So in sum, we believe the complaint should be

dismissed for lack of standing. Or in the alternative, if the court finds standing, counts 1, 4 and 5 should be dismissed due to their patent defects. Thank you, Your Honor.

THE COURT: Has Mr. Davis spoken well for other co-counsel here, Frenchman and James?

MS. O'CONNOR: We're good. Thank you, Judge.

MR. ANDERSON: Your Honor, good morning. I note that it's 9:58 and you gave us till 10:30, so I just wanted to...

THE COURT: I did? How generous of me.

MR. ANDERSON: I think that's the case. We only have until 10:30. I don't know how we want to handle it with Mr. Childers. I would just like to have equal time, if possible, to address --

THE COURT: Is it his motion?

MR. ANDERSON: Yes. We obviously definitely want to respond to this one and then I just wanted to make sure that I would have equal time to respond to Mr. Childers.

THE COURT: We'll try our best here.

MR. ANDERSON: Thank you very much.

And to start off, I prepared a notebook. It's nothing more than just the pleadings and the motion. There's no case law in it, but I'll be

1  referring primarily to tab 1, which is the amended

2  complaint which is in question here today.

3     The first case I'll hand Your Honor is the

4  Deutsche Bank v. Lippi case. This addresses the

5  standard for a motion to dismiss. I know Your

6  Honor's familiar with it, but we'd want to direct

7  Your Honor's attention to page 4 of the Deutsche

8  Bank v. Lippi case. It's citation 78 So. 3d 81.

9  It's page 4 of the printout, but it's page 84 of

10  the opinion. It just sets forth the basis, and

11  I've highlighted it here: In determining whether a

12  complaint properly states a cause of action upon

13  which relief can be granted, a court must confine

14  its review to the four corners of the complaint --

15  I know Your Honor's aware of this -- draw all

16  inferences in favor of the pleader and accept it as

17  true the well-pleaded allegations. The allegations

18  are taken as true, are then reviewed in light of

19  the applicable substantive law to determine whether

20  standing exists.

21     And then it goes on and it says: The trial

22  court may not speculate as to whether the

23  allegations are, in fact, true or whether the

24  plaintiff has the ability to prove them.

25     Then it goes on to say: A motion to dismiss

1    is not a motion for summary judgment, and the trial

2    court may not rely upon depositions, affidavits,

3    other forms of issues that might be brought to Your

4    Honor's attention of evidence or speculation as to

5    whether the allegations in the complaint will

6    ultimately be provable.

7         So the idea is that the court is supposed to

8    limit its gaze to the four corners of the

9    complaint, which is tab 1 of the exhibit notebook.

10   And I know Your Honor's aware of that, but I just

11   wanted to get that on the record.

12        So it's our position that there's nothing on

13   the face of the complaint that establishes that we

14   do not have standing.  The information relating to

15   what has happened or what is currently happening in

16   the Heintzes' bankruptcy proceedings is outside the

17   four corners of the complaint, and we've pled

18   standing as injured parties in the amended

19   complaint.  The issue then for Your Honor is

20   whether we have appropriately pled our causes of

21   action, which we contend we have.

22        If Your Honor would just briefly look at the

23   complaint.  It is long.  It's a long complaint.

24   Paragraphs 1 through 10 are jurisdiction and venue.

25   That's pages 1 and 2.  Paragraphs 11 through 45

1   describe the circumstances surrounding how the

2   plaintiff lenders became involved.  That's

3   paragraphs 46 through 92.  These paragraphs provide

4   background and context as for why the asset

5   transfer ultimately occurred and why it was

6   fraudulent.  They specifically describe in

7   paragraphs 46 through 92 how the Heintzes knowingly

8   made misrepresentations to our clients to induce

9   them to provide money.  It provides context as to

10  why the Heintzes formulated a scheme to transfer

11  Tutoring Zone's assets to keep them out of the

12  lender's hands.

13       These paragraphs also are necessary to

14  establish that the lenders actually have standing,

15  so that's paragraphs 46 through 92.  Paragraphs 93

16  through 215 detail the conspiracy to defraud the

17  lenders and each defendant's involvement in the

18  conspiracy.  That's paragraphs 93 through 215.

19  Then paragraphs 216 through 223 -- I know it's long

20  -- describe how Tutoring Zone was the alter ego of

21  the Heintzes at the time of the fraudulent

22  transfers.

23       And then, finally, I've tabbed them 1, 2, 3, 4

24  and 5, paragraphs 235 through the end, which is

25  paragraph 294 are the counts, the five counts that

are at issue.  First, the count 1 is the civil
conspiracy.  Count 2 is first FUFTA claim just
against James.  Count 3 is the second FUFTA claim
just against James and Frenchman.  Count 4 is the
aiding and abetting common law fraud; not aiding
and abetting the FUFTA, but aiding and abetting
common law fraud.  And then 5 is the tortious
interference claim against all three.

So that's the layout of the complaint.  And it
is long, and it's long because it's a pretty
detailed conspiracy that we intend to prove.  And
it's similar -- in a moment, we'll flip through the
trustee's claim and although the trustee's claim is
different, it's similarly long because it takes
that amount of detail to lay out what happened in
the case.

And if we're permitted to go further, then
there's tons of e-mails and all sorts of
representations that we would put into evidence
that demonstrate the conspiracy and the fraud and
the aiding and abetting fraud.  So that's the
layout of the complaint.  And we believe that we've
pled it appropriately and adequately.

There was reference in my opponent's argument
to the FUFTA, have we alleged FUFTA adequately.

1    And the two statutes that we rely upon are Florida

2    Statute 726.105.  That's the first FUFTA count.

3    And then the second is 726.106.  So the two FUFTA

4    counts, counts 2 and 3, are based on Section

5    726.105 and 726.106.  And if Your Honor would turn

6    to tab 2 of the exhibit notebook -- I'm sorry --

7    it's tab 1 but it's yellow sticky 2.  So yellow

8    sticky 2 is count 2 and yellow sticky 3 is count 3.

9         And, Your Honor, in the interest of time, I'm

10   not going to go through them.  But if you were to

11   go through each of the counts, you would see that

12   we essentially quoted the language from 726.105 and

13   726.106 into these counts to make sure that we

14   adequately pled the FUFTA counts against James and

15   also then James and Frenchman.  So I'm going to

16   press pause on that and kind of move forward.  I

17   don't know that that was argued.  I think we were

18   mostly focused on standing.

19        The next argument is standing.  We do allege

20   that we're creditors of the Heintzes.  We have

21   standing to bring the fraudulent transfer claim

22   against the defendants as transferees.  We also

23   allege at the time of the transfer, Tutoring Zone

24   was the alter ego of the Heintzes.  The plaintiffs'

25   notes -- actually our notes show up on the balance

1  sheets, and if we're permitted to go forward, we
2  would show the court that our notes -- my client's
3  notes actually show up on the balance sheets of
4  Tutoring Zone, and it shows how the Heintzes
5  commingled their debts with Tutoring Zone.
6  Therefore, the plaintiffs have alleged that they're
7  creditors of both Tutoring Zone and the Heintzes.
8  Either way, we've alleged that we have standing
9  under FUFTA for both count 2 and count 3.
10      There was reference in my opponent's argument
11  to Zwirn, and we'd like to distinguish Zwirn to
12  Your Honor.  I think it's in the notebooks.  I
13  don't know that it's necessary that I hand it to
14  you.  But, in essence, the defendants argue that
15  only the trustee in the Heintzes' bankruptcy case
16  can bring these claims we brought -- the two claims
17  that we brought.  And they rely on Zwirn.  The
18  distinction is, in Zwirn, the bankruptcy was
19  initiated by the debtor Zwirn while the fraudulent
20  transfer action was pending in New York.  The
21  trustee in bankruptcy then, they go straight to the
22  transferee, so it would be as if the trustee goes
23  to the defendants here -- trying to analogize it --
24  and they actually settle with the transferees in
25  that case.  They settle with them.  Then the

1   trustee goes to the bankruptcy court and says:

2   Give me a bar order preventing the pending FUFTA

3   count by the creditors outside of bankruptcy. They

4   obtained the bar order and then that's what

5   extinguishes the creditors' transfer claims against

6   the transferees because there's a bar order in

7   place.

8       The distinguishing factor here is the assets

9   transferred were assets of Tutoring Zone, not the

10  debtor. Tutoring Zone is not in bankruptcy.

11  Tutoring Zone is the transferor and is not in

12  bankruptcy. There's no trustee on behalf of

13  Tutoring Zone. There has been no judicial

14  determination that Tutoring Zone's assets are the

15  property of the bankruptcy estate and the trustee

16  did not seek determination in the complaint, which

17  is what we're going pass out to Your Honor in just

18  a few moments, which is Exhibit A -- Composite

19  Exhibit A that was filed on Friday.

20      The defendants requested -- in this particular

21  case, the defendants went to the trustee and

22  requested entry of a bar order in the bankruptcy

23  court to prevent this very litigation and other

24  litigation, but the court declined to enter a bar

25  order -- the bankruptcy court declined to enter a

1   bar order in this case.  Again, this is all things

2   that you shouldn't be considering here, but I'm

3   just doing it in response.  This is clearly outside

4   the four corners of the complaint.  But in

5   response, we're just giving the court a little bit

6   of background.

7        In the bankruptcy proceedings, James and

8   Frenchman wanted to settle with the trustee that

9   would bar us from litigating these claims.  James

10  offered to buy Tutoring Zone for $50,000.  The

11  condition of the settlement was entry of a bar

12  order precluding this type of action.  The court

13  decided that the proposed settlement was not in the

14  best interest of the creditors.  The court never

15  entered a bar order, which all of this is why

16  Mr. Wilcox is here because he is part of those

17  proceedings.

18        Therefore, the current case, there is no bar

19  order in place to prevent these claims, which is

20  the huge distinguishing factor with Zwirn.  In

21  fact, the court specifically declined to enter a

22  bar order, which is why we clearly have standing

23  and there is nothing here that would prevent this

24  action to continue on.

25        The case that was filed on Friday -- or

1    actually the complaint that was filed on Friday and

2    referenced in the opposition, this is -- it's

3    pretty thick.  Here you go (indicating).  But this

4    is the notice of filing.  It's the complaint by the

5    trustee.  This was Exhibit A.  In this complaint,

6    you'll see that it's the trustee versus Chris

7    James -- Theresa Bender, who's the trustee, versus

8    Matthew Bruce Heintz, Lorena Heintz, Paul Heintz,

9    Bruce Heintz, Tutoring Zone 2 and Cynthia L.

10   Frenchman and Christopher James.  So some of the

11   defendants in this case are parties to this

12   complaint.

13        If Your Honor would turn to page 52 of this

14   complaint, which I've tabbed, it's paragraph 276.

15   The trustee alleges in paragraph 276 that Mr. James

16   and TZ-2 conspired with the debtors to strip

17   Tutoring Zone of its substantial assets in an

18   effort to create a continuing business interest to

19   devoid Tutoring Zone's liabilities.  As part of

20   this conspiracy, the intellectual property lease,

21   which is count 2, and the intellectual transfer

22   agreement, which is our count 3, were executed, and

23   Matthew Heintz came to work for TZ-2 owned by

24   Mr. James.

25        In paragraph 280, the trustee goes on and

alleges: By transferring the substantial assets
and directing the migration of key personnel to
Tutoring Zone -- from Tutoring Zone to Tutoring
Zone 2 at the direction of and agreement with Mr.
James, Matthew Heintz then breached his duty.

If you would turn to the next page, paragraph
281, the overall effect, according to the trustee's
complaint here, of the conspiracy between the
debtors, Mr. James, and TZ-2 was to deprive
Tutoring Zone of substantial value and to defraud
its creditors.

So I've raised this to show that there are
similar -- they are similar, but they're different,
and I'd like to go through how they're different.
First of all, the trustee is not objecting to us
bringing this action. The defendants, we would
argue, lack standing to assert the trustee's right
to challenge the standing. This is something that
they don't -- The trustee should be coming in and
saying that we don't have standing to assert this
cause of action. If the trustee wanted to
intervene or seek relief in the bankruptcy court,
she could do that. As a practical matter, if the
trustee does not object, a creditor can bring
individual claims.

1      It's interesting in the bankruptcy case, as I

2 understand it, that the defendants in this case

3 take the position that the trustee cannot prosecute

4 the fraudulent transfer claims in the bankruptcy

5 because they are not part of the bankruptcy estate.

6 Yet, in this action, they're taking an opposite

7 position, that they can prosecute the claims

8 because they are part of the bankruptcy estate. So

9 according to the defendants, no one has standing to

10 prosecute any of these claims. We think that's the

11 position.

12      The defendants are trying to use the Heintzes'

13 bankruptcy to shield and to avoid liability for

14 their own wrongful conduct involving Tutoring Zone.

15 The Heintzes filed for bankruptcy as individuals.

16 Tutoring Zone has not filed for bankruptcy. None

17 of the named parties in this action have filed for

18 bankruptcy. There's nothing in the bankruptcy

19 code, we contend, Florida Statutes, or any order of

20 the bankruptcy court to preclude the plaintiffs

21 from bringing the FUFTA claim against the

22 defendants.

23      The defendants, in our opinion, do not cite

24 any Florida court case dismissing a FUFTA claim

25 based on standing. And although the trustee has

 1    asserted claims, she has not objected to us

 2    asserting our claims and they're not the same.   If

 3    you really look at the complaint, you would see

 4    that the trustee's claims concern the transfer of

 5    the Heintzes' membership interest, which is a

 6    distinction.   Our claims concern the transfer of

 7    assets such as the actual IP, such as the actual

 8    furniture.   We have an interest under our

 9    promissory notes, which we've attached to the

10    complaint, to those assets.

11         So the transfer of the membership interest,

12    which is the trustee's complaint, are different

13    than the transfer of the actual assets.   This is

14    very important because if the trustee thought that

15    we were doing something inappropriate, she could

16    seek a bar order precluding all of this, but she

17    has not done that.

18         Again, the issue here today is whether we have

19    appropriately pled the causes of action, which we

20    believe we have, and that the happenings in the

21    bankruptcy court is beyond the four corners of the

22    complaint.

23         Moreover, what gets lost a little bit is that

24    my clients have independent claims.   While, yes,

25    there are two FUFTA claims, there's also count 2,

1    count 4 and count 5. We've pled a claim for

2    conspiracy, a claim for aiding and abetting common

3    law fraud, and tortious interference which they

4    clearly have standing as injured parties. These

5    claims are based on unique damages that are unique

6    to my clients that the trustee has no bearing upon,

7    and the trustee could not bring these claims that

8    we're asserting in counts 1 -- well, really all of

9    the counts, but under the tortious interference,

10    aiding and abetting common law fraud, and the

11    conspiracy.

12    So with that, I would like to speak briefly

13    about whether we've adequately pled the civil

14    conspiracy count. I'm not sure if that's been

15    challenged, but I'm going to go through it anyway

16    and pass along the case of -- the Charles case

17    (indicating).

18    Your Honor, this is the Charles versus Florida

19    Foreclosure Placement Center case, citation 988 So.

20    2d 1157. It's an August 2008 case from the Third

21    District Court of Appeal. It sets forth on page 3

22    of the handout, which is 1159 and 1160, where it

23    quotes: A civil conspiracy requires an agreement

24    between two or more parties to do an unlawful act

25    or to do a lawful act by unlawful means, the doing

1    of some overt act in pursuance of the conspiracy

2    and damage to the plaintiff as a result of the acts

3    done under the conspiracy.

4        So those are the elements under Florida law.

5    And, in essence, in summary, our conspiracy

6    complaint alleges the winding down of Tutoring

7    Zone's business with plaintiffs' knowledge; the

8    transfer of its assets to a newly-formed

9    corporation; the intentional concealment of

10   plaintiffs -- from plaintiffs and to the public of

11   the existence of the transfers of the newly-formed

12   Tutoring Zone until enough time -- and this is

13   key -- until enough time that the Heintzes could

14   file for bankruptcy.

15       So, again, if we're permitted to proceed, you

16   would see e-mails back and forth saying:  You've

17   got to wait 90 days.  There's a certain time period

18   that you have to wait.  This is, again, all part of

19   the conspiracy.  The key for conspiracy is you must

20   have an underlying wrong.  In here, the underlying

21   wrong would not just be the fraudulent transfer.

22   It would also include the common law fraud.  It

23   would also include the tortious interference.  So

24   the conspiracy is supported not only by the FUFTA

25   counts, but also the aiding and abetting common law

1   fraud and the tortious interference.  And that's

2   count 1.

3       Count 4 is aiding and abetting common law

4   fraud.  And with that Your Honor, I'm handing you

5   the case of ZP No. 54 Ltd. Partnership versus

6   Fidelity Deposit Company of Maryland.  The citation

7   is 917 So. 2d 368.  It's a Fifth District 2005

8   opinion.  If Your Honor would turn to page 4 of the

9   handout.  Here, this court, the Fifth District, is

10  saying virtually -- and I've highlighted it -- all

11  of the courts have acknowledged the existence of

12  aiding and abetting -- Let me say that again.

13  Virtually all courts that have acknowledged the

14  existence of aiding and abetting for a fraud state

15  that the following are elements that must be

16  established.  First, there existed an underlying

17  fraud.  Second, the defendant had knowledge of the

18  fraud.  And, third, the defendant provided

19  substantial assistance to advance the commission of

20  the fraud.

21      Here, the underlying fraud, again, as I said

22  before, is not solely the fraudulent transfer.

23  That's one piece of it, but it's also the entire

24  scheme.  It's aiding and abetting the fraud and

25  then it's also the tortious interference.  What you

37

read from the complaint, and specifically in
paragraph 284, if Your Honor would turn to yellow
sticky number 4, this is the aiding and abetting
common law fraud. And if Your Honor would turn to
paragraph 284, you'll see that we went into great
detail to set forth the underlying wrongs. It's
284, subparagraph A through subparagraph T. These
are the underlying wrongs to support the aiding and
abetting common law fraud.

So, essentially, the defendants actively
counseled and coached the Heintzes on how to
conceal and misrepresent the existence of an
intellectual property lease. There's e-mails to
that effect. Intellectual property transfer
agreement, even the existence of Tutoring Zone from
my clients, the plaintiffs. Essentially,
defendants coached the Heintzes -- and there's
e-mails to this effect -- on how to mislead the
plaintiffs and the public about the continuation of
Tutoring Zone's business when actually it was
Tutoring Zone 2 that was operating the business.
The defendants coached the Heintzes on how to lie
to the plaintiffs about negotiations with Study
Edge, who was attempting to purchase Tutoring Zone
and to buy more time. It's these acts that are set

1    forth in paragraph 284 that constitute such false

2    representations that were knowingly made with the

3    intention that the plaintiffs would rely and did so

4    rely to their detriment.  The plaintiffs alleged

5    defendants had knowledge of the fraud and provided

6    substantial assistance in advance of commission of

7    the fraud.  So we believe the complaint is adequate

8    in alleging the count for aiding and abetting

9    common law fraud.

10       There was reference to Freeman versus First

11   Union, and we think that the reliance upon Freeman

12   is misplaced.  Again, Freeman was a case that the

13   Supreme Court dealt with aiding and abetting a

14   fraudulent transfer, but this case is not -- we're

15   not alleging aiding and abetting a fraudulent

16   transfer.  We're alleging a cause of action for

17   aiding and abetting common law fraud.  So we

18   believe that the Freeman case is not applicable to

19   this scenario and should not be relied upon for

20   this proceeding.

21       Then, finally, the last count is tortious

22   interference.  I'm handing Your Honor the case of

23   Palm Beach County Healthcare District versus

24   Professional Medical Education, Inc.  It is

25   13 So. 3d 1090 and it's a Fourth District case from

1    2009.  I'm sure Your Honor's aware of the elements

2    for tortious interference but, for the record, the

3    elements for tortious interference on page 4 of the

4    handout are:  The elements of tortious interference

5    with a business relationship are the existence of a

6    business relationship, not necessarily evidenced by

7    enforceable contract under which the plaintiff has

8    legal rights, the defendant's knowledge of the

9    relationship, an intentional and unjustified

10   interference with the relationship by the defendant

11   and damage to the plaintiff as a result of the

12   interference.

13       And if Your Honor would turn to yellow sticky

14   number 5, and you were to review the allegations,

15   specifically we allege the existence of a

16   legitimate business relationship with Tutoring Zone

17   in paragraphs 287 through 289.  In paragraph 290,

18   we allege that the plaintiffs allege that

19   defendants knew of the relationship between

20   plaintiffs, Tutoring Zone and the Heintzes.

21   Paragraphs 291 through 293 set forth the

22   defendants' intentional and unjustifiable

23   interference with the relationship, and they

24   described the nature of the interference.  And,

25   finally, in 294, we allege -- plaintiffs allege

they suffered damages as a direct and proximate
result of the interference.

    May I have a moment?

    THE COURT:  Sure.

    MR. CHILDERS:  Your Honor, while they're
conferring, taking look at the time...

    THE COURT:  I'll give you another half hour.

    MR. ANDERSON:  Your Honor, if we were here on
some other -- instead of a motion to dismiss, we
were on a motion for summary judgment, I would have
brought something outside of the four corners of
the complaint and presented it to the court, an
order -- and this is in response to my opponent --
from the court in the bankruptcy case indicating
that this proceeding supplementary that was
referenced, the court did not find that that was
any sort of stay violation.  I don't have it in
front of me, but it's my understanding from counsel
that the court -- this proceeding supplementary,
which is a FUFTA claim, the court said that that
was not a stay violation.  It's just I did not
realize I would be presenting evidence in a motion
to dismiss.

    THE COURT:  I think we're all talking about
how we need to stick with the four corners, but

1    we're certainly going outside of it a lot on both

2    sides here, so we need to be careful about that.

3           Do you have any brief rebuttal, Mr. Davis?

4           MR. DAVIS:  Your Honor, yes, I do have brief

5    rebuttal.

6           THE COURT:  I'll give you about five minutes,

7    and then we'll move on to Mr. Childers.

8           MR. DAVIS:  Thank you, Your Honor.

9           As to the four corners rule, there is an

10   exception when you're dealing with subject matter

11   jurisdiction.  The case that we cite in support of

12   that is Steiner Transocean v. Efremova.  And the

13   exceptions include if you're dealing with subject

14   matter jurisdiction, if you're dealing with venue

15   and standing is a precursor to invoking this

16   court's subject matter jurisdiction, so we believe

17   that exception would apply.

18          To the extent the court disagrees, the

19   complaint on its face in paragraph 186 alleges that

20   the Heintzes filed bankruptcy.  So once they made

21   that allegation, in order to have standing, it

22   becomes a two-step process.  They would have to

23   allege that the trustee's exclusive two-year window

24   has expired, which it has; and, B, the trustee

25   hasn't pursued the causes of action.  They haven't

1   made those allegations.  In fact, we know the

2   trustee has pursued the causes of action.  So we

3   think the complaint as drafted implicates and

4   raises the bankruptcy issue so the court can

5   consider it.

6       Now, in listening to Mr. Anderson's argument,

7   he says the assets that were transferred were

8   assets of TZ-1 to TZ-2, which we agree with.  We

9   acknowledge that the assets were transferred from

10  TZ-1 to TZ-2.  I said that during my presentation.

11  And that actually reverts the amended complaint

12  back to the original complaint, and that's the

13  reason why FLH didn't have standing.

14      If the transfer is from TZ-1 to TZ-2, which it

15  was, then only the creditors of TZ-1 have standing.

16  FLH and the plaintiffs are creditors of the

17  Heintzes.  They're creditors of the Heintzes by

18  virtue of the promissory notes which are attached

19  to the complaint which were made by the Heintzes.

20  So if it is their position that it's a transfer

21  from TZ-1 to TZ-2, then these plaintiffs do not

22  have standing.

23      The bankruptcy court order that was referenced

24  related to the proceeding supplementary that was

25  not stayed was the landlord claim that I mentioned,

1   which has a judgment against TZ-1.  The landlord is

2   a creditor of TZ-1.  These plaintiffs -- and that's

3   why this is so critical -- these plaintiffs are not

4   creditors of TZ-1.  They don't have standing.  They

5   recognized that deficiency so they amended the

6   complaint to make it allege that it was a transfer

7   of the membership interest, which does implicate

8   the bankruptcy issues, it implicates the Zwirn case

9   that we cited, and the Eleventh Circuit case that

10  we cited.  We are in no way taking opposite

11  positions.  We accepted the allegations in the

12  complaint as true as required in the context of a

13  motion to dismiss.  So that is my rebuttal, Your

14  Honor.  Thank you.

15       MR. CHILDERS:  Mr. Hughes may have a comment.

16       MR. HUGHES:  If you'll indulge me.  If not,

17  that's fine.

18       THE COURT:  Go ahead.

19       MR. HUGHES:  Your Honor, it's really simple.

20  All of the counts of this complaint are tied into a

21  fraudulent transfer.  The case law is pretty clear.

22  If they're alleging a fraudulent transfer of the

23  Heintzes' property, which they are, alter ego, then

24  this case belongs in the bankruptcy court as it's

25  already been alleged.  All you have to do to look

1    at all of the different counts of the complaint to

2    see that it is a fraudulent transfer case is to

3    look at the way they've pled it.

4         If you look at count 1, the conspiracy claim,

5    paragraph 237 describes the conspiracy as the

6    fraudulent transfer of the assets to the

7    newly-formed Tutoring Zone 2.  So they've named it

8    conspiracy, but the facts alleged of the conspiracy

9    is the fraudulent transfer.  And then you've got

10   the two fraudulent transfer counts which on their

11   face are to be in the bankruptcy count -- actually

12   three.  And then you go to the aiding and abetting,

13   count 4, paragraph 279 of the amended complaint

14   describes facts supporting the aiding and abetting

15   as the stripping of Tutoring Zone of substantial

16   assets to create a continuing business interest

17   devoid of the Heintzes' liabilities to hinder,

18   delay and defraud creditors.  That is a fraudulent

19   transfer claim.

20        Paragraph 280, the conspiracy involves the

21   winding down of Tutoring Zone's business.  The

22   fraudulent transfer of the assets to the

23   newly-formed Tutoring Zone 2.  So they've named it

24   aiding and abetting common law fraud, but the facts

25   alleged are fraudulent transfer.

And then the paragraph that Mr. Anderson referenced, paragraph 284 with the many subparts, all relate to the transfer of the assets, the transfer agreement, the IP lease, this is all fraudulent transfer.

And then you go to the final count, count 5, tortious interference, and you look at paragraph 291 -- which is, I think, a cut and paste of the previous paragraph with the subsection -- all of those facts are tied into the fraudulent transfer of the assets of TZ-1. And so they may slap a different name on it, but all of the facts alleged in each and every single count are tied into the transfer of the intellectual property. No matter what you call it, it's still a fraudulent transfer. It's just different evidence of that transfer.

And every item of damage for each and every single count they're alleging is all stemming from the fraudulent transfer. If there is no transfer of the IP, they have no cause of action for any one of those counts. So it gets back to the simple issue, if they are all fraudulent transfer claims, as a matter of law, it has to go to the bank court.

THE COURT: Mr. Childers, you have a motion, too. I'd like to go ahead and address that. I'll

1   give you all until 11:00 o'clock.  I know we're

2   running overtime.  This way, we'll get everything

3   heard and you don't have to reschedule another

4   hearing.

5       MR. CHILDERS:  Thank you, your Honor.

6       My motion to dismiss is a little bit

7   different, but since I filed my original motion to

8   dismiss, a couple things changed and so I joined

9   the co-defendants' motion to dismiss and I'll have

10  some different comments on the same issues.

11      Primarily what changed from the time that I

12  filed my motion to dismiss is that they filed their

13  opposition to it and they took a position on some

14  things that weren't perfectly clear in the original

15  amended complaint.

16      Before I start, since we have them on the

17  table, this is the trustee's complaint from the

18  bankruptcy case, and this is their complaint that

19  they served on me.  The trustee's complaint has 20

20  counts.  There are only five counts in this

21  complaint.  And in terms of the factual

22  allegations, I just checked while we were sitting

23  here, and there are 68 factual allegations in the

24  trustee's 20-count complaint and 230-something in

25  theirs.  And we're going to talk about that and how

1   they did it.  It's quite intentional.

2        This is not a dispositive issue whether the

3   complaint needs to be stated shortly and plainly.

4   Let me talk about some of the dispositive issues.

5   This complaint has a lot of problems, some profound

6   problems.  The first profound misunderstanding of

7   law on the part of the plaintiffs that affects

8   primarily the civil conspiracy and the aiding and

9   abetting count is they're misunderstanding what a

10  fraudulent transfer is under the law.

11       In my packet and filed in the record, we

12  provided case law and, in particular, very helpful

13  is that June 2004 Florida Bar article.  It kind of

14  summarizes the state of the law as it relates to

15  aiding and abetting, fraudulent transfers, as well

16  as the ethical issues surrounding attorney's advice

17  of fraudulent transfers which, as you can imagine,

18  is a very important issue to me in this case.

19       The cases, including the Freeman case, that

20  Florida Supreme Court case from 2004, make it clear

21  that a fraudulent transfer is not a tort and it

22  does not create any new torts.  A fraudulent

23  transfer is a statutory equitable remedy that's

24  provided to creditors to allow them a way to roll

25  back property -- I'm sure you've seen plenty of

1    these -- so they can claw back that property so

2    they can collect against it. It's not a tort.

3          And so that misunderstanding on the part of

4    the plaintiffs leads to a lot of their problems.

5    They don't understand, for instance, why the

6    Supreme Court said there's no aiding and abetting

7    or civil conspiracy over fraudulent transfers. The

8    answer is very simple. It's because a fraudulent

9    transfer is not a tort or an improper act. And for

10   a civil conspiracy, you have to have an underlying

11   improper act or tort in order to support that

12   conspiracy. Well, the fraudulent transfer and the

13   actions revolving around those transfers are not

14   improper acts under the law.

15         In a minute, if there's disagreement over

16   that, we can look at the cases that state that

17   explicitly. In particular, the defendants' Taiwan

18   case looked at very similar facts, and the

19   plaintiffs were alleging that the alleged

20   fraudulent transfer in that case constituted a tort

21   for purposes of statutory relief, and the court

22   said explicitly fraudulent transfer is not a tort

23   and, therefore, you can't take advantage of that

24   statutory relief against torts. It's not a crime

25   and it's not even improper.

1      The June 2004 article published in the Florida

2   Bar discusses, in fact, the constitutional

3   implications because the Florida constitution

4   guarantees all citizens a right to own, protect,

5   and preserve property.  And so, in fact, the last

6   paragraph of that article suggests that an attorney

7   has an affirmative duty to advise clients about the

8   possibilities of protecting their assets in this

9   way.  So because there's no underlying tort or

10  improper act, the civil conspiracy fails as a

11  matter of law and must be dismissed.  And the

12  aiding and abetting count fails as a matter of law

13  and must be dismissed.  Aiding and abetting is

14  something that is permissible but it is not a cause

15  of action.

16      Now, Mr. Davis brought up this alter ego fix,

17  the Band-Aid I call it.  They filed the original

18  complaint.  Mr. Davis called them on the fact that

19  they didn't have standing because they're not

20  creditors to Tutoring Zone, and they recognize that

21  so they put a Band-Aid on it by adding another 40

22  paragraphs of something alleging that the Heintzes

23  are alter egos of Tutoring Zone.  So the

24  implication is that they should be considered as

25  one and the same and, therefore, a creditor of

50

1    Heintz is also a creditor of Tutoring Zone if

2    they're alter egos of each other.

3        Well, that creates a fatal inconsistency

4    that's going to knock out their civil conspiracy

5    and aiding and abetting counts also.  Right?

6    Because it's settled law that an agent can't

7    conspire with a corporate principal.  That is, an

8    employee doesn't conspire with his company.

9    Otherwise, you would be naming all the employees

10   every time you had a civil conspiracy.  And I don't

11   think there's any disagreement about that law.

12       So if the Heintzes aren't alter egos, as was

13   raised in my co-defendant's first motion to

14   dismiss, if they're not alter egos, then they're

15   agents of the corporate principal, Tutoring Zone,

16   and they can't conspire with themselves in that

17   way.  If they're alter egos, they're the same and

18   they can't conspire with themselves if they're

19   alter egos.  The Heintzes can't conspire with

20   Tutoring Zone if they're the same thing.

21       Similarly, in terms of my particular position,

22   the Richard Bertram versus Sterling Bank case,

23   which is at page 41 of my packet, also analyzed a

24   claim where an attorney was accused of exactly the

25   same things that happened here, conspiring with his

1  client and tortiously interfering with the other

2  folks by advising his client.  And what this case

3  states pretty definitively is that the agent, the

4  attorney can't conspire with his own principal

5  because they're considered one and the same under

6  that same intra-corporate doctrine where an

7  employee of a corporation can't be considered to

8  conspire.  So I cannot have conspired with my

9  clients, the Heintzes, because I was their agent.

10  Similarly, I can't have conspired with Dr. James

11  because Dr. James was my client and I was his

12  agent.

13      This is going to flow also, this problem, into

14  their tortious interference count.  The complaint

15  alleges that I represented the Heintzes in all

16  material times, and I refer to paragraph 108 that

17  states it pretty definitively.  And it also alleges

18  that the Heintzes were parties to those promissory

19  notes with the plaintiffs, that's how they get

20  their standing, right, because they've got this

21  note relationship.

22      Well, in the Bertram case that we have opened,

23  it states very clearly, settled law:  The tortious

24  interference claim failed because an agent is not

25  liable for tortious interference with the contract

1   of which his principal is a party.

2          So my clients, the Heintzes, were parties to

3   those note contracts.  I can't tortiously interfere

4   with my clients' contract because for those

5   purposes I'm considered to be an agent and they're

6   the principal, and that would be them interfering

7   with themselves.  So, once again, the tortious

8   interference count has to fail and there's no way

9   that can be fixed by an amendment under these

10  facts.

11         I also will point out that the complaint

12  alleges that the notes defaulted first in June of

13  2011, when the first quarterly interest payment was

14  due.  The notes are all attached to the complaint.

15  It's clearly set forth in those notes.  And so as

16  alleged, that default occurred 10 months before the

17  alleged tortious interference.

18         So what they're alleging is that the

19  defendants tortiously interfered with the defaulted

20  contract that the Heintzes weren't paying on.  But

21  it's settled law that tortious interference

22  requires the existence of an advantageous business

23  relationship.  And a 10-month-old, stale, defaulted

24  note is not an advantageous business relationship

25  that anyone would have a reasonable expectation of

1   benefiting from.  Therefore, they failed to allege

2   the existence of that advantageous business

3   relationship or reasonable expectation of it, and

4   it must fail for that reason as well.

5        Finally, what the complaint alleges in regard

6   to tortious interference, the relationship is a

7   debtor-creditor relationship.  All of these

8   paragraphs amount to just a debtor-creditor

9   relationship between the plaintiffs and the

10  Heintzes.  And that is not the kind of advantageous

11  business relationship that tortious interference

12  law is founded on.  Somebody owing you money does

13  not create an advantageous business relationship

14  that someone else can tortiously interfere with.

15       If it did, just think about the implications

16  of that.  That anybody who did debtor practice and

17  was counseling debtors with regard to their

18  relationship with creditors, would be potentially

19  liable for somehow tortiously interfering with that

20  debtor-creditor relationship.  It's nonsense.

21  There's no law whatsoever that supports that.

22       Finally, I would just add to my comments with

23  regard to the aiding and abetting count.  The

24  plaintiffs, as I'm sure it must be apparent by now,

25  are trying to plead around the Freeman limitation.

1    That is the Freeman case and all the related DCA

2    cases.  And there's much, much case law in this

3    area that say you can't aid and abet a fraudulent

4    transfer.  They're trying to call it common law

5    fraud.  Well, the fraudulent transfer action

6    itself, as we've already seen, is not a tort.  It's

7    an equitable remedy and it's statutory, so there is

8    no common law analogue to it.  There's no fraud in

9    that sense of the fraudulent transfer itself that

10   they could be referring to.  And they failed to

11   allege common law fraud, the elements of common law

12   fraud, with sufficient specificity.  We all know

13   what they are, a misrepresentation of fact to the

14   plaintiffs that they relied on that they were

15   intended to rely on that caused them some injury.

16       There's no identified statement that was made

17   by any of these defendants.  Now, they go on and on

18   about, in particular, there's 92 paragraphs where

19   they talk about the things the Heintzes told them

20   in 2011, which are completely irrelevant as I

21   pointed out in my motion to any of these

22   defendants.  But they don't tie those up into their

23   aiding and abetting count anyway.  So we're left

24   with the allegations of statements that are made in

25   2012.  And if you look at them one by one, you'll

1  see that none of them satisfy the condition of

2  common law fraud. They all have profound problems.

3  The one that counsel referred to a couple times was

4  that the Heintzes were negotiating apparently for

5  some kind of a deal with the Fieldmans. The

6  Fieldmans aren't any of these plaintiffs, so that's

7  not a statement that was made to any of these

8  plaintiffs and certainly wasn't one that the

9  Heintzes, I assume, intended these plaintiffs to

10  rely on since they weren't the recipient of those

11  statements.

12      THE COURT: Okay.

13      MR. CHILDERS: I think my comments in my

14  motion about the parallax nature of this complaint

15  are obvious. I'm not going to go through it with

16  you, but I'll just point it out that what they did

17  was they just repeated the same allegations over

18  and over and over again and then attached example

19  after example of this where I've cut out this

20  paragraph and you can see the same paragraph

21  repeated 6, 9, 12 times throughout the complaint.

22      THE COURT: I understand. I'll give you equal

23  time, Mr. Anderson.

24      MR. ANDERSON: Thank you, Your Honor. I

25  appreciate it. There was reference in my

1   opponent's argument to this Florida Bar Journal

2   article. If I could direct your attention to the

3   third-to-the-last page. It's highlighted at the

4   top and it says: Secondly, there is an important

5   ethical distinction between assisting actual common

6   law fraud and assisting a fraudulent conveyance.

7   And I could read further, but the point I'm trying

8   to make is, and you can also look at the last

9   paragraph, first sentence: The Florida Supreme

10  Court has also differentiated fraudulent transfers

11  from common law fraud. So to present this case or

12  this article as a way to assert that our pleadings

13  are deficient and should be barred by Freeman or

14  the rationale behind the Florida Bar Journal

15  ignores the difference which is we're alleging

16  aiding and abetting common law fraud, not aiding

17  and abetting fraudulent transfers, and that there

18  is a distinction between common law fraud and the

19  fraudulent transfers.

20       I'd also like to reiterate that my clients

21  have pled conspiracy, as you know, aiding and

22  abetting common law fraud, tortious interference

23  for which they have standing. These are distinct

24  claims based on unique damage that are separate and

25  apart from the fraudulent transfer. The fraud was

1  perpetrated against my clients in a matter unique

2  to them and causing them damage.

3      We've set forth of the allegations of each of

4  those separately in counts 1 and 4 and 5.  So we

5  would assert that they are independent claims that

6  would stand on their own.  We went through earlier

7  how the amended complaint was laid out, and so I

8  would rely upon that argument as to how it was

9  constructed.

10      I believe my opponent spoke briefly about the

11  intra-corporate conspiracy doctrine.  I don't know

12  that it was brought up here, but it is important

13  that -- basically they're arguing that the actions

14  taken by the defendants in the alleged transfers

15  would be attributable to Tutoring Zone 2, I think,

16  is the allegation.  I think that's the allegation.

17  Maybe I'm wrong.

18      But the point is that the fraudulent transfers

19  actually occurred prior to the formation of

20  Tutoring Zone 2.  So if you were to go back and

21  look at the actual facts and the evidence, the

22  transfers that are at issue in the case occurred

23  before Tutoring Zone 2 was actually formed.  And so

24  the ultimate owners of Tutoring Zone 2 are

25  Frenchman and James, but there's a period of time

1   where actually the transfers were conferred to the

2   benefit of James before they actually were formally

3   transferred to Tutoring Zone 2.

4       Now, that distinction is important because it

5   is part of the scheme to conceal it from my

6   clients. So to assert the idea that Tutoring Zone

7   2 -- that everyone's just acting as an officer or

8   owner or some sort of representative of Tutoring

9   Zone 2 forgets the fact that during -- there's a

10  period of time where the transfers occur and then a

11  month or two go by before Tutoring Zone 2 is

12  actually created. So that would strip away any

13  intra-corporate conspiracy doctrine.

14      There's also reference by my opponent that

15  he's acting as an agent for the Heintzes sometimes

16  and an agent for James at other times and so,

17  therefore, he should be absolved. I don't think

18  that's appropriate for this stage. This stage

19  should be confined to the pleadings. But if we

20  were to address that, you know, he's wearing

21  different hats at different times and he's

22  interfering at points in times wearing different

23  hats and individually. So we've alleged that he

24  has individual liability. And the idea that he can

25  change a hat here and there to escape liability, we

1    don't think is something that would ultimately be

2    found based upon the evidence were we permitted to

3    present it to Your Honor.

4        At the end of the day, there's nothing on the

5    face of the complaint that does not establish -- or

6    that we do not have standing.  It establishes that

7    we, in fact, do have standing.  The information

8    that has been presented to Your Honor that's

9    outside the four corners of the complaint, the

10   orders that have been presented, the complaints and

11   things of that nature, we offer to Your Honor you

12   shouldn't shift your gaze away from the four

13   corners of the complaint.

14       We've pled that we have standing as injured

15   parties and we believe that we've shown by the

16   pleading that all counts have been adequately pled.

17   With that, thank you very much for your time.

18       THE COURT:  Any rebuttal?  Any other comments

19   by anybody?  All right.

20       I'm going to deny the motion to dismiss, both

21   of the motions that were made and have been argued

22   this morning, and require an answer within 20 days.

23   I'm going to ask Mr. Anderson to give me an order.

24       MR. ANDERSON:  Yes, sir.  Thank you, Your

25   Honor.

60

1    THE COURT:  Thank you.

2    Mr. Tessitore, if you're still with us,

3    I'm going to say goodbye to you now.

4    MR. TESSITORE:  I am, Your Honor.

5    THE COURT REPORTER:  Does anybody need a

6    transcript?

7    MR. ANDERSON:  We'll let you know if we need a

8    transcript.

9    (The proceedings were concluded at 10:50 a.m.)

10   ------

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

CERTIFICATE OF REPORTER

1

2

3 STATE OF FLORIDA     )

4 COUNTY OF ALACHUA)

5

6      I, CAROL BAER, Court Reporter, certify that I was

7 authorized to and did stenographically report the

8 foregoing proceedings and that the transcript is a true

9 and complete record of my stenographic notes.

10      Dated this 27th day of July, 2016.

11

12                    _____

                      CAROL BAER, Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT, EIGHTH
JUDICIAL CIRCUIT, IN AND FOR
ALACHUA COUNTY, FLORIDA

CASE NO.: 2016-CA-000538
DIVISION: J

FLH HOLDINGS OF FLORIDA, LLC, a Florida
limited liability company, JOHN SPENCE,
SHEILA SPENCE, INTERMED BIOMEDICAL
SERVICES, INC. a Florida corporation, and
DAVID WHITNEY

        Plaintiff,

v.

CHRISTOPHER M. JAMES, CYNTHIA L.
FRENCHMAN, and SELDON J. CHILDERS,

        Defendants.

_____/

## PLAINTIFF JOHN SPENCE'S RESPONSES TO DEFENDANT CHRISTOPHER JAMES' REQUEST FOR ADMISSIONS

Plaintiff, John Spence ("Plaintiff"), by and through the undersigned counsel and pursuant to Florida Rules of Civil Procedure, hereby responds to Defendant Christopher James', Request for Admissions, as follows:

### RESPONSES

1.    The property alleged to have been fraudulently transferred to James was the property of TutoringZone, LC.

**RESPONSE:** Denied.



144

2. The property alleged to have been fraudulently transferred to James was the property of the Hintzes.

**RESPONSE:** Denied.

3. The intellectual property that was leased to James and Frenchman through the Intellectual Property Lease was the property of Tutoring Zone, LC.

**RESPONSE:** Denied.

4. The intellectual property that was leased to James and Frenchman through the Intellectual Property Lease was the property of the Hintzes.

**RESPONSE:** Denied.

5. FLH Holdings of Florida, LLC was not a creditor of TutoringZone, LC. at the time of the subject transfers.

**RESPONSE:** Plaintiff objects to the request as calling for a legal conclusion.

6. John Spence was not a creditor of TutoringZone, LC. at the time of the subject transfers.

**RESPONSE:** Plaintiff objects to the request as calling for a legal conclusion.

7. Sheila Spence was not a creditor of TutoringZone, LC. at the time of the subject transfers.

**RESPONSE:** Plaintiff objects to the request as calling for a legal conclusion.

2

8.      Intermed Biomedical Services, Inc. was not a creditor of Tutoring Zone, LC. at the time of the subject transfers.

**RESPONSE:** Plaintiff objects to the request as calling for a legal conclusion.


9.      David Whitney was not a creditor of TutoringZone, LC. at the time of the subject transfers.

**RESPONSE:** Plaintiff objects to the request as calling for a legal conclusion.


10.      John Spence did not notify the Chapter 7 Trustee in the Matthew and Larina Hintze Bankruptcy case of the filing of the Complaint and/or Amended Complaint in this matter.

**RESPONSE:** Plaintiff denies the request to the extent that Plaintiff filed a Motion for Determination of Stay Relief on August 1, 2016.


11.      John Spence did not seek the permission of the Chapter 7 Trustee in the Matthew and Larina Hintze Bankruptcy case of the filing of the Complaint and/or Amended Complaint in this matter.

**RESPONSE:** Plaintiff denies the request to the extent that Plaintiff filed a Motion for Determination of Stay Relief on August 1, 2016.


**MURPHY & ANDERSON, P.A.**


/s/ Geddes D. Anderson, Jr.
**GEDDES D. ANDERSON**
Florida Bar No. 0138894
ganderson@murphyandersonlaw.com

3

lbrooks@murphyandersonlaw.com
**GERRY A. GIURATO**
Florida Bar No. 0032548
ggiurato@murphyandersonlaw.com
pmarchman@murphyandersonlaw.com
1501 San Marco Blvd.
Jacksonville, FL 32207
904-598-9282 (phone)
904-598-9283 (fax)
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2016, the foregoing was furnished via email to the following:

W. Charles Hughes, Esq.
knorman@shrlawfirm.com
ssiler@shrlawfirm.com
4046 Newberry Road
Gainesville, Florida 32607
*Counsel for Christopher M. James and*
*Cynthia L. Frenchman*

Ryan Davis, Esq.
rdavis@whww.com
Winderweedle, Haines, Ward & Woodman, PA
PO Box 1391
Orlando, FL 32802-1391
*Co-Counsel for Christopher M. James and*
*Cynthia L. Frenchman*

Peggy-Anne O'Connor, Esq.
peg@tunerlawpartners.com
lah@turnerlawpartners.com
Turner, O'Connor, Kozlowski, PL
102 NW Second A venue
Gainesville, FL 32601
*Co-Counsel for Christopher M. James and*
*Cynthia L. Frenchman*

Michael A. Tessitore, Esq.
mtessitore@morankidd.com
epolanco@morankidd.com
Moran, Kidd, Lyons & Johnson, PA
111 N. Orange Ave., Suite 900
Orlando, FL 32801
*Counsel for Seldon J. Childers*

Seldon J. Childers, Esq.
jchilders@smartbizlaw.com
notice@smartbizlaw.com
ellen.lord@smartbizlaw.com
Childers Law, LLC
2135 N.W. 40th Terrace, Suite B
Gainesville, FL 32605-5802

/s/ Geddes D. Anderson, Jr.

4

# WINDERWEEDLE, HAINES, WARD & WOODMAN, P.A.

### ATTORNEYS AT LAW

MAIN TELEPHONE (407) 423-4246
WWW.WHWW.COM

Ryan E. Davis
Direct Dial: (407) 246-8665
E-mail: rdavis@whww.com

Please Reply To:

Orlando Office

July 29, 2016

*Via Electronic Mail*
Geddes Anderson, Jr., Esq.
Murphy & Anderson, P.A.
1501 San Marco Blvd.
Jacksonville, FL 32207

re:   *FLH Holdings of Florida, LLC, et. al., v. Christopher James, et. al.,*
*Case No. 01-2016-CA-00538 (the "State Court Action")*

*Notice of 11 U.S.C. § 362 Automatic Stay Violation*

Dear Mr. Anderson:

As you know, this firm represents Christopher James and Cynthia Frenchman with respect to the above-referenced State Court Action. Please consider this correspondence as notification of an 11 U.S.C. § 362 automatic stay violation by your law firm and by the Plaintiffs in the State Court Action.

By way of background, the Plaintiffs, who hold promissory notes made by Matthew and Larina Hintze (the "Hintzes"), filed an Amended Complaint in the State Court Action on May 20, 2016 (the "Amended Complaint"). As you know, the Hintzes filed a petition for bankruptcy relief on or about November 1, 2012, in the United States Bankruptcy Court, Northern District of Florida, Gainesville Division, Case No. 12-10462-KKS (the "Bankruptcy Case"), which case is still pending and in which case your clients are extremely active.

Despite the pending Bankruptcy Case, Plaintiffs filed the Amended Complaint, which contains a section entitled "TutoringZone as the Alter Ego of the Hintzes," contending that TutoringZone, LC ("TZI") "is the alter ego of the Hintzes." To the extent this supposition is true (which Defendants dispute), then the assets of TZI would be the assets of the Hintzes, yet the Plaintiffs failed to obtain relief from stay prior to pursuing this theory.

Based upon the alter ego theory, the Amended Complaint later states that, "[a]lthough the form was a transfer of the assets of TutoringZone, the substance was a transfer of the entire value of the Hintzes' ownership interest in TutoringZone to TutoringZone II." In other words, as drafted, the Amended Complaint seeks relief based upon a purported transfer of the Hintzes' equity in TZI. The problem with the pursuit of such a theory is, again, that the Plaintiffs never obtained relief from stay first in the Bankruptcy Case. This is particularly troublesome considering that the Chapter 7 Trustee in the Bankruptcy Case had already filed a lawsuit based

ORLANDO, FLORIDA
1500 BANK OF AMERICA CENTER
390 NORTH ORANGE AVENUE 32801
POST OFFICE BOX 1391 32802-1391
FAX (407) 423-7014

WINTER PARK, FLORIDA
329 PARK AVENUE, NORTH 32789
SECOND FLOOR
POST OFFICE BOX 880 32790-0880
FAX (407) 645-3728


EXHIBIT
"E"

148

July 29, 2016
Page 2

upon an identical theory, as set forth in Counts XIII-XV of Adversary Proceeding No. 14-01005-KKS (the "Trustee's Complaint"). The similarities between the theory underpinning the Amended Complaint and the Trustee's Complaint are striking. For example, paragraph 226 of the Trustee's complaint states that, "[t]he practical economic reality of the transaction was an indirect method of disposing of the membership interest in TutoringZone." Meanwhile, paragraph 219 of the Amended Complaint states that, "[t]he transfers had the effect of permitting the Hintzes to continue to enjoy the benefits of ownership in TutoringZone. . . ."

Consequently, Plaintiffs have pursued a theory of recovery identical to the theory contained in the Trustee's Complaint without first obtaining relief from stay. The Defendants' Motion to Dismiss, dated June 9, 2016, paragraphs 12-16, alerted the Plaintiffs and your law firm to the automatic stay issue and the undersigned also brought the issue to your and the State Court's attention at the June 27, 2016 hearing on the Motion to Dismiss. Your response at the hearing was as follows:

> First of all, the trustee is not objecting to us bringing this action. The defendants, we would argue, lack standing to assert the trustee's right to challenge the standing. This is something that they don't – the Trustee should be coming in and saying that we don't have standing to assert this cause of action. If the trustee wanted to intervene or seek relief in the bankruptcy court, she could do that. As a practical matter, if the trustee does not object, a creditor can bring individual claims.

Transcript of Proceeding, dated June 27, 2016, page 31, lines 15-25. You later reiterated this representation by claiming that, "if the trustee thought that were doing something inappropriate, she could seek a bar order precluding all of this, but she has not done that." Transcript of Proceeding, page 33, lines 13-17. The clear implication of your representation to the State Court was that the Trustee had somehow authorized the filing of the Amended Complaint. In reality, you had never contacted the Trustee seeking permission to file the Amended Complaint, nor had the Plaintiffs ever obtained relief from stay to do so (which would have been the proper course of action).

You further represented at the June 27, 2016, hearing that relief from stay was unnecessary because with respect to the separate "proceeding supplementary that was referenced, the [bankruptcy] court did not find that that was any sort of stay violation. I don't have it in front of me, but it's my understanding from counsel that the court– this proceeding supplementary, which is a FUFTA claim, the court said that that was not a stay violation." Transcript of Proceeding, p. 40, lines 15-21. Your reference to "counsel" was presumably a reference to Robert Wilcox, who was sitting next to you at the hearing. In reality, the separate proceeding supplementary by Intermed Recovery, LLC (which is an entity related to a Plaintiff in the State

July 29, 2016
Page 3

Court Action), involves a creditor of *TZI*, not the Hintzes, and does not seek any type of determination that TZI is the alter ego of the Hintzes. When you made your misstatement, Mr. Wilcox noticeably did not correct you.

The Defendants acknowledge that, as of the date of the filing the Amended Complaint, the Trustee had attempted to convey Counts XIII-XV of the Trustee's Complaint, but the issue was undecided by the Bankruptcy Court. As it turns out, the Chapter 7 Trustee did not have the ability to convey Counts XIII-XV, as reflected by the *Order Determining Causes of Action Sold or Transferred Pursuant to Order Approving Report and Notice of Trustee's Intention to Sell (ECF 580), and Sustaining Objection of Christopher James and Tutoringzone II, LLC (ECF 574)*, dated July 22, 2016 (Doc. No. 591)("Sale Order"). As such, the Trustee, as of the date of the filing of the Amended Complaint, retained exclusive rights to pursue the fraudulent transfer counts, which thereby required relief from stay prior to Plaintiffs' filing of the Amended Complaint. The Bankruptcy Court made this point clear by citing the following language from *Steffen v. Gray, Harris, & Robinson, P.A.*, 283 F. Supp. 2d 1272 (M.D. Fla 2003), *aff'd*, 138 F. App'x 297 (11th Cir. 2005):

> Even though this Court has concluded that *the fraudulent transfer action* was not property of the estate, the automatic stay barred the SEC form seeking avoidance of the transfers until the stay was lifted or terminated.

The Bankruptcy Court also cited its own opinion, *In re C.D. Jones & Co., Inc.*, 482 B.R. 449 (Bankr. N.D. Fla. 2012), in support of this proposition, which held that state law fraudulent transfer claims belong to the trustee. Of note, in *C.D. Jones & Co.*, the Bankruptcy Court relied upon the reasoning of *In re Xenerga, Inc.*, 449 B.R. 594 (Bankr. M.D. Fla 2011), which held that alter ego claims were property of the estate and that only the chapter 7 trustee may bring an alter ego claim on behalf of the general creditor body.

In this instance, based upon the precedent adopted by the Bankruptcy Court, it is clear that the Plaintiffs' pursuit of the alter ego claim and the Plaintiffs' seeking relief based upon an alleged transfer of ownership constituted a violation of the stay.

The necessity for relief from stay was not academic. With the Trustee's pending sale of the fraudulent transfer counts, either TZ Acquisitions, LLC, would have obtained the rights to pursue the purported transfer of the membership interest or the Trustee would have retained that right. Under either scenario, the Plaintiffs would not have had the right, so relief from stay would have likely been denied. Of note, Plaintiff FLH Holdings of Florida, LLC, is also the plaintiff in a discharge action in the Bankruptcy Case and lists Steven Fieldman as its manager, who also happens to be the principal of TZ Acquisition LLC, the high bidder at the auction in the

July 29, 2016
Page 4

Bankruptcy Case. In other words, the Plaintiffs were fully aware of the auction process in the Bankruptcy Case and knew that, under any circumstances, they would not have standing, yet forged ahead anyway.

Section 362(k)(1) permits the recovery of actual damages, including costs and attorneys' fees, and, in appropriate circumstances, punitive damages, for violations of the automatic stay. Here, my clients have incurred significant fees in responding to the Amended Complaint, which never should have been filed without relief from stay. At the hearing, to avoid dismissal, you insinuated to the State Court that the Trustee somehow blessed or approved the filing, which is not true, to the extent even relevant. In circumstances involving wilful violations, such as this one, courts have awarded punitive damages. Case law also holds that actions taken in violation of the stay are deemed "void and without effect." *See In re Radson*, 462 B.R. 911, 912 (Bankr. S.D. Fla. 2011 (finding that actions taken in violation of the stay are generally considered to be void). Therefore, the Amended Complaint should be stricken as void.

In an effort to resolve this matter in an amicable fashion without Court action, Defendants hereby request that you dismiss the Amended Complaint within three (3) days of the date of this letter. Failure to do so will require the filing of a Motion for Sanctions or Adversary Proceeding in the Bankruptcy Case to address the stay violation, in which case Defendants will seek recovery of all fees and costs incurred in defending the Amended Complaint, a determination that the Amended Complaint is void, and the recovery of punitive damages.

Sincerely,

Ryan E. Davis

RED/th

cc: Robert Wilcox

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

IN RE:                                                    Case No.: 12-10462-KKS

MATTHEW BRUCE HINTZE and                Chapter 7
LARINA K. HINTZE,

           Debtors,

_____/

**NOTICE OF FILING AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF**
**FROM THE AUTOMATIC STAY AND REQUEST FOR HEARING (DOC. NO. 607)**

FLH Holdings of Florida, LLC, John Spence, Sheila Spence, Intermed Biomedical

Services, Inc., and David Whitney (collectively "Movants"), by and through the undersigned

counsel, give notice of the filing of the attached Affidavit of Robert D. Wilcox in support of

Movants' *Motion for Relief from Stay and Request for Hearing* (Doc. No. 607).

                                        ***/s/ Robert D. Wilcox***
                                        Robert D. Wilcox
                                        Florida Bar No. 755168
                                        Elizabeth R.P. Bowen
                                        Florida Bar No. 97297
                                        814 North Hwy. A1A, Suite 202
                                        Ponte Vedra Beach, FL 32082
                                        Telephone: 904-405-1248
                                        rw@wlflaw.com
                                        eb@wlflaw.com

**ATTORNEYS FOR MOVANTS**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished on September
22, 2016, by electronic notification to all parties who have appeared in this case and consented
to electronic service, and by electronic notification or U.S. mail, postage prepaid to:

VIA ELECTRONIC SERVICE
Justin M. Luna, Esq. (jluna@lseblaw.com)
Christina Y. Taylor, Esq. (ctaylor@lsbelaw.com)
Latham, Shuker, Eden & Beaudine, LLP
111 N. Magnolia Ave, Suite 1400
P.O. Box 3353 (32802-3353)
Orlando, Florida 32801

Keith L. Bell, Jr., Esq. (kbell@clarkpartington.com)
Trevor A. Thompson, Esq. (tthompson@clarkpartington.com)
Clark, Partington, Hart Larry, Bond & Stackhouse
106 E. College Ave., Ste. 600
Tallahassee, Florida 32301

Ryan E. Davis, Esq.(rdavis@whww.com)
Winderweedle, Haines, Ward & Woodman, P.A.
PO Box 1391
Orlando, FL  32802-1391

VIA U.S. MAIL
Matthew B. Hintze
Larina K. Hintze
708 N.E. Blvd.
Gainesville, FL 32601-4375

Theresa M. Bender
Chapter 7 Trustee
Theresa M. Bender, P.A.
Post Office Box 14557
Tallahassee, FL 32317

                                                    */s/ Robert D. Wilcox*
                                                    Robert D. Wilcox, Attorney

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

In re:                                          Case No.: 12-10462-KKS

MATTHEW BRUCE HINTZE and
LARINA K. HINTZE,                               Chapter 7
            Debtors,
_____/

AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM STAY
(DOC. NO. 607)

STATE OF FLORIDA          )
COUNTY OF ST. JOHNS       )

Before me, the undersigned authority, personally appeared Robert D. Wilcox, who being

duly sworn deposes and says:

1.      I am one of the attorneys representing FLH Holdings of Florida, LLC, John Spence,

Sheila Spence, Intermed Biomedical Services, Inc., and David Whitney (collectively "Movants")

in connection with the Movants' *Motion for Relief from Stay and Request for Hearing* (Doc. No.

607) (The "Motion"). I submit this affidavit in accordance with the *Court's Order and Notice of

Preliminary Hearing on Motion for Relief from Stay* (Doc. No. 611).

2.      Movants are (a) creditors of the Debtors, (b) the Plaintiffs in an adversary

proceeding pending before this Court,[2] and (c) the Plaintiffs in a case styled "FLH Holdings of

Florida, LLC, et al. vs. Christopher M. James, et al." pending in Florida state court   (the "State

Court Case").  A copy of the Amended Complaint filed in the State Court Case on May 20, 2016

is attached as Exhibit A to the Motion.   In the Amended Complaint, the Movants, as Plaintiffs

assert the Claims in five counts: (1) a count for civil conspiracy; (2) two counts of fraudulent

_____

[2] AP 13-01007 (KKS).

transfer pursuant to Chapter 726, Florida Statutes; (3) a count for aiding and abetting common law fraud, and (4) a count for tortious interference.

3.      On August 1, 2016, Movants filed their *Motion for Determination No Automatic Stay is in Effect as to State Court Lawsuit Against Non-Debtor Defendants* (Doc. No. 593) (the "Motion for Stay Determination"), which, along with Mr. James and Ms. Frenchman's *Motion to Deem Amended Complaint as Void and for Recovery of Damages Due to Violation of Automatic Stay* (Doc. No. 596), is scheduled for hearing on October 6, 2016. See, *Notices of Rescheduled Non-Evidentiary Hearing* (Doc. Nos. 603 and 604). Movants filed the Motion to seek relief from the automatic stay, to the extent that the Court determines that the stay applies to the Claims in the Amended Complaint.

4.      On its face, the Amended Complaint does not seek recovery from the Debtors. Further, none of the Claims asserted in the Amended Complaint are "property of the estate". Thirdly, the Trustee has made it very clear that she is not, and has no intention of, pursuing any of the Claims in the Amended Complaint. While the Trustee asserted in Adversary Proceeding 14-01005 claims that are facially similar to some of the Claims in the Amended Complaint, the Trustee has repeatedly made it clear since 2015 that she had no intention of asserting any further litigation against Mr. James and Ms. Frenchman. In fact, she has sought the dismissal of the remaining claims she holds in Adversary Proceeding 14-01005. See, Motion for Voluntary Dismissal with Prejudice (Doc. No. 158, AP 14-01005).

5.      In this instance, if the stay applies and the Movants are not able to pursue the Claims they will be prejudiced, because they will lose a potentially valuable cause of action that might provide a mechanism for the Movants to recover their damages. In my opinion, this Court's grant of stay relief to Movants to pursue the Amended Complaint will not prejudice the Debtors, as the

2

Movants are not seeking to recover from the Debtors or their property. The grant of stay relief will not permit any collection efforts against property of the Debtors' estate, and neither the Debtors nor any creditors will be adversely affected.

6.      No requests have been made, nor have any motions been filed, suggesting the extension of the automatic stay in the Debtors' bankruptcy case to Mr. James or Ms. Frenchman.

Robert D. Wilcox

Sworn to and subscribed before me
on September 21, 2016.

Notary Public
State of Florida at Large

Elizabeth R.P. Bowen
Commission # GG025877
Expires: August 30, 2020
Bonded thru Aaron Notary

3